1  ## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2  Name __LEWIS__          __SAMUEL__          __W.__

3       (Last)                (First)             (Initial)

   Prison Number __E05524__

4  Institutional Address __P.O. BOX 689, Soledad, CA 93960-0689__

5

**FILED**

AUG 1 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6  ===================================================

7  ### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

**JF**

8  Samuel W. Lewis _____ )
  (Enter the full name of plaintiff in this action.)  )

9                     )   CV 08   3934

10         vs.          )
                     )   Case No.
                    )   (To be provided by the Clerk of the Court)   **(PR)**

11 Ben Curry, Warden _____ )

12 _____ )   **PETITION FOR A WRIT**
                    )   **OF HABEAS CORPUS**

13 _____ )

14 (Enter the full name of respondent(s) or jailor in this action) )   E-filing

15 ===================================================

16 ### Read Comments Carefully Before Filling In

17 ### When and Where to File

18      You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as the

22 loss of good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23      If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located.  If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution in

28 which you are confined.  Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g. detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

    1.  What sentence are you challenging in this petition

        (a)   Name and location of court that imposed sentence (for example, Alameda County Superior Court, Oakland):

| | |
|---|---|
| Superior Court | Los Angeles County |
| (Court) | (Location) |

(b) Case number, if known   A964645

(c) Date and terms of sentence   11/21/88, 15 years to life.

(d) Are you now in custody serving this time? (Custody meaning being in jail, on parole or probation, etc.)    Yes  X      No _____

Where?

Name of institution:   Correctional Training Facility

Address:   P.O. Box 686, Soledad, CA 93960-0686

    2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Second-degree murder.

PET. FOR WRIT OF HAB. CORPUS       - 2 -

3. Did you have any of the following?

    Arraignment:               Yes _X___        No _____

    Preliminary Hearing:      Yes _X___        No _____

    Motion to Suppress:       Yes _X___        No _____

4. How did you plead?

    Guilty_____    Not Guilty_____   Nolo Contendere _X___

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury_____    Judge alone _____   Judge alone on transcript_____

6. Did you testify at your trial?             Yes _____        No _____

7. Did you have an attorney at the following proceedings:

    (a)     Arraignment           Yes _X___        No _____

    (b)     Preliminary hearing     Yes _X___        No _____

    (c)     Time of plea          Yes _X___        No _____

    (d)     Trial                Yes _____        No _____

    (e)     Sentencing           Yes _X___        No _____

    (f)      Appeal              Yes _____        No _X___

    (g)     Other post-conviction proceeding   Yes _____        No _X___

8. Did you appeal your conviction?         Yes _X___        No _____

    (a)     If you did, to what court(s) did you appeal?

           Court of Appeal        Yes _X___        No _____

           Year: _1995_      Result: _Denial_____

           Supreme Court of California    Yes _X___        No _____

           Year: _1996_      Result: _Denial_____

           Any other court        Yes _X___        No _____

           Year: _1996_      Result: _Denial_____

    (b)     If you appealed, were the grounds the same as those you are raising in this

Petition?                                    Yes _____    No _X___

Was there an opinion?                        Yes _____    No _X___

(c)    Did you seek permission to file a late appeal under Rule 31(a)?

                                             Yes _____    No _X___

If you did, give the name of the court and the result:

N/A _____

_____

9. Other than appeals, have you previously filed any petitions, application or motions with respect to this conviction in any court, state of federal?    Yes _X___    No _____

[Note; if you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.      Name of Court: Los Angeles Superior Court _____

II.     Type of Proceeding: Habeas corpus _____

Grounds raised (Be brief but specific):

a. Violation of due process (parole hearing). _____

b. Violation of due process (plea agreement). _____

c. _____

d. _____

Result: Denied _____ Date of Result: 04/10/08 _____

II.     Name of Court: California Court of Appeals. _____

Type of Proceeding: Habeas corpus. _____

Grounds raised (Be brief but specific):

a. Violation of due process (parole hearing).

b. Violation of due process (plea agreement).

c.

d.

Result: Summarily denied_____ Date of Result: 05/15/08

III.    Name of Court: California Supreme Court.

Type of Proceeding: Petition for review.

Grounds raised (Be brief but specific):

a. Violation of due process (parole hearing).

b. Violation of due process (plea agreement).

c.

d.

Result: Summarily denied_____ Date of Result: 07/23/08

IV.    Name of Court:

Type of Proceeding:

Grounds raised (Be brief but specific):

a.

b.

c.

d.

Result:_____ Date of Result:_____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes X_____    No _____

Name and location of court: U.S. Dist. Court, Northern Dist. of Cal. C08-02191
& 1 appeal in Ninth Circuit.

B.  GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully.  Give facts to

support each claim. For example, what right or privilege were you denied? . What happened?  Who

1  made the error?  Avoid legal arguments with numerous case citations.  Attached extra paper if you

2  need more space.  Answer the same questions for each claim.

3        [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

4  petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); **McCleaskey v. Zant**,

5  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

6        Claim One:   The Board of Parole Hearings' denial of parole suitability violated the
   some evidence standard and Petitioner's Constitutional right to due process under the

7  5th and 14th Amendments to the United States Constitution. (Continued on page 8.)

8        Supporting Facts: _____

9        _____

10       _____

11       _____

12       Claim Two:_____

13       _____

14       Supporting Facts: _____

15       _____

16       _____

17       _____

18       Claim Three: _____

19       _____

20       Supporting Facts: _____

21       _____

22       _____

23       _____

24       If any of these grounds were not previously presented to any other court, state briefly which

25  grounds were not presented and why:

26       _____

27       _____

28       _____

PET. FOR WRIT OF HAB. CORPUS                - 6 -

1

2          List, by name and citation only, any cases that you think are close factually to yours so that

3   they are an example of the error you believe occurred in your case.  Do not discuss the holding or

4   reasoning of these cases:

5   _____

6   _____

7   _____

8   Do you have an attorney for this petition?              Yes _____      No _X_____

9   If you do, give the name and address of your attorney:

10          In Pro Persona. _____

11         WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled

12  in this proceeding.  I verify under the penalty of perjury that the foregoing is true and correct.

13

14  Executed on _August 11, 2008_____     _Samuel Lewis_____

15                    Date                                          Signature of Petitioner

16

17

18

19

20

21

22

23

24

25

26

27

28

THE BOARD OF PAROLE HEARINGS DENIAL OF PAROLE
SUITABILITY VIOLATED THE SOME EVIDENCE
STANDARD AND PETITIONER'S CONSTITUTIONAL
RIGHT TO DUE PROCESS UNDER THE 5TH AND 14TH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.

1) On November 21, 1988, Petitioner Samuel Lewis, in the Los Angeles Superior Court, Case Number A964645, was convicted of one count of second-degree murder by plea of no contest.

2) Petitioner was sentenced to a term of 15 years to life.

3) Petitioner's Minimum Eligible Parole Date was February 19, 1997.

4) On October 1, 2007, Petitioner went before the Board of Parole Hearings for his fifth parole suitability hearing. Petitioner was found unsuitable and received a one-year denial. (Exhibit 1, Parole Hearing Transcript, hereinafter referred to as PHT.)

5) The Board's stated reasons for denial were: "One of many factors that was considered does go back to the commitment offense. [T]his was…a cruel, cold-blooded killing that had multiple victims involved." "It was [ ] done in a calculated manner.

6) "However, this panel feels that this prisoner should be commended for a variety of things. Your educational endeavors really need to be commended. You have done exceptionally well considering you dropped out of school when you were in the 11th grade. Since you've come into prison you set a goal for yourself, apparently, and you went after it. And you're – you know, you're attaining those. You've got – you've received a GED. You've gotten two AA's and now you're close to getting your Bachelor's degree. You – and not just that, but your active participation in our discussion about the Alternatives to Violence Program and how you have a bit of passion for that. And I hope you continue with that, because I know it's an excellent program, and the fact that you are a facilitator in that says something about you. You're also – even though, you know, we sort of touched upon it, and I did some research in the documents about any substance abuse background, you really didn't. I mean, you experimented with it, but you weren't an addict in any way, whether that be an alcoholic or a drug addict. And yet, you have been consistently involved with substance abuse programming here, I believe it's AA and NA, since 1991. And even though we didn't ask you any direct questions about it, you spoke very freely about how certain steps have helped you, and you explained to the panel in what ways. And that's very commendable. You have been really an

8

1  excellent prisoner, a superb prisoner. [ ] You've got two vocations. You participated in the [B]rag

2  program recently, the Father's Behind Bars. And again you've been doing a lot of good things, and

3  you seem to have a desire to want to give back and do something with at risk youth." (Exhibit 1,

4  PHT, p. 1,1 4-234, 8, 1. 1-20.)

5      "This panel believes you mean what you stated to us, and that I hope no matter what, sir,

6  whether you're in prison or you're out of prison, I hope that you continue your quest to continually

7  give back. And you can do some good things. And you have been. And I hope you continue with

8  that. So don't get discouraged. This is a one year denial. Okay? And that, again we do recommend

9  that you've got to get some more distance with those disciplinaries, even though, you know still eight

10  years [old] having a serious disciplinary is still a bit soon. So, no 128's, no 115's. Continue in your

11  educational quest. Continue to upgrade yourself in any way you can, and continue with your self-

12  help, because you never know how you're going to become more enlightened than you already are."

13  (Exhibit 1, PHT, Decision p. 9,1. 10-24.)

14      7) On January 18, 2008, Petitioner filed a petition for writ of habeas corpus in the Los Angeles

15  Superior Court.

16      8) On April 10, 2008, the Los Angeles Superior Court denied the petition for writ of habeas

17  corpus, Case Number BH005090. (Exhibit 15.)

18      9) On May 2, 2008, Petitioner filed a writ of habeas corpus in the California Court of Appeals.

19  On May 15, 2008, the California Court of Appeals summarily denied the petition for habeas corpus,

20  Case Number B207575. (Exhibit 16.)

21      10) On May 21, 2008, Petitioner filed a petition for review in the Supreme Court of California.

22  On July 23, 2008, the Supreme Court of California summarily denied the petition for review, Case

23  Number S163758. (Exhibit 17.)

24                                STANDARD OF REVIEW

25      This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

26  pursuant to the judgment of a state court only on the grounds that he is in custody in violation of the

27  Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a).. The petition may not be

28  granted with respect to any claim that was adjudicated on the merits in state court unless the state

1   courts' adjudication of the claim: "(1) resulted in a decision that was contrary to or involved an

2   unreasonable application of clearly established federal law, as determined by the Supreme Court of

3   the United States; or (2) resulted from a decision that was based on an unreasonable determination of

4   the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d); see

5   Williams (Terry) v. Taylor, 529 U.S. 362, 409-413 (2000). Section 2254(d) applies to habeas petition

6   from a state prisoner challenging the denial of parole; see Sass v. California Board of Prison Terms,

7   461 F.3d 1123, 1126-1127 (9th Cir. 2006).

8       Petitioner submits that the Los Angeles Superior Court's adjudication of the claims resulted in

9   a decision that is contrary to clearly established federal law and involved an unreasonable application

10  of clearly established federal law as determined by the Supreme Court of the United States. Petitioner

11  further submits that the Los Angels Superior Court's adjudication of the claims resulted in a decision

12  that was based on an unreasonable determination of the facts in light of the evidence presented in the

13  state court proceedings.

14  **THE BOARD OF PAROLE HEARING'S DENIAL OF PAROLE**
    **SUITABILITY VIOLATED THE "SOME EVIDENCE"**
15  **STANDARD AND PETITIONER'S STATE AND FEDERAL**
    **CONSTITUTIONAL RIGHT TO DUE PROCESS.**

16

17      California's parole scheme creates a cognizable interest in parole. This interest is protected by

18  the procedural safeguards of the due process clause of the United States Constitution. (U.S.

19  Constitution, 5th and 14th Amendments; Biggs v. Terhune 334 F.3d 910, 914-915 (9th Cir. 2003).)

20  See Sass, 461 F.3d at 1127-1128; Board of Pardons v. Allen 482 U.S. 369 (1987); Greenholtz v.

21  Inmates of Nebraska Penal and Corr. Complex 442 U.S. 1 (1979); California Penal Code § 3041(b).

22      A Parole Board's decision satisfies the requirement of due process if "some evidence"

23  supports the decision. Sass, 461 F.3d at 1125-1129 (adopting some evidence standard for disciplinary

24  hearings outlined in Superintendent v. Hill 472 U.S. 445, 454-455 (1985).

25      The Ninth Circuit Court of Appeals in Hayward v. Marshall 572 F.3d 536, 542-543 (9th Cir.

26  2008) determined "[W]hen [ ] assess[ing] whether a state Parole Board's suitability determination was

27  supported by "some evidence" in a habeas case, our analysis is framed by the statutes and regulations

28  governing parole suitability determinations in the relevant state." "Accordingly, regulations

1    promulgated by the Board pursuant to California Penal Code Section 3041(a) provide that a life

2    prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner

3    will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs., tit. 15,

4    § 2402(a). The Board decides whether a prisoner is too dangerous to be suitable for parole by

5    applying factors it has set forth in the California Code of Regulations.

6        "Even though these suitability and unsuitability factors are helpful in analyzing whether a

7    prisoner should be granted parole, California courts have made clear that the 'findings that are

8    necessary to deem a prisoner unsuitable for parole,' Irons, 505 F.3d at 850, are not that a particular

9    factor or factors indicating unsuitability exist, but that prisoner's release will unreasonably endanger

10   public safety. In re Dannenberg 156 Cal.App.4th at 1400, 68 Cal.Rptr.3d at 198 (Cal.App.Nov. 16,

11   2007), modified, 2007 WL 4227229, ___Cal.Ct.App.___, Cal.Rptr.3d.___ (Cal.Ct.App. Dec 3, 2007);

12   In re Lee 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (Cal.Ct.App. 2006); In re Scott 1333

13   Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 [.]" The court further determined that for its purposes

14   "'[t]he test is not whether some evidence supports the reason the [Board] cites for denying parole, but

15   whether some evidence indicates a parolee's release unreasonably endangers public safety. Some

16   evidence of the existence of a particular factor does not necessarily equate the parolee's release

17   endangers public safety.' Lee, 143 Cal.App.4th at 1408, 49 Cal.Rptr.3d 931 (citations and footnote

18   omitted); see also In re Elkins 144 Cal.App.4th 475, 499, Cal.Rptr.3d 503 (Cal.Ct.App. 2006)."

19       In the instant case, the Board used the commitment offense, and Petitioner's last 115 (prison

20   disciplinary) as "some evidence" to support their determination that Petitioner would pose an

21   unreasonable risk of danger to society or threat to public safety if released from prison.

22       In finding Petitioner's commitment offense to have been carried out "in an extremely cruel,

23   brutal, cold and vicious manner [.]" The Board relied on their finding that multiple victims were

24   attacked. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(A)). After 19+ years the Board's reliance on

25   the commitment offense does not indicate Petitioner's release would significantly endanger public

26   safety.

27       In recent years, both California appellate courts and the federal district courts have found a

28   commitment offense which involved multiple victims insufficient to sustain a denial of parole many

11

years later.

In October 2006, the appellate court in <u>In re Lee</u> 49 Cal.Rptr.3d 931, 936, found that after 17 years the second-degree murder and attempted premeditated murder for which he had been convicted no longer provided some evidence supporting parole denial.

In December 2006, another appellate court in <u>In re Weider</u> 52 Cal.Rptr.3d 147, 161, found that while "[t]he evidence that two additional victims were injured shows the crime was callous and showed Weider's indifference to human life when he fired the gun in the restaurant. But this does not make the murder [ ]so excessively violent that it suggests Weider remains a public safety risk."

In May of 2006, the U.S. Court for the Northern District in <u>Martin v. Marshall</u> (N.D. Cal. 2006) 431 F.Supp.2d 1038, 1048, found that the commitment offense after 26 years did not provide "some evidence" sufficient to justify a denial of parole. In this case, petitioner Martin killed two people and wounded a third.

In May 2007, the appellate court in <u>In re Barker</u> 59 Cal.Rptr.3d 746 found that [t]he Board's observation that "[m]ultiple victims were also killed is of course, accurate, [but] given the lapse of 2[9] years and the exemplary rehabilitative gains made by [Barker] over that time, continued reliance on the aggravating facts of the crime no longer amount[s] to 'some evidence' supporting denial of parole. (<u>Elkins, supra,</u> 144 Cal,App.4th at p. 498, 50 Cal.Rptr.3d 503.)" In this case, <u>Barker</u> had been convicted of one count of first-degree murder and two counts of second-degree murder.

In each of these court cases, the petitioners were convicted of multiple counts. <u>Lee</u> was convicted of second-degree murder and attempted premeditated murder. <u>Weider</u> was convicted of second-degree murder and two counts of assault with a firearm. <u>Barker</u> was convicted of first-degree murder and two counts of second-degree murder. In the case at bar, Petitioner was convicted of one count of second-degree murder. Petitioner contends that the commitment offense is insufficient to sustain a denial of parole after almost two decades. This is based on his multiple psychological evaluations which the Board previously found to be totally supportive of parole (Exhibit 11, 2006 Board Decision), and significant evidence in the record of Petitioner's positive institutional behavior. Accordingly, the Board's use of the commitment offense, without additional evidence demonstrating that Petitioner is presently a threat to public safety, does not provide the necessary some evidence to

1  support a finding if unsuitability.

2      On April 8, 2006, Petitioner was evaluated by a CDCR psychologist, (see attached Exhibit 2).

3  This psychological evaluation conducted by M. Macomber, Ph.D., assessed Petitioner's potential for

4  violence as "no greater than the average citizen in the community." "This conclusion is supported by

5  the administration of the Level of Service Inventory – Revised, which is an actuarial measure that

6  assesses criminal history, substance abuse history, academic achievements and social factors to

7  determine the risk level on parole. His [Petitioner's] score on this assessment is 4.2 cumulative

8  frequency for prison inmates. This means that if 100 men were released on parole, he would do better

9  than 95 of them. This is a very low risk level. He no longer poses a risk to society." During October

10 2005, a Life Prisoner Evaluation Report was completed by Correctional Counselor I, M. Rubio. (See

11 Exhibit 3.) This evaluation concluded that "Lewis has a valid residence and viable work skills. He

12 has met the BPT recommendations and should have a successful parole. This writer has witnessed his

13 growth and maturity over the years. He has been a positive example to his peers, his daughter and his

14 nephew(s)."

15     On February 25, 2004, Dr. E.W. Hewchuk, Ph.D., found that, "currently inmate Lewis has a

16 risk potential no greater than the average citizen, and is a suitable candidate for release consideration."

17 (Exhibit 4.)

18     On November 15, 2001, Dr. Joe Reed, Ph.D., found that Petitioner's "violence potential is

19 considered to be below average relative to this Level II inmate population." (Exhibit 5.)

20     In addition to the psychological evaluations and life prisoner evaluation, Petitioner attaches

21 three additional life prisoner evaluations. (Exhibits 6, 7, and 8 respectively). Additionally, Petitioner

22 has received a number of laudatory documents from various correctional and other staff members,

23 attesting to Petitioner's everyday attitude and behavior. They contain statements, such as (1) "There

24 are many inmates who also have similar traits and a will to succeed, Lewis is the first I have witnessed

25 to strive so hard and doggedly to achieve his life, educational and work goals. I feel inmate Lewis's

26 determination to succeed and his positive attitude will carry into his life once [he] attains his release;"

27 (2) "I have no doubt inmate Lewis' exceptional work and personal ethics will allow him to be a

28 productive member of society when released from custody;" (3) "I believe his sincere desire to

succeed and his positive attitude will carry into his life when he is released;" (4) "It is my formal judgment that inmate Lewis could be a productive citizen if given the opportunity to do so." This documentation demonstrates that Petitioner has matured into a positive, responsible and productive person. (Exhibit 9.)

In addition to the documentary evidence, Petitioner contends that "[t]he reliability of the facts of [Petitioner's] crime as a predictor of his dangerousness is further diminished by Petitioner's age at the time of the offense." Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1085. Petitioner was an 18-year-old high school drop out when he committed his offense. After dropping out of High School Petitioner began working in a gang-infested neighborhood. While working at a store Petitioner was confronted by the neighborhood gang many times, resulting in conflict. Peer pressure and the desire to be accepted eventually led Petitioner to associate with members of this street gang. This association eventually led to the commitment offense. "As the Supreme Court recently recognized, the evidentiary/predictive value of the conduct of such a young person is diminished." "The susceptibility of juveniles to immature and irresponsible conduct is not as morally reprehensible as that of an adult. Thompson [v. Oklahoma 487 U.S. 815, 835, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988)] (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings means juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their environment. See Stanford [v. Kentucky 492 U.S. 361, 395, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989)]."

As noted in Rosenkrantz v. Marshall, supra, at p. 1085; Roper v. Simmons 543 U.S. 561-562, 125 S.Ct. 1183, 161 L.Ed.2d (2005); see also Thompson v. Oklahoma, 487 U.S. 815, 835, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (Stevens, J.) (plurality opinion) ("[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. The basis of this conclusion is too obvious to require extensive explanation. Inexperience, less intelligence and less education makes a teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is more apt to be motivated by mere emotion or peer pressure than as an adult.")

With the passage of time the commitment offense has little, if any predictive value for future criminality. The parole board's continued reliance on the commitment offense violates due process,

1    because it has resulted in an arbitrary decision. The offense no longer constitutes "some evidence" of

2    Petitioner's dangerousness. See Superintendent v. Hill (1985) 472 U.S. at 455; Biggs v. Terhune (9th

3    Cir. 2003) 334 F.3d 910, 916-917; In re Lee (2006) 49 Cal.Rptr.3d 931, 939; In re Elkins (2006) 50

4    Cal.Rptr.3d 503, 518; In re Lawrence (2007) 59 Cal.Rptr.3d 537, 575; In re Weider (2006) 52

5    Cal.Rptr.3d 747, 161; In re Barker (2007) 59 Cal.Rptr.3d 746, 761.

6        For these reasons Petitioner's commitment offense no longer amounts to some evidence

7    supporting the conclusion that Petitioner would presently pose an unreasonable risk of danger to

8    society if released on parole.

9        The second finding used by the Board to find Petitioner would pose an unreasonable risk of

10    danger to society was "the fact that your last 115 was in '99 and you have six 115's and we realize

11    that the last one was administrative [.]" (Exhibit 2, p. 76.) This finding as used by the Board does not

12    demonstrate that Petitioner's release unreasonably endangers public safety. As the commissioner

13    pointed out, the last CDC 115 in 1999 was administrative, which means non-serious.

14        There is significant evidence in the record of Petitioner's positive institutional behavior, which

15    reasonably mitigates the effects of Petitioner's past violations have on his suitability for parole.

16    Petitioner has demonstrated exemplary behavior and evidence of rehabilitation for a significant period

17    of time. He came to prison as an 18-year-old High School dropout. Since his incarceration Petitioner

18    has completed his G.E.D., earned an Associates Degree in Business Management, graduating with

19    honors and an Associates Degree in Paralegal Studies, again graduating with honors. He is presently

20    working toward a Bachelors of Science Degree in Business Administration with a major in marketing

21    and needs only 10 classes to complete this degree. Petitioner has also completed vocational forklift

22    operations and vocational dry cleaning. He has consistently received exceptional work supervisor

23    reports. (See Exhibit 10.) As stated by the Board commissioner, "You are not the 18-year-old that

24    you were – during that time." (Exhibit 2, p. 79:1 5-10.) "As for institutional behavior, you have

25    programmed exceptionally well. Just since your last hearing, you've been a co-facilitator of

26    Alternatives to Violence Project mini-workshop. You have complete 25 video reports. You've got

27    certificates for 25 of those. You've got a certificate for 10 additional ones. You were a co-facilitator

28    of a 21 hour Alternatives to Violence Project workshop. You did a Bible correspondence course,

Hope at Will. You've done a – several anger management course [ ] You also, and this has gone on since you've been incarcerated. You've got a – probably have more self-help courses in the things you have accomplished in self-help than all the inmates I've seen this week [.]" (Exhibit 2, p. 81, 1. 12-15.) Clearly, evidence of rehabilitation for a significant period of time.

The psychological reports prepared in November 2001, February 2004 and April 2006, acknowledged the rules violation reports and concluded that Petitioner would be a low risk of dangerousness upon release. In the 2001 Mental Health Evaluation, Dr. Joe Reed, Ph.D., determined that "While in CDC, [Petitioner] has obtained seven CDC-115 violations [.] On the other hand, however, [Petitioner] has not received a significant disciplinary for violent behavior in approximately seven years. He shows significant improvement over the last six years, and he appears to have profited from his participation in numerous self-help groups. He has shown consistent goal attainment ability by obtaining his AA degrees in 1999 and 2000. Moreover, his achievements indicate, over the last six years, good acceptance of responsibility, good behavior controls and a strong pattern of pro-social behavior. No further association with gangs was found. Therefore, in light of these factors, his violence potential is considered to be below average relative to this Level II inmate population." (11/15/01), (Exhibit 5).

In the 2004 psychological evaluation, Dr. E.W. Hewchuk, Ph.D. found that "Since [Petitioner's] last BPT psychological evaluation in 2001, inmate Lewis has continued to program well within the institutional framework, with no 115's on file. [ ] Currently, inmate Lewis has a risk potential no greater than the average citizen, and is a suitable candidate for release consideration." (2/25/04), (Exhibit 4).

In the most recent Mental Health Evaluation, Dr. M. Macomber, Ph.D. stated that "In considering potential for dangerous behavior in the institution, he has not had a serious disciplinary since 1999. His last cell fight was in 1994. This was 12 years ago. He is no longer the irresponsible [18] year old he was at the time of the commitment offense. In comparison to other inmates, potential for dangerous behavior is below average. In considering potential for dangerous behavior when released to the community I agree with the previous two psychological evaluations that stated his potential for violence is no greater than the average citizen in the community. This conclusion is

1    supported by the administration of the Level of Service Inventory – Revised, which is an actuarial

2    measure that assesses criminal history, substance abuse history, academic achievements, and social

3    factors to determine the risk level on parole. His score on this assessment is 4.2 cumulative frequency

4    for prison inmates. This means that if 100 men were released on parole, he would do better than 95 of

5    them. This is a very low risk level. He no longer poses a risk to society." (Exhibit 2.)

6        Three separate and independent psychologists acknowledged the past rule violation reports and

7    concluded that Petitioner would be a low risk of dangerousness upon release. Additionally, there is

8    significant evidence in the record of Petitioner's positive institutional behavior, which reasonably

9    mitigates the effect that Petitioner's past violations have on his suitability for parole. Some evidence

10   of the existence of rule violations does not necessarily equate to some evidence that Petitioner's

11   release unreasonably endangers public safety.

12       In Valdivia v. Brown (E.D. Cal. March 14, 2008), No. 05-00416, 2005 WL 706927, the

13   District Court when considering the disciplinary history of Valdivia determined that, "the Superior

14   Court [ ] unreasonably applied the some evidence standard. It's description of the three rules

15   violations relied on by the BPT do not support the conclusion that Petitioner's release will

16   unreasonably endanger public safety. At most, they lend some correlation to a conclusion that one of

17   the factors the BPT may consider that "the prisoner has engaged in serious misconduct while in

18   prison," indicates parole unsuitability. See Cal. Code Regs., tit. 15, § 2402(c)(6). Yet, some evidence

19   of the existence of a particular Cal. Code Regulations factor applied by the BPT to decide if a prisoner

20   is suitable for parole "does not necessarily equate to some evidence the parolee's release unreasonably

21   endangers public safety." Hayward, 512 F.3d at 543 (citation omitted). On its own, and viewed in the

22   context of the overwhelming evidence that Petitioner is rehabilitated, it does not establish that

23   Petitioner's release unreasonably endangers public safety. As a result, the Superior Court's

24   conclusion that Petitioner was unsuitable for parole is an unreasonable application of the some

25   evidence standard."

26       In Guardado v. Perez (N.D. Cal. April 9, 2008) No. 03-00194, 2008 WL ___, the District

27   Court, when considering the disciplinary record of Guardado determined that, "that he has committed

28

no serious misconduct in prison.  His disciplinary history consists of one instance of mutual combat in 1998, and failure to clean his cell in 1993."

The Ninth Circuit Court of Appeal in <u>Hayward v. Marshal</u>, 512 F.3d 536 determined that "[t]he test is not whether some evidence supports the reasons the [Board] chose for denying parole, but whether some evidence indicates the parolee's release unreasonably endangers public safety." "Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety."

Petitioner contends that the Superior Court's conclusion that there is some evidence to support the Board's finding that the Petitioner's institutional behavior supports a finding of unsuitability is an unreasonable determination of the facts in light of the evidence of rehabilitation presented in the state court proceedings.

In the case at bar there is no evidence that Petitioner's release would unreasonably endanger public safety.  The overwhelming evidence indicates Petitioner is no longer a risk to society. Therefore, Petitioner contends that the Superior Court's decision resulted in a decision that is contrary to clearly established federal law and involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  The Superior Court's ruling resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court's proceedings.

<div align="center">CONCLUSION</div>

Petitioner requests this court find, since no evidence supports his parole denial, his continued imprisonment violates his state and federal right to due process, depriving him of his liberty interest in parole, and order the state to hold a parole hearing which comports with due process as defined herein within 45 days.

Respectfully submitted,

Dated: _August 11_ , 2008

_Samuel Lewis_

Samuel Lewis, Petitioner
In pro per

18

# EXHIBIT 1

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration ) CDC Number E-05524
Hearing of: )
                          )
SAMUEL LEWIS              ) **INMATE COPY**
_____  )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 1, 2007

1:10 P.M.

PANEL PRESENT:

JANICE ENG, Presiding Commissioner
FERNANDO PEREZ, Deputy Commissioner

OTHERS PRESENT:

SAMUEL LEWIS, Inmate
PAT FOX, Attorney for Inmate
ALEXIS DELAGARZA, Deputy District Attorney
Correctional Officer(s) Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

**Debra Aubert**                          **WPU, Inc.**

ii

## INDEX

Page

Proceedings ................................. 1

Case Factors .............................. 13

Pre-Commitment Factors .................... 33

Post-Commitment Factors ................... 50

Parole Plans .............................. 61

Closing Statements ....................... 101

Recess ................................... 112

Decision ................................. 113

Adjournment .............................. 126

Transcriber Certification ................ 127

--oOo--

1

<div align="center">

P R O C E E D I N G S
</div>

1
2         **PRESIDING COMMISSIONER END:**  Mr. Lewis, you

3  doing okay?

4         **INMATE LEWIS:**  Yes, Ma'am.

5         **DEPUTY COMMISSIONER PEREZ:**  We're on record.

6         **PRESIDING COMMISSIONER ENG:**  Take deep breaths.

7  Okay.  Good afternoon, everyone.  This is a Subsequent

8  Parole Consideration Hearing for Samuel Lewis, CDC

9  Number E05524.  Today's date is October 1, 2007, and

10  the time is 1:10 in the afternoon.  We are located at

11  CTF Soledad.  The inmate was received on January 4,

12  1989 from Los Angeles County.  His life term began on

13  that same date, January 4, 1989, and his minimum

14  eligible parole date was February 19, 1998.  The

15  controlling offense for which the inmate has been

16  committed is murder two, Case Number A964645, count

17  one, Penal Code 187.  The inmate received a total term

18  of 15 years to life.  This hearing is being recorded,

19  so for the purpose of voice identification each of us

20  will be required to state our first and last name,

21  spelling out our last name. 'So, Mr. Lewis, when it

22  comes to your turn, after you spell your last name,

23  please provide us with your CDC number.  Okay?

24         **INMATE LEWIS:**  Yes, Ma'am.

25         **PRESIDING COMMISSIONER ENG:**  So, I'll begin, and

2

1    we'll move around the room to my left.  My name is

2    Janice Eng, E-N-G, Commissioner.

3          **DEPUTY COMMISSIONER PEREZ:**  Mr. Lewis, my name

4    is Fernando Perez, that's P-E-R-E-Z, Deputy

5    Commissioner, Board of Parole Hearings.

6          **ATTORNEY FOX:**  Pat Fox, F-O-X, attorney for

7    Mr. Lewis.

8          **INMATE LEWIS:**  Samuel Lewis, L-E-W-I-S, CDC

9    Number E05524.

10         **PRESIDING COMMISSIONER ENG:**  Thank you, sir.

11   All right.  For the record, we have two correctional

12   officers present for security reasons, and they will

13   not be participating in the hearing.  We are supposed

14   to have a representative from the Los Angeles County

15   District Attorney's Office, Estella Garza.  And

16   somebody called in because she is currently detained at

17   the airport, but there is a possibility that she might

18   be coming in sometime during the hearing.  So, I just

19   wanted to go on record and state that no (inaudible)

20   warned about that.  Okay, sir, before we go any

21   further, I'm going to ask if you would kindly read

22   aloud that ADA statement that's in front of you, and

23   you can begin at any time.

24         **INMATE LEWIS:**  Okay.

25         "ADA, Americans With Disabilities Act.

3

```
1              The Americans With Disabilities Act, ADA,

2         is a law to help people with

3         disabilities.  Disabilities are problems

4         that make it harder from some people to

5         see, hear, breathe, talk, walk, learn,

6         think, work or take care of themselves

7         than it is for others.  Nobody can be

8         kept out of public places or activities

9         because of a disability.  If you have a

10        disability, you have the right to ask for

11        help to get ready for your BPT Hearing,

12        get to the hearing, talk, read forms and

13        papers and understand the hearing

14        process.  BPT will look at what you ask

15        for to make sure that you have a

16        disability that is covered by the ADA,

17        and that you have asked for the right

18        kind of help.  If you do not get help or

19        if you don't think you got the kind of

20        help you need, ask for a BPT 1074

21        grievance form.  You can also get help to

22        fill it out."

23        PRESIDING COMMISSIONER ENG:  Okay.  Thank you,

24   sir.

25        ATTORNEY FOX:  You're welcome.
```

4

1        **PRESIDING COMMISSIONER ENG:**  In general, do you

2    understand what your rights are under the ADA?

3        **INMATE LEWIS:**  Yes, Ma'am.

4        **PRESIDING COMMISSIONER ENG:**  Okay.  Just to be

5    sure, we're going to go over a few more things.  I see

6    that you did sign a BPT 1073 back on April 28, 2007.

7    Let me pull it out so you can take a look at it.  This

8    form, sir, is a Reasonable Accommodation Notice and

9    Request in Accordance With Provisions of the Americans

10    With Disabilities Act.  And all that means is, this is

11    a form you would use to identify if you had or have any

12    of the disabilities as defined under ADA.  Do you

13    understand what I'm talking about so far?

14        **INMATE LEWIS:**  Yes, Ma'am.

15        **PRESIDING COMMISSIONER ENG:**  Okay.  Generally

16    speaking, you should have checked off to see if you had

17    any of these disabilities, or checked off the box that

18    states that, no, you do not.  You didn't check anything

19    off here.

20        **ATTORNEY FOX:**  Oh, he -- Down below it says,

21    inmate parolee rights and self-identification, so he

22    did check that box, the bottom third of the page or so.

23        **PRESIDING COMMISSIONER ENG:**  Where he does not

24    need any help for his parole hearing?

25        **ATTORNEY FOX:**  Right.

5

1     **PRESIDING COMMISSIONER ENG:**  That's correct.

2   But I just wanted to be sure that your counselor went

3   over this with you, that you understood what these

4   disabilities are, and that, in fact, you do or do not

5   have any of these.  So, I just need to be sure about

6   that, sir.

7          **INMATE LEWIS:**  No, I do not have --

8          **PRESIDING COMMISSIONER ENG:**  You do not any of

9   these disabilities?

10         **INMATE LEWIS:**  No, Ma'am.

11         **PRESIDING COMMISSIONER ENG:**  Okay.

12         **ATTORNEY FOX:**  Would you like us to check the

13  box?

14         **PRESIDING COMMISSIONER ENG:**  Well, as long as we

15  have it on the record, and --

16         **ATTORNEY FOX:**  Okay.

17         **PRESIDING COMMISSIONER ENG:**  -- I just did that.

18         **ATTORNEY FOX:**  Okay.  Great.

19         **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

20  And, also, you did check that you don't need any help

21  for your hearing, and that you appear to understand

22  what your rights are.  See, what happens is, if you had

23  any of these problems, then you would write -- also

24  determine what type of help you need to accommodate.

25  So, for instance, if you had a broken leg, you would --

6

1    if you had to go walking down or something, you would

2    either need crutches or you would need a wheelchair to

3    get to the hearing.  Does that --

4         INMATE LEWIS:  Right.

5         PRESIDING COMMISSIONER ENG:  -- make sense to

6    you?

7         INMATE LEWIS:  That's right.

8         PRESIDING COMMISSIONER ENG:  Okay.  But you

9    don't.  All right.  Sir, do you have any problems

10   walking up and down stairs or for distances of 100

11   yards or more?

12        INMATE LEWIS:  No, I do not.

13        PRESIDING COMMISSIONER ENG:  And do you need any

14   glasses or a magnifying device in order to read

15   documents?

16        INMATE LEWIS:  No, Ma'am.

17        PRESIDING COMMISSIONER ENG:  And do you have any

18   hearing impairments?

19        INMATE LEWIS:  No, Ma'am.

20        PRESIDING COMMISSIONER ENG:  Have you ever been

21   included in a CCCMS or EOP program?

22        INMATE LEWIS:  No, Ma'am.

23        PRESIDING COMMISSIONER ENG:  Do you know what

24   those are?

25        INMATE LEWIS:  Yes, Ma'am.

7

1    **PRESIDING COMMISSIONER ENG:**  Okay.  Have you
2    taken any psychotropic medications, either in prison or
3    on the streets?

4        **INMATE LEWIS:**  No, Ma'am.

5        **PRESIDING COMMISSIONER ENG:**  And how far did you
6    get in school?

7        **INMATE LEWIS:**  While incarcerated or prior to
8    incarceration?

9        **PRESIDING COMMISSIONER ENG:**  No, prior to that,
10   how long did you go?  You didn't graduate from high
11   school, did you?

12       **INMATE LEWIS:**  No, Ma'am.  I dropped out in 11th
13   grade.

14       **PRESIDING COMMISSIONER ENG:**  In 11th grade.
15   Okay.  When you were growing up, though, do you recall
16   if you were enrolled in any special education classes?

17       **INMATE LEWIS:**  No, Ma'am.

18       **PRESIDING COMMISSIONER ENG:**  So, do you suffer
19   from any disability that would prevent you from
20   participating in the hearing today?

21       **INMATE LEWIS:**  No, Ma'am.

22       **PRESIDING COMMISSIONER ENG:**  Ms. Fox, any ADA
23   issues that you believe need further discussion?

24       **ATTORNEY FOX:**  No, and I would join in his
25   assessment that he has no ADA issues.

8

1     **PRESIDING COMMISSIONER ENG:** Okay. Thank you,
2   very much. We always have to be sure. All right.
3   Sir, this hearing is being conducted pursuant to the
4   Penal Code and the rules and regulations of the Board
5   of Parole Hearings governing parole consideration
6   hearings for life inmates. So, the purpose of today's
7   hearing is to once again to consider your suitability
8   for parole. And in doing that, we will be considering
9   the number and nature of the crimes for which you were
10  committed, your prior criminal and social history, your
11  behavior and programming since your commitment and your
12  plans if released. So, we've already had an
13  opportunity to review your Central File, and you will
14  be given a chance to make any corrections or clarify
15  the record for us. Okay? We will consider your
16  progress since your commitment, your counselor's
17  reports and your mental health evaluations. But we
18  will focus on your progress and any new reports since
19  your last hearing. So, if you have -- if you have had
20  any changes to your parole plans, you should bring that
21  to our attention when we address that issue. Okay?
22      **INMATE LEWIS:** Yes, Ma'am.
23      **PRESIDING COMMISSIONER ENG:** And just for the
24  record, I see that the last time you came before a
25  Panel was October 12, 2006; is that correct?

9

1       **INMATE LEWIS:**  Yes, Ma'am.

2          **PRESIDING COMMISSIONER ENG:**  Okay.  So, it's

3    just about a year ago.  Okay.  Sir, we will reach a

4    decision today and inform you whether or not we find

5    you suitable for parole, and, of course, the reasons

6    for our decision.  So, if you are found suitable for

7    parole, the length of your confinement will be

8    explained to you at that time.

9          **INMATE LEWIS:**  Yes, Ma'am.

10         **PRESIDING COMMISSIONER ENG:**  Before we take a

11   recess for deliberations, if a representative from the

12   DA's Office is present, they will make a final

13   statement along with your attorney and you, yourself.

14   Everyone will have an opportunity to make a final

15   statement to this Panel regarding parole suitability.

16   You don't have to make a statement if you don't want

17   to.  You might be totally satisfied with what Ms. Fox

18   makes as a final statement.  The choice is yours.  If

19   you decide that you want to make a final statement, you

20   should focus on why you believe you are suitable for

21   parole today.  Okay.  After that we will go ahead and

22   take a recess.  We'll clear the room and we'll begin

23   our deliberations.  Once we complete those

24   deliberations we'll resume the hearing and announce our

25   decision.  California Code of Regulations states that,

10

1    regardless of time served, a life inmate shall be found
2    unsuitable for and denied parole if, in the judgment of
3    the Panel, the inmate would pose an unreasonable risk
4    of danger to society if released from prison.  Okay?
5    You do have certain rights.  Those rights include the
6    right to a timely notice of this hearing, the right to
7    review your Central File, and the right to present
8    relevant documents.  Ms. Fox, so far, have your
9    client's rights been met?

10          **ATTORNEY FOX:**  As to this hearing, mostly they
11    have.  However, the 3042 notice was not sent to his
12    lawyer, and we would waive that for purposes of this
13    hearing.

14          **PRESIDING COMMISSIONER ENG:**  All right.  Thank
15    you.

16          **ATTORNEY FOX:**  You're welcome.

17          **PRESIDING COMMISSIONER ENG:**  Sir, you have the
18    additional right to be heard by an impartial panel.
19    You have been introduced to this Panel.  Do you have
20    any objections?

21          **INMATE LEWIS:**  No, Ma'am.

22          **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.
23    Ms. Fox, any objections to the Panel?

24          **ATTORNEY FOX:**  No, we have no objection.  Thank
25    you.

11

| | |
|---|---|
| 1 | **PRESIDING COMMISSIONER ENG:**  Thank you.  Sir, |
| 2 | you will receive a copy of our written tentative |
| 3 | decision today.  That decision does become final within |
| 4 | approximately 120 days.  So, a copy of the final |
| 5 | decision and a copy of the hearing transcript will be |
| 6 | sent to you later on.  Please do note, though, that on |
| 7 | May 1, 2004, your -- the regulations regarding your |
| 8 | right to appeal a decision made at this hearing were |
| 9 | repealed.  You basically have to go to court. |
| 10 | **INMATE LEWIS:**  Yes, Ma'am. |
| 11 | **PRESIDING COMMISSIONER ENG:**  So, if you have any |
| 12 | questions about that policy you should discuss that |
| 13 | with your legal counsel or review the policy at your |
| 14 | prison law library.  Okay? |
| 15 | **INMATE LEWIS:**  Yes, Ma'am. |
| 16 | **PRESIDING COMMISSIONER ENG:**  So, you're not |
| 17 | required to admit to or discuss your offense, but this |
| 18 | Panel does accept as true the findings of the court. |
| 19 | So, do you understand what that means? |
| 20 | **INMATE LEWIS:**  Yes, Ma'am. |
| 21 | **PRESIDING COMMISSIONER ENG:**  Commissioner Perez, |
| 22 | is there any confidential material in the files, and, |
| 23 | if so, will we be using it today? |
| 24 | **DEPUTY COMMISSIONER PEREZ:**  Yes.  For the |
| 25 | record, there is confidential material in Mr. Samuel's |

12

1    -- or, excuse me, Mr. Lewis' confidential file.

2    However, for purposes of this hearing they will not be

3    considered.

4            **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

5    All right.  I've already passed the hearing checklist

6    marked Exhibit One over to your legal counsel, and both

7    of us have signed off on this.  And, sir, we do this to

8    make sure that all of us are operating off the same set

9    of documents for your hearing.  Okay?  So, that goes in

10   with the paperwork.  All right.  Ms. Fox, any

11   additional documents to be submitted besides the ones

12   that you presented to us?

13           **ATTORNEY FOX:**  No, not at this time.  However,

14   we would reserve the right to request the ability to

15   submit them if it becomes necessary during the hearing.

16           **PRESIDING COMMISSIONER ENG:**  Okay.  Very good.

17           **ATTORNEY FOX:**  Thank you.

18           **PRESIDING COMMISSIONER ENG:**  And any preliminary

19   objections?

20           **ATTORNEY FOX:**  No, we have none.  And Mr. Lewis

21   will be testifying as to all aspects of the hearing.

22           **PRESIDING COMMISSIONER ENG:**  Okay.  Good.

23   Mr. Lewis, I'll have to swear you in, so please raise

24   your right hand.  Do you solemnly swear or affirm that

25   the testimony you give at this hearing will be the

13

```
1    truth, the whole truth and nothing but the truth?

2            INMATE LEWIS:  Yes, Ma'am.

3            PRESIDING COMMISSIONER ENG:  Okay.  Thank you.

4    And what I want to do first is read into the record the

5    statement of facts about the life crime.  Okay.  And

6    then we'll have a discussion about that.  So, I'm going

7    to take that from the probation officer's report in the

8    legal section of our documents of our packets, and it

9    is pages two through three.  And this states that,

10   "Defendant, armed with a shotgun, fired into a group of

11   people, killing one victim and injuring two others.  To

12   summarize information contained in the District

13   Attorney's file, Marcus --" Is it Villegas?

14           INMATE LEWIS:  Yes, Ma'am.  Yes, it is.

15           PRESIDING COMMISSIONER ENG:

16           "-- V-I-L-L-E-G-A-S, had gotten into a

17           verbal dispute with defendant over gang

18           territory.  Defendant challenged him to a

19           fight, but victim's brother would not let

20           him.  Defendant stated that he was going

21           to get his, quote, unquote, 'homeboys,'

22           and returned with friends.  After another

23           argument, it was stated that it was their

24           neighborhood, and that he was going to

25           get them both.  Later that evening, this
```

14

```
 1              victim and a number of teenagers were
 2              sitting on the front porch when the
 3              defendant approached carrying a sawed off
 4              shotgun.  Five or six rounds were fired,
 5              and victim Lavelle Bullard,
 6              B-U-L-L-A-R-D, was shot in the arm.
 7              Victim Perry got up from the couch to run
 8              and was shot in the back.  Defendant shot
 9              at Villegas, however missed.  April
10              Purcell was then shot.  Witnesses
11              identified defendant as the shooter, and
12              stated that he was accompanied by Leon
13              Milton."
14         You know, this occurred back on February 18,
15    1988.  Is that correct, sir?
16         INMATE LEWIS:  Yes, Ma'am.
17         PRESIDING COMMISSIONER ENG:  Okay.  And that
18    brief description that I just read, is that a pretty
19    accurate description of what occurred on that day?
20         INMATE LEWIS:  Yes, Ma'am.
21         PRESIDING COMMISSIONER ENG:  Okay.  So, you had
22    been -- Did you know this group of people before?
23         INMATE LEWIS:  I didn't -- Marcus Villegas, I
24    didn't know him, but I had known -- seen him around in
25    the neighborhood.  But I didn't know him.  And the only
```

15

```
 1   thing that I would say is incorrect is that it wasn't
 2   over gang territory.  It started over staring, and then
 3   a verbal disrespect between both me and Mr. Villegas.
 4        PRESIDING COMMISSIONER ENG:  So, it wasn't over
 5   gang territory --
 6        INMATE LEWIS:  No, Ma'am.
 7        PRESIDING COMMISSIONER ENG:  -- or anything like
 8   that?
 9        INMATE LEWIS:  I was --
10        PRESIDING COMMISSIONER ENG:  Was it a racial
11   thing?
12        INMATE LEWIS:  It wasn't racial.  No, Ma'am.  I
13   was driving by.  I looked at him.  He stared at me.  He
14   said something to me.  I said something to him.  I got
15   out the car and challenged him to a fight.  When his
16   brother stepped into it, I didn't want to fight.  His
17   brother -- his brother was much bigger.  And I went and
18   got some guys from whose gang I was trying to join to
19   come up there with me.  And that's how it started.  It
20   started --
21        PRESIDING COMMISSIONER ENG:  Okay.  So, you left
22   the --
23        INMATE LEWIS:  Yes, Ma'am, I left and --
24        PRESIDING COMMISSIONER ENG:  You left that area
25   where they were?  They were sitting on the steps, what,
```

16

| | |
|---|---|
| 1 | in front of their house? |
| 2 | **INMATE LEWIS:** Yes, Ma'am. |
| 3 | **PRESIDING COMMISSIONER ENG:** Okay. So, you |
| 4 | left. You drove away. You found some of your friends. |
| 5 | And your friends were in a gang? |
| 6 | **INMATE LEWIS:** Yes, Ma'am. |
| 7 | **PRESIDING COMMISSIONER ENG:** Okay. And where |
| 8 | did you pick up the sawed off shotgun? |
| 9 | **INMATE LEWIS:** That happened later that night. |
| 10 | Because we came back. When we came back we argued |
| 11 | again. |
| 12 | **PRESIDING COMMISSIONER ENG:** Okay. |
| 13 | **INMATE LEWIS:** We left. I went home to my |
| 14 | mother's house. Later that night, Leon, a guy named |
| 15 | Serge and a guy named Randy came and picked me up. As |
| 16 | we drove up to 9th Avenue, Leon gave me the shotgun. He |
| 17 | showed me how to load it. He told me we were fixing to |
| 18 | go handle this. |
| 19 | **PRESIDING COMMISSIONER ENG:** Can I ask you this? |
| 20 | It starts off earlier in the day as just staring at |
| 21 | each other, and then saying some comments between you |
| 22 | and Villages, correct? |
| 23 | **INMATE LEWIS:** Yes, Ma'am. |
| 24 | **PRESIDING COMMISSIONER ENG:** All right. So, you |
| 25 | go away, then you return -- |

17

```
1        INMATE LEWIS:  Yes, Ma'am.

2        PRESIDING COMMISSIONER ENG:  -- with some of

3   your buddies.  And you're in a car, correct?

4        INMATE LEWIS:  Well --

5        PRESIDING COMMISSIONER ENG:  Or did you walk up?

6        INMATE LEWIS:  We walked up.  We drove up to 9th

7   Avenue and then walked to 10th Avenue.

8        PRESIDING COMMISSIONER ENG:  Okay.  So, and they

9   were still out in front, the second time?

10       INMATE LEWIS:  Yes, Ma'am.

11       PRESIDING COMMISSIONER ENG:  Why did you go

12  back?

13       INMATE LEWIS:  I wanted to be in this gang.

14  When I look back now, I couldn't tell you why I went

15  back.  It was probably just -- I wasn't probably.  It

16  was the stupidest decision I've made in my life.  I

17  went back.  I wanted to be in this gang, and I didn't

18  stop and really think until we were already halfway

19  there.  Then I started thinking how to get out of it.

20       PRESIDING COMMISSIONER ENG:  This was the second

21  time?

22       INMATE LEWIS:  Yes, Ma'am.

23       PRESIDING COMMISSIONER ENG:  All right.  The

24  second time you went back with your gang buddies.  And

25  what did you think was going to happen?
```

18

| | |
|---|---|
| 1 | **INMATE LEWIS:** I thought we would fight. That's |
| 2 | what I thought it would come out to, a fight. I didn't |
| 3 | think it would erupt into nothing. As it turned out -- |
| 4 | **PRESIDING COMMISSIONER ENG:** Well, it hadn't |
| 5 | yet, correct? |
| 6 | **INMATE LEWIS:** It hadn't yet. No, Ma'am. |
| 7 | **PRESIDING COMMISSIONER ENG:** So, when you went |
| 8 | back the second time you exchanged words again? Did |
| 9 | you do a lot of staring down and yelling and screaming, |
| 10 | or what happened? |
| 11 | **INMATE LEWIS:** Yelling and screaming, and that |
| 12 | was it. It was -- We left. I'm figuring that's it. |
| 13 | You know, I showed my bravado. You know, I'm not |
| 14 | scared of you. And I went back home. I was at my |
| 15 | mother's house. When they came and got me, what I |
| 16 | should have did when I look back now is like, no, I'm |
| 17 | cool. That's over with. But I didn't. I went with |
| 18 | them. |
| 19 | **PRESIDING COMMISSIONER ENG:** Okay. Who were you |
| 20 | with? |
| 21 | **INMATE LEWIS:** Leon Milton, a guy named Surgeon, |
| 22 | and a guy named Randy. |
| 23 | **PRESIDING COMMISSIONER ENG:** So, there were four |
| 24 | of you? |
| 25 | **INMATE LEWIS:** Yes, Ma'am. Well, Randy didn't |

19

```
 1   -- Randy never left 9th Avenue, though.

 2        PRESIDING COMMISSIONER ENG:  All right.  But

 3   were these guys with you the second time around?

 4        INMATE LEWIS:  Yes, Ma'am.

 5        PRESIDING COMMISSIONER ENG:  So, they decided

 6   not to let this rest, and they came to get you?

 7        INMATE LEWIS:  Yes, Ma'am.

 8        PRESIDING COMMISSIONER ENG:  And who is the one

 9   that gave you the shotgun?

10        INMATE LEWIS:  Leon.

11        PRESIDING COMMISSIONER ENG:  Leon gave you the

12   shotgun.  And he loaded it and told you what to do?

13        INMATE LEWIS:  Yes, Ma'am.

14        PRESIDING COMMISSIONER ENG:  Okay.  So, you went

15   back that evening with them.  You had the sawed off

16   shotgun.  So, again, you parked at 9th and walked over?

17        INMATE LEWIS:  Yes, Ma'am.

18        PRESIDING COMMISSIONER ENG:  When you were

19   approaching, and they were on the porch, right?

20        INMATE LEWIS:  Yes, Ma'am.

21        PRESIDING COMMISSIONER ENG:  And do you recall

22   how many people were sitting up there?

23        INMATE LEWIS:  I'm not sure.  Maybe five.

24        PRESIDING COMMISSIONER ENG:  But you knew it was

25   a group of people?
```

20

1       INMATE LEWIS:  Yes, Ma'am.

2       PRESIDING COMMISSIONER ENG:  Did you say

3   anything before you drew the shotgun?

4       INMATE LEWIS:  No, Ma'am.

5       PRESIDING COMMISSIONER ENG:  Or you just walked

6   up?  What did you do?

7       INMATE LEWIS:  Walked up, closed my eyes and

8   started shooting.

9       PRESIDING COMMISSIONER ENG:  Okay.  What were

10  the other guys doing that were with you?

11      INMATE LEWIS:  Leon and Surgeon stayed back,

12  maybe two, three houses back.

13      PRESIDING COMMISSIONER ENG:  So, you walked up

14  alone with the shotgun?

15      INMATE LEWIS:  Yes, Ma'am.

16      PRESIDING COMMISSIONER ENG:  And you just

17  arbitrarily shot?

18      INMATE LEWIS:  Yes, Ma'am.

19      PRESIDING COMMISSIONER ENG:  When you opened up

20  your eyes, what did you see?

21      INMATE LEWIS:  I didn"t even look.  I turned

22  around and started running.

23      PRESIDING COMMISSIONER ENG:  Okay.  You did

24  decide to go ahead and discharge that weapon?

25      INMATE LEWIS:  Yes, Ma'am.

21

1  **PRESIDING COMMISSIONER ENG:** And you were
2  shooting at a group of people. What went through your
3  head? Did you even think that you were going to hit
4  anybody, kill everybody or what?

5  **INMATE LEWIS:** I didn't think I -- My intention,
6  when I look back, I didn't think I would kill anyone.
7  I'm thinking it's a shotgun. Maybe bird shots come out
8  of it, you know. I would hurt somebody but I wouldn't
9  kill anybody.

10  **PRESIDING COMMISSIONER ENG:** How far away were
11  you from the people, would you say?

12  **INMATE LEWIS:** About from here to maybe five
13  more feet from that wall.

14  **PRESIDING COMMISSIONER ENG:** Well, tell me how
15  many feet, because the recorder doesn't know how far
16  away that is.

17  **INMATE LEWIS:** Maybe 15, 20 feet.

18  **PRESIDING COMMISSIONER ENG:** Fifteen or twenty
19  feet?

20  **INMATE LEWIS:** Yes, Ma'am.

21  **PRESIDING COMMISSIONER ENG:** That's how far you
22  were. Okay. So, it didn't bother you to think that
23  when you were going to discharge that shotgun, it
24  didn't bother you that you would end up most likely
25  hurting someone?

22

1         **INMATE LEWIS:**  I didn't give it a lot of

2    thought, Ma'am.

3         **PRESIDING COMMISSIONER ENG:**  Okay.  How about

4    afterwards?  When did you find out what the damages

5    were?

6         **INMATE LEWIS:**  When they arrested us.  When --

7    We were arrested maybe 45 minutes later or so, and when

8    they charged us, that's when I realized that someone

9    had been killed.

10        **PRESIDING COMMISSIONER ENG:**  How did you feel

11   about that?

12        **INMATE LEWIS:**  At that time, more than anything,

13   the best description I'd give is I was scared.  I

14   didn't want to face what I had done.  I look back and I

15   know what I did.  I didn't want to face it, and I was

16   more than anything scared.  I'm sitting in the holding

17   tank, and I'm scared, and I'm thinking to myself, what

18   could I have done, and trying not to think about it.

19   And afraid of what's going to happen and what comes

20   next.

21        **PRESIDING COMMISSIONER ENG:**  And you're stating

22   that you were not an active gang member at the time?

23        **INMATE LEWIS:**  No, Ma'am.  I was not.

24        **PRESIDING COMMISSIONER ENG:**  Because I thought

25   the things that I had seen in the documents, and I'm

23

1    just telling you overall, because there is a lot of

2    paperwork here, but I had the impression that you were

3    an active gang member, that you weren't just a wannabe

4    trying to get in.  And that was with the Bloods?

5         INMATE LEWIS:  Yes, Ma'am.

6         PRESIDING COMMISSIONER ENG:  The Van Ness

7    Gangsters?

8         INMATE LEWIS:  Yes, Ma'am.

9         PRESIDING COMMISSIONER ENG:  So, how long --

10   Yeah.  See, this states that you had been -- you were

11   identified as a hardcore gang member of the Van Ness

12   Gangsters, and at this time of the probation officer's

13   report that you denied that you were a member.

14        INMATE LEWIS:  I was not a member.

15        PRESIDING COMMISSIONER ENG:  Okay.

16        INMATE LEWIS:  I did this so that I could become

17   a member of their gang.  I hadn't been a member.  For a

18   long time I had been getting into conflicts with these

19   guys, along with other gang members, because I wouldn't

20   join.  That was part of the reason why I dropped out of

21   school.  Going back and forth to school, you'd run into

22   different gangs.  And eventually you get tired of it.

23   You either fighting or running.

24        PRESIDING COMMISSIONER ENG:  Okay.  So, did the

25   Bloods and the Crips make it pretty clear for you, for

24

1    anyone that wants to become a member that you'd have to
2    commit a violent crime, that you'd have to shoot
3    someone or kill them?
4        **INMATE LEWIS:**  Up to that point, I didn't
5    realize that was what it was going to take.  I figured,
6    you know, if I fought a few fights, stood up, you know,
7    with these guys and show them that I'm tough like them,
8    then I'd be accepted.  I had got into a fight before in
9    front of a dairy (indiscernible), and I had beat one of
10   these guys because he came and he turned over a
11   newspaper rack.  And when I went to straighten up the
12   newspaper rack he hit me.  So, we started fighting, and
13   I beat this guy.  What I'm thinking is, that will get
14   me respect.  Instead what it gets me is three or four
15   more guys jumping on me.  And it goes back to when I
16   was 15, 16, going back and forth, going to Audubon
17   Junior High School.  Audubon is in one neighborhood, I
18   live in another neighborhood.  So, you getting chased
19   coming from Audubon.  Then you get to your
20   neighborhood, you're coming from Audubon, so
21   automatically you're -- you have to be from over there.
22   Now, you tell them you're not from over there, but that
23   doesn't make a difference.  You're coming from over
24   there, therefore, you are.  I got -- We got -- I look
25   back and I see where I gave in and I shouldn't have.

25

```
 1   One of my biggest mistakes, and my mother always asked
 2   me is why didn't I come to her.  I never told my mother
 3   what it was like, because, to me, at that age I felt
 4   you don't tell your mother something like that.  You
 5   don't -- These guys at school, you know, jumping on me,
 6   you know, there was a gang here and there is a gang
 7   there.  I didn't feel that was something that a boy
 8   should tell his mother.  You know, you handle your
 9   business.  You don't come home crying to your mother.
10   After I was arrested for this crime and my mother and I
11   started talking, and she said, why didn't I know about
12   this.  And I said, because I wouldn't let you.  I
13   wouldn't come home and tell you these things.  She felt
14   that it was her fault.  And I'd always tell her, it
15   wasn't your fault.  It was my fault.  I could have came
16   home easily and say, hey, this is the problem that I'm
17   going through.  Instead I chose to handle it the way I
18   did, which is wrong.  And I know it was wrong.
19           PRESIDING COMMISSIONER ENG:  So, your earliest
20   exposure to these gangs was, what, when you said you
21   were about 15, or was it earlier than that?
22           INMATE LEWIS:  It might have been earlier than
23   that.  But I didn't have the problem of being picked on
24   or chased home from school until I was about 15 -- 14,
25   15.
```

26

1        **PRESIDING COMMISSIONER ENG:**  But you dropped out

2    of school and you started working.  Is that when you

3    were working at the dairy?

4        **INMATE LEWIS:**  Yes, Ma'am.

5        **PRESIDING COMMISSIONER ENG:**  So, you dropped out

6    so that type of harassment at school should have gone

7    away when you left school.

8        **INMATE LEWIS:**  No, because the dairy that I

9    worked at was right around the corner, in a gang

10   neighborhood, where they came to get beer, cigarettes

11   and everything else.  So, I would still run into them.

12       **PRESIDING COMMISSIONER ENG:**  Did you leave

13   school to try to get away from that?

14       **INMATE LEWIS:**  Yes, Ma'am.  I figured --

15       **PRESIDING COMMISSIONER ENG:**  And yet, you went

16   from one boiling pot into another?

17       **INMATE LEWIS:**  Yes, Ma'am.

18       **PRESIDING COMMISSIONER ENG:**  When you came into

19   prison, did you have any affiliation with the prison

20   gangs?

21       **INMATE LEWIS:**  No, Ma'am.

22       **PRESIDING COMMISSIONER ENG:**  Did they try to get

23   you?

24       **INMATE LEWIS:**  Yes, Ma'am.

25       **PRESIDING COMMISSIONER ENG:**  How old was

1    Shavonne Perry?

2         **INMATE LEWIS:**  She was 17.

3         **PRESIDING COMMISSIONER ENG:**  What goes through

4    your head?  Do you ever think about Shavonne Perry?  Do

5    you know what she looks like?  Do you know anything

6    about her?

7         **INMATE LEWIS:**  I don't know anything about her,

8    and I do think about her all the time.  I have a

9    daughter that's 19 now, and as she was coming up she

10   was getting caught up in a number of different

11   situations where, you know, wanted to be accepted.  And

12   I looked at her more and more and started worrying.

13   And when I'd look at her I would think about Shavonne.

14   And I would ask myself, well, how would I feel if that

15   happened to my daughter.  And when I think about how I

16   feel about it, it's -- I thought about writing a

17   statement to tell you how I felt, and when I sat down

18   it's like words -- you can't put into words to really

19   understand how it feels.  It's -- Horrible is a word,

20   ashamed, saddened because it's something that I can't

21   change.  I can't bring it back.  I can't change what I

22   did.  I can't bring Shavonne back.  What I have

23   realized is this.  I know, for me, I don't know about

24   anybody else who's committed a murder, but for me,

25   after prison, after parole, this doesn't stop.  I have

28

```
 1   to continue to give back because Shavonne -- I don't
 2   know what she would have contributed to the world, but
 3   she was a person and she had the potential to impact
 4   this world in a major way.  Each person does, and
 5   knowing this and knowing that I took what she had to
 6   offer from her, from this world, from our society, from
 7   her mother, I know I have to pay that back the rest of
 8   my life.  Not just my punishment in prison, on parole,
 9   but for the rest of my life.  When I am released, I
10   still have to continue to do that.  And the way I
11   figure, the best way for me to do that is to try to get
12   young me like myself not to do what I did.  I talked to
13   a lot of guys in here, and I know some of them won't
14   let the façade down of being a tough guy.  And some of
15   them will when I get them one on one.  They'll admit
16   some of the stuff I did I did because I wanted to be
17   accepted.  And the majority -- maybe not the majority,
18   but a lot.  Knowing what I took from Shavonne, I
19   believe it's my job to stop kids, teenagers, whoever I
20   can from doing this.  I think about it all the time.
21   Like I said, I thought about writing a statement.  And
22   words don't do enough.
23          PRESIDING COMMISSIONER ENG:  Well, why don't you
24   tell me this.  Tell this Panel this.  If you were
25   sitting across -- If somebody else, a wannabe gang
```

29

```
1   member or a gang member had arbitrarily shot into a
2   group that your daughter was part of and your daughter
3   was the one that got shot in the back by a sawed off
4   shotgun, and you're sitting across from the guy that
5   did it, what would you -- what would you want to say to
6   him?  This is your 19 year old daughter.  She's 19.
7   She's dead.  What would you say to the person that took
8   her life?
9        INMATE LEWIS:  You owe me your life.  You've got
10  to make -- You got to make this right somehow, some
11  way.  I'd probably tell him I hate him.  I'd probably
12  tell him you should be the one that's dead.  I've
13  thought about that, if it was my daughter what would I
14  say, and that's the nice way to say it.
15       PRESIDING COMMISSIONER ENG:  Okay.
16       INMATE LEWIS:  I took an Impact class sometime
17  ago, and there was a lady named Angela Torrez, whose
18  son was -- she lost her son to gang violence.  And she
19  got a chance to meet the guy who had killed her son
20  while he was in juvenile hall.  And the guy basically
21  apologized, told her he wanted to change what he had
22  done but he couldn't.  And she told him to make a
23  promise to her, and this was how he was to pay her
24  back, by making something out of his life.  Listening
25  to her, this was in 2002 when I took this Impact class,
```

30

1   and listening to Ms. Torrez, I understand the impact

2   that I've had on Shavonne's family.  I understand it.

3   And for her to give him that opportunity, I can only

4   pray that Shavonne's mother would give me that

5   opportunity.  If it was a person sitting across from

6   me, I can't honestly say that I would be able to

7   forgive them.  Sitting here now when I think about how

8   much I love my daughter, I can't -- to be honest with

9   you, I can't say that I'd be able to, but I would pray

10  that Shavonne's mother would be able to forgive me.

11      PRESIDING COMMISSIONER ENG:  Okay.  Well, I hope

12  you think about that a lot.  If you were -- If roles

13  were reversed, you know.

14      INMATE LEWIS:  I do.

15      PRESIDING COMMISSIONER ENG:  So you don't ever

16  forget the impact of what you did had on a lot of other

17  people.  And not just Shavonne, but you ended up -- you

18  wounded --

19      INMATE LEWIS:  The (inaudible) bullet --

20      PRESIDING COMMISSIONER ENG:  You wounded two

21  others, but you also shot at another, Marcus.

22      INMATE LEWIS:  Yes, Ma'am.

23      PRESIDING COMMISSIONER ENG:  Okay.  And the

24  suffering that they went through, the fear and the

25  suffering.  Do you understand that?

31

```
1         INMATE LEWIS:  Yes, Ma'am.
2         PRESIDING COMMISSIONER ENG:  What do you think
3    that was?
4         INMATE LEWIS:  If I were in their shoes,
5    initially, would be fear, and more than likely to this
6    day they probably -- probably hate me.  If I was in
7    their shoes I would feel the same way.
8         PRESIDING COMMISSIONER ENG:  Do you think they
9    have nightmares?
10        INMATE LEWIS:  They probably do.
11        PRESIDING COMMISSIONER ENG:  Okay.
12   Commissioner, do you have any questions right now?
13        DEPUTY COMMISSIONER PEREZ:  Yeah.  Have you
14   forgiven yourself?
15        INMATE LEWIS:  Yes, Sir.
16        DEPUTY COMMISSIONER PEREZ:  What journey did you
17   take to get to that point?
18        INMATE LEWIS:  My first journey came from asking
19   God to forgive me, and really getting back into my
20   spiritual background.  The 12 steps actually helped me
21   a lot, because one of the things, if I can't forgive
22   myself, how can I ask anybody else to forgive myself.
23   But in doing so I have to understand that, as I said
24   before, I have to start giving back.  In a limited
25   situation like this, there are ways to give back, and I
```

1    do so.  But I had to first ask myself, if you really
2    forgive yourself you have to start changing.  That's
3    one of the things that you have to do and that's what I
4    began to do.  That's what I've been doing and that's
5    what I would continue to do.

6        **DEPUTY COMMISSIONER PEREZ:**  In what ways have
7    you made amends to the victim, which is one of the
8    steps?

9        **INMATE LEWIS:**  I haven't been able to make
10   amends to the victim because, I mean, not only that,
11   but step nine says, you know, and before you make
12   amends you want to make sure it wouldn't harm them.
13   I'm not sure if it would harm them or not.  Part of it
14   is paying off my restitution, which, to me, is --
15   paying restitution is not -- it doesn't give back what
16   you've taken.  So, part of making amends for me is to
17   start changing myself, and I started changing myself a
18   number of years ago, and started trying to get others
19   to change themselves.  Not just what you say but what
20   you do everyday.

21       **DEPUTY COMMISSIONER PEREZ:**  Okay.
22       **PRESIDING COMMISSIONER ENG:**  Okay.
23       **DEPUTY COMMISSIONER PEREZ:**  Commissioner.
24       **PRESIDING COMMISSIONER ENG:**  We may have other
25   questions.  We'll just ask you when they come up.

33

1       **INMATE LEWIS:**  All right.

2       **PRESIDING COMMISSIONER ENG:**  But let's move on.

3    I want to take a look at your prior record.  And what I

4    see here, and you'll have to correct me if this is

5    incorrect, but your first arrest was January 24, 1987?

6    So, I think you were, what, about 17?

7       **INMATE LEWIS:**  Yes, Ma'am.

8       **PRESIDING COMMISSIONER ENG:**  For grand theft

9    auto?

10       **INMATE LEWIS:**  Yes, Ma'am.

11       **PRESIDING COMMISSIONER ENG:**  Okay.  It just says

12    that the petition was requested but no further

13    disposition was shown.  So, I'm not sure I understand

14    what that means.  But then in March, God, you were

15    arrested again, carrying a concealed weapon.

16       **INMATE LEWIS:**  That was a year later.

17    Commissioner Eng --

18       **PRESIDING COMMISSIONER ENG:**  Yes.

19       **INMATE LEWIS:**  -- the first one, the grand

20    theft, was --

21       **PRESIDING COMMISSIONER ENG:**  Right.

22       **INMATE LEWIS:**  -- dismissed, and I have the

23    documentation --

24       **PRESIDING COMMISSIONER ENG:**  Okay.

25       **INMATE LEWIS:**  -- it was dismissed because it

34

```
 1   was found that I actually owned the car.
 2          PRESIDING COMMISSIONER ENG:  Oh, all right.  All
 3   right.  So, for the record, this is your juvenile
 4   history.  Okay.  So, that was dismissed, so we know the
 5   disposition.  You have the proof of that too, correct?
 6          INMATE LEWIS:  Yes, Ma'am.
 7          PRESIDING COMMISSIONER ENG:  Okay.  What about
 8   this other one about not quite a month and a half
 9   later, carrying a concealed weapon?
10          INMATE LEWIS:  I was convicted of carrying a
11   concealed weapon.
12          PRESIDING COMMISSIONER ENG:  I'm sorry, what?
13          INMATE LEWIS:  I was convicted of carrying a
14   concealed --
15          PRESIDING COMMISSIONER ENG:  You were?
16          INMATE LEWIS:  Yes, Ma'am.
17          ATTORNEY FOX:  What kind of weapon?
18          PRESIDING COMMISSIONER ENG:  What was the
19   weapon?
20          INMATE LEWIS:  It was .25 pistol.
21          PRESIDING COMMISSIONER ENG:  Whose was it?
22          INMATE LEWIS:  It was mine.
23          PRESIDING COMMISSIONER ENG:  When did you get
24   it?
25          INMATE LEWIS:  Maybe two, three weeks before.
```

35

```
1              PRESIDING COMMISSIONER ENG:  Was that the first
2    weapon you ever had for yourself?
3              INMATE LEWIS:  Yes, Ma'am.
4              PRESIDING COMMISSIONER ENG:  And what possessed
5    you to buy that weapon?
6              INMATE LEWIS:  Protection.  This was part of
7    when I was going through getting into the gangs.
8              PRESIDING COMMISSIONER ENG:  Okay.
9              INMATE LEWIS:  I don't know if I have -- or if
10   shows I was actually on a bicycle when they stopped me.
11             PRESIDING COMMISSIONER ENG:  Okay.  It does say
12   that you acknowledge that you were placed on probation
13   because of this offense.
14             INMATE LEWIS:  Yes, Ma'am.
15             PRESIDING COMMISSIONER ENG:  Okay.  And it says
16   you spent two days in Los Padrinos?
17             INMATE LEWIS:  Yes, Ma'am.
18             PRESIDING COMMISSIONER ENG:  Which is what?
19             INMATE LEWIS:  Like juvenile.
20             PRESIDING COMMISSIONER ENG:  It's like juvenile
21   hall or something?
22             INMATE LEWIS:  Yes, Ma'am.
23             PRESIDING COMMISSIONER ENG:  Okay.  But you did
24   not acknowledge the arrest for grand theft auto.  And
25   we know that got dismissed.
```

36

1      **INMATE LEWIS:**  Yes, Ma'am.

2      **PRESIDING COMMISSIONER ENG:**  Okay.  But it

3    doesn't say anything else.  Let me see if I have any

4    more information.  I'm taking that right out of the

5    probation officer's report, and I don't know if there

6    is anything else.  I didn't see anything in these Board

7    reports.  Let me just check very, very quickly.  But

8    you stated that you were riding -- It doesn't have

9    anything in here either.  Okay.

10      **ATTORNEY FOX:**  Because it was a juvenile case,

11    the records generally were sealed.

12      **PRESIDING COMMISSIONER ENG:**  Right.  Okay.

13      **ATTORNEY FOX:**  Even to get -- Well, the petition

14    was sustained for --

15      **PRESIDING COMMISSIONER ENG:**  But we do know you

16    were on probation for how long?  A couple years?

17      **INMATE LEWIS:**  Until I was 18, I believe.

18      **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

19    And then we see -- That was 3/13/87.  Okay?  Then

20    2/5/88, on 2/5/88 your first adult arrest, carrying a

21    concealed weapon in a vehicle, but released,

22    insufficient evidence.  Do you remember that?

23      **INMATE LEWIS:**  Yes, Ma'am.  I was in the car.

24      **PRESIDING COMMISSIONER ENG:**  Okay.

25      **INMATE LEWIS:**  They pulled -- I wasn't the

1    driver.  They pulled us over.  A guy named John was

2    driving.  When they searched the car they found the gun

3    under the driver's seat there.  They arrested both of

4    us, but they released me at the substation and they

5    just dismissed the case.

6         PRESIDING COMMISSIONER ENG:  Whose gun was it?

7         INMATE LEWIS:  It was John's.  It was his car

8    and it was his gun.

9         PRESIDING COMMISSIONER ENG:  It was his?

10         INMATE LEWIS:  Yes, Ma'am.

11         PRESIDING COMMISSIONER ENG:  Okay.

12         ATTORNEY FOX:  Did you know he had it in there?

13         INMATE LEWIS:  I didn't know he had it.

14         PRESIDING COMMISSIONER ENG:  Okay.  You know, in

15    a very short amount of time, because here you -- You

16    know, you ran around with another guy that's got a gun

17    in the car and both of you got arrested, and that got

18    dismissed.  That was on February 5th.  Okay.  This life

19    crime happened on February 18th.

20         INMATE LEWIS:  Yes, Ma'am.

21         PRESIDING COMMISSIONER ENG:  And you were 18.

22    Okay.  You had already been picked up before in '87 a

23    year before for carrying a concealed.

24         INMATE LEWIS:  Yes, Ma'am.

25         PRESIDING COMMISSIONER ENG:  And that one you

38

1   were guilty.  So, you were still on probation, correct?

2           INMATE LEWIS:  Yes, Ma'am.

3           PRESIDING COMMISSIONER ENG:  When you did the

4   life crime?

5           INMATE LEWIS:  Yes, Ma'am.

6           PRESIDING COMMISSIONER ENG:  Okay.  Did I miss

7   anything?  Was there anything else?

8           INMATE LEWIS:  No, Ma'am.

9           PRESIDING COMMISSIONER ENG:  Okay.  So, let's

10  take a look at your personal history.  You were born in

11  Los Angeles on, what, March 23, 1969?

12          INMATE LEWIS:  Yes, Ma'am.

13          PRESIDING COMMISSIONER ENG:  Okay.  And, again,

14  you were 18 when you committed this life crime, and

15  you're now 38?

16          INMATE LEWIS:  Yes, Ma'am.

17          PRESIDING COMMISSIONER ENG:  Okay.  And it

18  states here that you had three sisters and three

19  brothers.  So, you came from a large family?

20          INMATE LEWIS:  Yes, Ma'am.

21          PRESIDING COMMISSIONER ENG:  Okay.  Seven of

22  you.

23          INMATE LEWIS:  All of us didn't stay with my

24  mother, though.

25          PRESIDING COMMISSIONER ENG:  Okay.

39

1      **INMATE LEWIS:**  My older sister, my younger

2  sister and an older brother, who is mentally disabled,

3  stayed with my mother.

4      **PRESIDING COMMISSIONER ENG:**  Were you with your

5  mother too?

6      **INMATE LEWIS:**  Yes, Ma'am.

7      **PRESIDING COMMISSIONER ENG:**  Okay.  So, how many

8  older brothers did you have?

9      **INMATE LEWIS:**  Two.

10     **PRESIDING COMMISSIONER ENG:**  Two older brothers?

11     **INMATE LEWIS:**  Yes, Ma'am.

12     **PRESIDING COMMISSIONER ENG:**  Did they have any

13 problems with the law?

14     **INMATE LEWIS:**  No, Ma'am.

15     **PRESIDING COMMISSIONER ENG:**  Did they have any

16 problems or were they members of gangs?

17     **INMATE LEWIS:**  No, Ma'am.  My oldest brother

18 lives in Oceanside.  I didn't have much contact with

19 him.  My other older brother, name is Paris, he is

20 mentally disabled.

21     **PRESIDING COMMISSIONER ENG:**  Right.  All right.

22 And what about any of your sisters have gang

23 involvement?

24     **INMATE LEWIS:**  No, Ma'am.

25     **PRESIDING COMMISSIONER ENG:**  Whether they're

40

```
1    older or younger?
2           INMATE LEWIS:  No, Ma'am.
3           PRESIDING COMMISSIONER ENG:  You have younger
4    brothers too?
5           INMATE LEWIS:  I have one younger brother.
6           PRESIDING COMMISSIONER ENG:  One younger
7    brother.  Did he have a problem with the gangs?
8           INMATE LEWIS:  I didn't have much contact.  He
9    lived with my father.  I didn't have much contact with
10   him either.  But from what I understand, he'd never had
11   problems with gangs.
12          PRESIDING COMMISSIONER ENG:  So, you're the only
13   one?
14          INMATE LEWIS:  Yes, Ma'am.
15          PRESIDING COMMISSIONER ENG:  Okay.  So, it
16   states here that you were seven when your parents
17   divorced; is that correct?
18          INMATE LEWIS:  Yes, Ma'am.
19          PRESIDING COMMISSIONER ENG:  Okay.  You were
20   very active in sports when you were growing up?
21          INMATE LEWIS:  Yes, Ma'am.
22          PRESIDING COMMISSIONER ENG:  And that it just
23   states that your prior work experience was at the
24   Altadena Dairy, and we know you were working there when
25   this occurred, correct?  All right.  Okay.  It states
```

41

```
1    here that you received your GED in 1992; is that
2    correct?
3             INMATE LEWIS:  1991.
4             PRESIDING COMMISSIONER ENG:  1991?
5             INMATE LEWIS:  Yes, Ma'am.
6             PRESIDING COMMISSIONER ENG:  Okay.  And did you
7    -- You have two AA Degrees?
8             INMATE LEWIS:  Yes, Ma'am.
9             PRESIDING COMMISSIONER ENG:  Very good.  Yeah.
10   I think I know, too, that you have -- you got an AA in
11   Business in 1999?
12            INMATE LEWIS:  Yes, Ma'am.
13            PRESIDING COMMISSIONER ENG:  And then you got
14   your second AA in 2002 for -- in the paralegal area?
15            INMATE LEWIS:  Yes, Ma'am.
16            PRESIDING COMMISSIONER ENG:  Okay.  Okay.  1988
17   you married Joan Moore?
18            INMATE LEWIS:  Joanne.
19            PRESIDING COMMISSIONER ENG:  Joanne Moore?
20            INMATE LEWIS:  Yes, Ma'am.
21            PRESIDING COMMISSIONER ENG:  Okay.  And you had
22   one child.  That's your daughter?
23            INMATE LEWIS:  Yes, Ma'am.
24            PRESIDING COMMISSIONER ENG:  Okay.  Divorced
25   after a couple of years, though, correct?
```

42

| | |
|---|---|
| 1 | **INMATE LEWIS:**  Yes, Ma'am. |
| 2 | **PRESIDING COMMISSIONER ENG:**  All right.  Because |
| 3 | you were in prison already, right? |
| 4 | **INMATE LEWIS:**  Yes, Ma'am. |
| 5 | **PRESIDING COMMISSIONER ENG:**  And then in '96 you |
| 6 | married Tracy Steel Lewis. |
| 7 | **INMATE LEWIS:**  Well -- |
| 8 | **PRESIDING COMMISSIONER ENG:**  No? |
| 9 | **INMATE LEWIS:**  -- I married -- Yes, Ma'am, but |
| 10 | prior to that I was married, and we annulled our |
| 11 | marriage, to Wanda Johnson in '92. |
| 12 | **PRESIDING COMMISSIONER ENG:**  So, you had a |
| 13 | marriage in between Joanne and Tracy? |
| 14 | **INMATE LEWIS:**  Yes, Ma'am. |
| 15 | **PRESIDING COMMISSIONER ENG:**  But that was |
| 16 | annulled, so that was very short lived? |
| 17 | **INMATE LEWIS:**  Yes, Ma'am. |
| 18 | **PRESIDING COMMISSIONER ENG:**  Okay.  So, your |
| 19 | third marriage is to Tracy? |
| 20 | **INMATE LEWIS:**  Yes, Ma'am. |
| 21 | **PRESIDING COMMISSIONER ENG:**  Okay.  You have two |
| 22 | stepdaughters from that relationship? |
| 23 | **INMATE LEWIS:**  No, Ma'am.  The stepdaughters are |
| 24 | Joanne's daughters. |
| 25 | **PRESIDING COMMISSIONER ENG:**  Okay. |

43

1           **INMATE LEWIS:**  Tracy didn't have any children.

2           **PRESIDING COMMISSIONER ENG:**  Oh, so this is

3    incorrect in your -- in the Board report.  All right.

4           **INMATE LEWIS:**  Yes, Ma'am.

5           **PRESIDING COMMISSIONER ENG:**  And you and Tracy

6    divorced --

7           **INMATE LEWIS:**  Yes, Ma'am.

8           **PRESIDING COMMISSIONER ENG:**  -- in '97?

9           **INMATE LEWIS:**  Yes, Ma'am.

10          **PRESIDING COMMISSIONER ENG:**  Okay.  You married

11   now?

12          **INMATE LEWIS:**  Yes, Ma'am.

13          **PRESIDING COMMISSIONER ENG:**  Is that number

14   four?

15          **INMATE LEWIS:**  Yes, Ma'am.  Commissioner Biggers

16   and I discussed this at our last hearing, and one of

17   the things that I attempted to point out to

18   Commissioner Biggers is, I went to the Board March, I

19   believe it was 28th, 1997, and I was denied four years.

20   And Tracy --

21          **PRESIDING COMMISSIONER ENG:**  That was your

22   initial hearing?

23          **INMATE LEWIS:**  Yes, Ma'am.  And Tracy didn't

24   want to -- It hurt, and I'm not angry with her or

25   anything, but she didn't want to wait four years

44

1   because she felt like it was a waste of her time, and I

2   understood that.  She filed for divorce, I believe it

3   was May 16, 1997, about two months after the denial.

4   And I, you know, I respect and understand her decision.

5   A four year denial is a long time to wait.  I still

6   hadn't matured enough to understand what I needed to do

7   to get myself together at that time.

8        **PRESIDING COMMISSIONER ENG:**  I have to ask you

9   this, sir.  Did you or Tracy understand what your

10  sentence was?

11       **INMATE LEWIS:**  Initially, originally, I thought

12  I would be found -- granted parole.  I didn't have the

13  full grasp and understanding of what my sentence

14  entailed.

15       **PRESIDING COMMISSIONER ENG:**  Did you think it

16  was sort of an automatic thing that you'd do so many

17  years and then --

18       **INMATE LEWIS:**  Yes, Ma'am.

19       **PRESIDING COMMISSIONER ENG:**  -- be paroled?

20       **INMATE LEWIS:**  Yes, Ma'am.

21       **PRESIDING COMMISSIONER ENG:**  Okay.  Now what's

22  your understanding?

23       **INMATE LEWIS:**  My understanding is that I can

24  very well possibly be here for the rest of my life.

25       **PRESIDING COMMISSIONER ENG:**  That's correct.

45

```
 1    Okay.
 2        ATTORNEY FOX:  Commissioner, I do have a copy of
 3    the juvenile court petition, and it's stamped
 4    dismissed.  I'll pass them over. .
 5        PRESIDING COMMISSIONER ENG:  Is this the one
 6    that he sent to us, he gave us?
 7        ATTORNEY FOX:  Does it say dismissed at the
 8    bottom?  No.  I'll take -- You'll have to --
 9        PRESIDING COMMISSIONER ENG:  Okay.
10        ATTORNEY FOX:  If you look at the case numbers.
11        PRESIDING COMMISSIONER ENG:  This is for the
12    grand theft --
13        INMATE LEWIS:  Yes, Ma'am.
14        PRESIDING COMMISSIONER ENG:  -- auto.  Okay.
15    And for the record, counsel and Mr. Lewis did pass over
16    to the Panel, it's from the Superior Court of
17    California, juvenile court, that it's stamped that this
18    is dismissed, this particular case.  I never looked at
19    one of these.  I'm just trying to see --
20        ATTORNEY FOX:  The juvenile paperwork is a
21    little different from the adult.
22        PRESIDING COMMISSIONER ENG:  States that the
23    minor was taken into custody by LAPD 77$^{th}$, okay, on
24    January 24, 1987.  Okay.  And count one, okay.  And
25    we're talking about the other car.  I thought I just
```

46

1  saw the Penal Code.  Oh, it's Section 496 of the Penal

2  Code, a felony.  Okay.  And it does state that it was

3  dismissed, so -- Okay.  All right.  So, you are in your

4  fourth marriage right now?

5      INMATE LEWIS:  Yes, Ma'am.

6      PRESIDING COMMISSIONER ENG:  Okay.  And how long

7  have you been married?

8      INMATE LEWIS:  Two years, six months and 14

9  days.

10      PRESIDING COMMISSIONER ENG:  All right.  Does

11  she have any children?

12      INMATE LEWIS:  Yes, Ma'am.

13      PRESIDING COMMISSIONER ENG:  Was she married

14  before?

15      INMATE LEWIS:  Yes, Ma'am.

16      PRESIDING COMMISSIONER ENG:  Was she married to

17  a prisoner?

18      INMATE LEWIS:  No, Ma'am.

19      PRESIDING COMMISSIONER ENG:  Okay.  So, how did

20  you meet her?

21      INMATE LEWIS:  I met her -- She saw a picture of

22  me from a friend who visits, or used to visit here, and

23  we started writing.

24      PRESIDING COMMISSIONER ENG:  So, she was never

25  married to anyone who has been in prison?

47

1    **INMATE LEWIS:**  No, Ma'am.

2    **PRESIDING COMMISSIONER ENG:**  Or any gang

3    membership?

4    **INMATE LEWIS:**  No, Ma'am.

5    **PRESIDING COMMISSIONER ENG:**  How about anybody

6    in her family; do you know?

7    **INMATE LEWIS:**  In her family?

8    **PRESIDING COMMISSIONER ENG:**  Yeah.

9    **INMATE LEWIS:**  No, Ma'am.

10    **PRESIDING COMMISSIONER ENG:**  Okay.  So, it also

11    states here that you were using alcohol and marijuana

12    at the age of 18; is that correct?

13    **INMATE LEWIS:**  I wasn't using.  I tried it, but

14    I didn't use it.  I tried it and didn't like it.

15    **PRESIDING COMMISSIONER ENG:**  Were you selling?

16    **INMATE LEWIS:**  No, Ma'am.

17    **PRESIDING COMMISSIONER ENG:**  I'm trying to

18    remember what I had seen about that before.  Did you

19    like drinking better?

20    **INMATE LEWIS:**  No.

21    **PRESIDING COMMISSIONER ENG:**  You didn't like to

22    drink?

23    **INMATE LEWIS:**  I tried it and didn't like it.  I

24    tried marijuana, didn't like it.  I tried beer, didn't

25    like it.

48

1    **PRESIDING COMMISSIONER ENG:**  Okay.  Now, are

2    both your mother and father still alive?

3    **INMATE LEWIS:**  Yes, Ma'am.

4    **PRESIDING COMMISSIONER ENG:**  Are you in touch

5    with them?

6    **INMATE LEWIS:**  Not my father.  My mother.

7    **PRESIDING COMMISSIONER ENG:**  So, did you sort of

8    lose touch with your father when you -- since you were

9    growing up, or was he still active in your life?

10    **INMATE LEWIS:**  He was in -- He was around

11    periodically.  I know he lives in Missouri now, but

12    that's the extent of it.

13    **PRESIDING COMMISSIONER ENG:**  Okay.

14    **INMATE LEWIS:**  My uncle, his brother, I'm in

15    contact with him, and he keeps me posted on what's

16    going on with my father.  But --

17    **PRESIDING COMMISSIONER ENG:**  And tell me, is

18    your daughter in touch with you?

19    **INMATE LEWIS:**  The last few months she's been

20    going through something.  I'm not sure what.  And the

21    advice that I got from my mother and my sister and my

22    wife was like, don't push it.  Because she had enrolled

23    in school, got -- She was in college, and then she

24    decided to drop out of school.  And like, you know, you

25    could tell me what's going on, and it's more like I'm

49

```
1  pushing her away then doing any good.  So, they said
2  just give her some room, let her go through the phase
3  that she's going through, and, you know --
4          PRESIDING COMMISSIONER ENG:  Did you ever sit
5  down and have a heart to heart with her about why
6  you're here?
7          INMATE LEWIS:  Yes, Ma'am.  I think she does --
8  No, I don't think.  I know she holds that against me.
9  And I don't blame her.  At her age, knowing that she
10 was on the way here, I can understand her looking at it
11 as if I put this before her, which I did.
12         PRESIDING COMMISSIONER ENG:  Okay.  Is there
13 anything that I missed?  So, as far as you know, she
14 doesn't have any children, does she?
15         INMATE LEWIS:  No, Ma'am, she doesn't.
16         PRESIDING COMMISSIONER ENG:  Okay.  So, you only
17 have the one daughter.  All right.  And you're still in
18 touch with your mother.  Have you seen your mother?
19         INMATE LEWIS:  Yes, Ma'am.  As a matter of fact,
20 they'll be coming up probably this month after this
21 hearing.
22         PRESIDING COMMISSIONER ENG:  You're close with a
23 couple of your siblings also?
24         INMATE LEWIS:  Yes, Ma'am.  My sister -- both my
25 sisters, my mother, my brother.
```

50

1         **PRESIDING COMMISSIONER ENG:** Okay. Good. Okay.

2  Is there anything I missed that you feel is pertinent

3  that we should put into the record?

4         **INMATE LEWIS:** No, Ma'am.

5         **PRESIDING COMMISSIONER ENG:** Okay. We're going

6  to move on, and Commissioner Perez is going to bring us

7  up to date on what you've been doing in the

8  institution, and then he'll be reviewing your most

9  recent psychological evaluation too. Okay?

10        **INMATE LEWIS:** Yes, Ma'am.

11        **DEPUTY COMMISSIONER PEREZ:** Good afternoon,

12  Mr. Lewis.

13        **INMATE LEWIS:** Good afternoon, Sir.

14        **DEPUTY COMMISSIONER PEREZ:** Mr. Lewis, the

15  documents that were reviewed for post-convictional

16  information was information that was secured from your

17  Central File as well as the life prisoner evaluation

18  report prepared for this October 2007 calendar by

19  Correctional Counselor P.O. Daporto. Post-convictional

20  progress reports covering the period of 10/12/2006 to

21  the present prepared by a correctional counselor. I

22  don't know. I can't quite figure out his name, but

23  it's scribbled pretty fast. The psychological

24  evaluation prepared for the April 2006 calendar by

25  Dr. Macomber, Ph.D., as well as any additional

51

```
1    information that may come out as a result of this
2    hearing, and anything you want to enter in the record,
3    certainly we'll consider it for post-convictional
4    information.  So, we will allow you to fill in the
5    blanks should we have missed anything.  Okay?
6              INMATE LEWIS:  Yes, Sir.
7              DEPUTY COMMISSIONER PEREZ:  All right.  Prior
8    BPT action was at the time of your last parole
9    consideration hearing, Mr. Lewis, which was on October
10   12, 2006.  You were housed here at CTF.  And at that
11   time the Board took action to deny parole for one year.
12             INMATE LEWIS:  Yes, Ma'am -- Yes, Sir.
13             DEPUTY COMMISSIONER PEREZ:  And recommended --
14   And yes, I am over here.  And recommended that the
15   inmate have no more 115s or 128s.
16             INMATE LEWIS:  Yes, Sir.
17             DEPUTY COMMISSIONER PEREZ:  That you continue to
18   receive self-help --
19             INMATE LEWIS:  Yes, Sir.
20             DEPUTY COMMISSIONER PEREZ:  -- and that you stay
21   disciplinary free.  And a review of our records shows
22   that you have taken that to heart, and you've done
23   extremely well in complying with those recommendations
24   by the last Board.  And that's probably a full
25   compliance with those recommendations.  Mr. Lewis, your
```

52

1   classification -- your prior classification score was
2   19, and it has remained at 19.  Your custody level --
3   your prior custody level was Medium A, and has remained
4   at Medium A.  And, of course, you know, we've done our
5   research and our notes, and, of course, you made our
6   role easy for us with this here.  I wish I would have
7   ran into this before I started the research, but that's
8   okay.  What we really -- And both Commissioner and
9   myself have noticed that you really have made an
10  excellent effort to seek self-help, to identify those
11  issues that, certainly, we grow as a result of.  But it
12  shows here that you have, since 1991, have been
13  involved continuously in Narcotic Anonymous and
14  Alcoholic Anonymous.

15           **INMATE LEWIS:**  Yes, Sir.

16           **DEPUTY COMMISSIONER PEREZ:**  Entries for -- Well,
17  it's quite a long time, about 16 years.  You have four
18  entries of education, and I know that doesn't include
19  your formal education.  Educational classes, you've
20  taken Five Anger management classes, 16 bible study
21  classes, which are related to self-help, which we
22  understand.  You've taken 14 Alternatives to Violence,
23  six self-help, five family courses, and in addition to
24  that you've taken psychology classes at Coastline
25  Community College.  Commissioner Eng indicated that you

53

1    have two AA Degrees, which we confirmed in here; one in

2    1999 and one in 2000 in Business as well as paralegal.

3    It says you have a BA pending?

4         INMATE LEWIS:  Yes, Sir.

5         DEPUTY COMMISSIONER PEREZ:  How far along are

6    you on that?

7         INMATE LEWIS:  I need, I think, 10 more classes.

8    I just finished microeconomics.  I think Ms. Fox has --

9         DEPUTY COMMISSIONER PEREZ:  Okay.

10        ATTORNEY FOX:  The grades over there.

11        INMATE LEWIS:  And I just reenrolled in Personal

12   Selling and macroeconomics.

13        DEPUTY COMMISSIONER PEREZ:  And you're going in

14   -- What direction, are you getting a degree in

15   Business?

16        INMATE LEWIS:  Yes, Sir, majoring in marketing.

17        DEPUTY COMMISSIONER PEREZ:  All right.

18        ATTORNEY FOX:  There was an anomaly on his

19   grade, and I asked him about it, because he did get an

20   F in one class.  Are they in here?

21        DEPUTY COMMISSIONER PEREZ:  That's All right.  I

22   got a couple of those, too, Mr. Lewis.

23        PRESIDING COMMISSIONER ENG:  There.

24        ATTORNEY FOX:  Oh, there you go.

25        DEPUTY COMMISSIONER PEREZ:  Yeah.

54

1    **ATTORNEY FOX:**  Those two pages.

2        **INMATE LEWIS:**  One of the quizzes -- It's

3    required that you submit 15 quizzes, and what I would

4    do is I would do two quizzes at a time with handwritten

5    notes.  And as I'm typing out the answers, I typed out

6    the wrong answers for the wrong quiz --

7        **DEPUTY COMMISSIONER PEREZ:**  Oh, I see.

8        **INMATE LEWIS:**  -- and submitted it, and ended up

9    getting an F in that class.  So, I changed my study

10   habits on that where I just do one quiz at a time --

11       **DEPUTY COMMISSIONER PEREZ:**  Okay.

12       **INMATE LEWIS:**  -- type it and then submit it.

13       **DEPUTY COMMISSIONER PEREZ:**  Tried to cut some

14   corners, eh?

15       **INMATE LEWIS:**  Yes, Sir.

16       **DEPUTY COMMISSIONER PEREZ:**  Okay.  Well,

17   congratulations for your tenacity with that.  I know

18   that's certainly not an easy task.  You've taken -- One

19   of the things I noticed here is you did some book

20   reports, Men are From Mars and Women are From Venus,

21   the Proper Care and Feeding of Marriage, Teaching How

22   to Love You.

23       **INMATE LEWIS:**  Yes, Sir.

24       **DEPUTY COMMISSIONER PEREZ:**  Why don't you

25   summarize these books that you read.

55

1       **INMATE LEWIS:**   In each book -- One of the
2    underlying concepts in all three of them was
3    communication, patience and understanding in a
4    relationship in a marriage.   Those were the underlying
5    concept, but each book approaches it differently.
6    Laura Schlessinger -- Dr. Laura Schlessinger, what she
7    -- the main concept of her book was to always put your
8    partner first, always put your wife first, even when
9    you're not feeling it.   I remember one of the things
10   she said, even when you're not feeling it, you should
11   always give your best to your wife or your husband.
12   You know, she counsels both.   Putting their needs
13   first, being patient and understanding their needs, you
14   know, putting yourself in -- Making yourself the type
15   of person that you would want to love, you would want
16   to come home to run home to, hug, give a kiss to and
17   spend time with.   That was her main concept in her
18   book.   And understand that communication, patience and
19   understanding working out -- taking the time to work it
20   out.   And I understand that all marriages aren't
21   perfect, but in your point of view they can be perfect.
22   It all -- It depends on how you approach it.   No
23   marriage goes without disagreements and bumps along the
24   road.   It's how you work them out.   It's how you work
25   those bumps and those disagreements out between the two

56

1    of you.  That was Laura's -- Dr. Laura Schlessinger.

2    Whereas Dr. Gray in Men Are From Mars, Women Are From

3    Venus, his concept, it's the same as far as

4    understanding, patience, communication, but

5    understanding the differences between men and women and

6    how we communicate differently, how we process

7    information differently, how we deal with problems.

8    Whereas Dr. Gray says, men look to solve problems.  If

9    your wife comes home and she wants to talk to you about

10   a problem, she just may want to talk.  She wants to

11   vent.  The first thing a man wants to do is figure out

12   how to solve it, you know.  And sometimes, you have to

13   -- like I tell my wife, do you want my advice or do you

14   want me to just listen?  You know, I'm not sure how you

15   want me to approach this.  Sometimes she wants advice,

16   sometimes she wants me to figure it out, and sometimes

17   she just wants me to listen.  And understanding the

18   differences in how we process information to deal with

19   different situations, being patient, that's the key

20   concept with Dr. Gray.  Dr. Tyrone Wiese -- or Thomas

21   Wiese, his was the same, but it was the foundation of

22   his is scripture bound or based on the Bible.

23        DEPUTY COMMISSIONER PEREZ:  But, basically, the

24   same kind of concept.

25        INMATE LEWIS:  Same kind of concept.  Patience,

57

1    understanding, always putting your wife first,
2    communication more than anything.  If you don't have
3    communication, you know, you're not going to listen, or
4    you're not going to attempt to speak and understand
5    what your wife is going through then you're going to
6    cause your marriage to fail.  And being mature about it
7    too.  You're not going to always agree on everything,
8    but you can come to a compromise and understand, okay,
9    we can agree to disagree on this particular topic.
10   Lisa and I went through all the books.  She had a sit
11   and I had a sit.  So, we went through all of them.
12   There were some questions in them.  We'd sit down and
13   visit and go through the questions and see what the
14   answers were, how similar they were, how dissimilar
15   they were.  And we used this as a model to prepare for
16   when I am paroled and transition back into society
17   knowing that it's going to be a lot of things that -- a
18   lot of challenges that we're going to face, from the
19   smaller challenges like closet space or adjusting to
20   being around each other all the time to the more
21   complex challenges, such as managing our finances
22   jointly and things of that nature.
23        **DEPUTY COMMISSIONER PEREZ:**  All right.  It's an
24   interesting concept.  I know there is some people that
25   say that you have to keep yourself first and take care

58

```
 1    of yourself first before you take other people.  So,
 2    I'm sure that's kind of a little bit of balance to that
 3    concept.  All right.  Mr. Samuel, there is -- in review
 4    of your diagnostic impressions by -- excuse me -- by
 5    the Board report for your 2006 evaluation report for --
 6    excuse me -- October 2007 calendar says that prior to
 7    your release you'd benefit from remaining disciplinary
 8    free, getting self-help, and indicating that the
 9    assessment has remained the same from the prior
10    assessment.  So, it looks like you've been in
11    compliance with that -- those recommendations.
12    Diagnostic impressions by the psychiatrist, Macomber,
13    indicates that you have Axis I, no mental disorder,
14    Axis II, no personality disorder, and you have a
15    current GAF score on Axis V of 95.  Assessment of
16    dangerousness states that in considering potential for
17    dangerous behavior in the institution, you have had --
18    have not had a serious disciplinary since 1999.  Your
19    last cell fight was in 1994.  That was 12 years ago.
20    You're no longer the irresponsible 19 year old that was
21    -- that you were at the time of the commitment offense.
22    In comparison to other inmates, potential for dangerous
23    behavior is below average.  Also says that you no
24    longer pose a risk to society.  Further recommendations
25    state that there are no mental or emotional problems in
```

59

1   this case that would interfere with parole planning.

2   Mr. Lewis has not only achieved two Associate Arts --

3   Associate of Arts Degrees while in custody.  You've

4   also completed vocational dry cleaning, vocational

5   forklift operation.  You have a degree as a paralegal.

6   In addition, you are certified to prepare income tax.

7   "And with these skills, employment will not be an issue

8   in this case.  He has the support of his wife, who

9   lives in Salinas, California."  You also have job

10  offers in the Monterey County Area, and these factors

11  would indicate a positive prognosis on parole.  And you

12  have family -- strong family support in the community

13  that will help to ensure you have all the resources

14  necessary to do well on parole.  And prognosis,

15  according to Mr. -- Dr. Macomber says that, "His

16  successful adjustment in the community is excellent."

17  Have I missed anything here?  Is there anything else

18  that you want to state for the record that I did not

19  cover in my --

20          **INMATE LEWIS:**  For education, I did complete

21  electronic commerce --

22          **DEPUTY COMMISSIONER PEREZ:**  Okay.

23          **INMATE LEWIS:**  -- and quality management.  And

24  also, this is the classes that are necessary to

25  complete the Bachelor's of Science Degree.

60

1      **ATTORNEY FOX:**  We're passing over some

2    transcripts from Indiana Tech.

3      **DEPUTY COMMISSIONER PEREZ:**  Okay.  And I noticed

4    that too.  I'm sorry.  It does state here that you've

5    completed 81 units at Indiana Institution of Technology

6    in Leadership in Business, as well as a psychology

7    course at Coastline Community College.  Thank you for

8    bringing that to my attention.

9      **INMATE LEWIS:**  These are the classes I finished

10   since the last hearing.

11     **DEPUTY COMMISSIONER PEREZ:**  Okay.

12     **PRESIDING COMMISSIONER ENG:**  So, you've

13   completed 81 credits.  How many do you need to graduate

14   to get a BA Degree?

15     **INMATE LEWIS:**  120.

16     **PRESIDING COMMISSIONER ENG:**  120?

17     **INMATE LEWIS:**  With microeconomics that will be

18   84 now, so --

19     **PRESIDING COMMISSIONER ENG:**  Okay.

20     **DEPUTY COMMISSIONER PEREZ:**  Thank you.

21     **ATTORNEY FOX:**  Okay. ·

22     **DEPUTY COMMISSIONER PEREZ:**  Anything else?

23     **INMATE LEWIS:**  I believe that covers it.  Yes,

24   Sir.

25     **DEPUTY COMMISSIONER PEREZ:**  Very good.  You're

61

```
 1    certainly to be commended for your efforts in this --
 2    in your education, and certainly in self-help and
 3    therapy issues.  Commissioner.
 4         PRESIDING COMMISSIONER ENG:  Sir, let's talk
 5    about your future plans, specifically regarding parole.
 6    Okay?  And we have the most current Board report just
 7    says that it remains the same as the previous hearing,
 8    which let's see if I have something here.  Okay.  I'm
 9    not sure if that is the most current.  Oh, okay.
10         ATTORNEY FOX:  Here's the packet.
11         PRESIDING COMMISSIONER ENG:  Here we go.  The
12    '05 -- October '05 it says that since your last Board
13    hearing you were married.  Okay.  Lisa Kushman, and
14    they provide an address in Salinas, that you wish to
15    parole to Monterey County to reside with your wife, who
16    is a manager of Rite Aid drug store in Salinas.  But
17    your current summary states -- I thought she was with
18    Longs.
19         INMATE LEWIS:  She did move to Longs.
20         PRESIDING COMMISSIONER ENG:  Okay.  Yeah.  You
21    state, which basically the Board report is usually as a
22    result of an interview, your counselor interviews you.
23    But you took the time, I'm putting that on the record,
24    to write up and sign your 2007 parole plans. And you do
25    state that you would live with your wife, Lisa, on
```

62

1    Cadiz, C-A-D-I-Z, Circle in Salinas.  And she is

2    employed in the pharmacy department at Longs Drug Store

3    in Carmel.

4         INMATE LEWIS:  Yes, Ma'am.

5         PRESIDING COMMISSIONER ENG:  Is she a

6    pharmacist?

7         INMATE LEWIS:  No, she is a pharmacist tech.

8    She does the labels.

9         PRESIDING COMMISSIONER ENG:  Okay.

10        INMATE LEWIS:  She was trying to explain it to

11   me.  I was like, that's kind of not my field, but I

12   listened.

13        PRESIDING COMMISSIONER ENG:  But it's steady

14   work, and it's dependable, correct?

15        INMATE LEWIS:  Yes, Ma'am.

16        PRESIDING COMMISSIONER ENG:  And she's -- I'm

17   assuming she does very well in that?

18        INMATE LEWIS:  Yes, Ma'am.

19        PRESIDING COMMISSIONER ENG:  How long has she

20   been doing that?

21        INMATE LEWIS:  She moved to the pharmacy because

22   she was managing part of the department store.  But she

23   moved to the pharmacy tech position.  She says it's

24   better pay, better off days.

25        PRESIDING COMMISSIONER ENG:  Oh, okay.

63

1    **INMATE LEWIS:** So, she's been doing that for

2    maybe eight, nine months now.

3    **PRESIDING COMMISSIONER ENG:** Okay. Good. And

4    it states here that both you and your wife have

5    continued to submit your resume to a lot of different

6    companies in Salinas, Monterey Area. And you have been

7    able to secure part time employment with Labor Ready?

8    **INMATE LEWIS:** Yes, Ma'am.

9    **PRESIDING COMMISSIONER ENG:** Okay. And that is

10   part time, but can lead to full time employment. Labor

11   Ready, are they a temporary agency?

12   **INMATE LEWIS:** Yes, Ma'am.

13   **PRESIDING COMMISSIONER ENG:** Okay. Well,

14   temporary agencies, they still place you for full time

15   work, but on a temporary basis. In other words, you're

16   not a regular employee.

17   **INMATE LEWIS:** Well, what Ms. Mora had explained

18   to my wife was usually what they'll do, if you work

19   out, in other words, if you're a good worker, a hard

20   worker, you end up working for a particular company for

21   a time you no longer go through Labor Ready.

22   **PRESIDING COMMISSIONER ENG:** Right.

23   **INMATE LEWIS:** Labor Ready finds you placement

24   first.

25   **PRESIDING COMMISSIONER ENG:** Yeah. But the way

64

```
1    you state it here is that it's part time employment.

2    So, does that mean that they're promising to place you

3    for like up to 20 hours a week or 30 hours a week?

4           INMATE LEWIS:  To begin with.  To begin with.

5           PRESIDING COMMISSIONER ENG:  So, it wouldn't be

6    a 40 hour week?

7           INMATE LEWIS:  No, Ma'am.

8           PRESIDING COMMISSIONER ENG:  Okay.  That's --

9           INMATE LEWIS:  Not that I --

10          PRESIDING COMMISSIONER ENG:  -- what I wanted to

11   be sure of the difference there, because -- And I

12   understand about temporary agencies.  And a lot of

13   times when people do work out they often get hired by

14   the company directly.  So --

15          INMATE LEWIS:  Yes, Ma'am.

16          PRESIDING COMMISSIONER ENG:  Okay.  All right.

17   But it also says that you will continue to seek

18   opportunities as a paralegal, forklift operator,

19   drycleaner and with other companies that can utilize

20   your skills.  Now, we didn't go over it, because I

21   think this was covered in prior hearings.  How many

22   vocations do you have?

23          INMATE LEWIS:  Two.

24          PRESIDING COMMISSIONER ENG:  And what are those?

25          INMATE LEWIS:  Vocational dry-cleaning and
```

65

1    forklift operating.

2         **PRESIDING COMMISSIONER ENG:**  So, that's why we

3    have those down there.

4         **INMATE LEWIS:**  Yes, Ma'am.

5         **PRESIDING COMMISSIONER ENG:**  Okay.  That's what

6    I wanted to be sure.  But when did you get those?

7         **INMATE LEWIS:**  Dry-cleaning was 1997, and

8    forklift operation was 1998.

9         **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

10   But you are getting -- And it says that you want to

11   continue pursuing your degree.  Okay.  And it also says

12   that you'd like to spend most of your free time as a

13   volunteer counseling and/or mentoring at risk youth.

14        **INMATE LEWIS:**  Yes, Ma'am.

15        **PRESIDING COMMISSIONER ENG:**  Have you inquired

16   as to the type of organizations that you would be able

17   to affiliate with in order to do that?

18        **INMATE LEWIS:**  In this area -- I wrote to Second

19   Chance and didn't receive a response, but in this area

20   here would be Second Chance.  But I have an idea that I

21   have been -- I'm a facilitator for the Alternatives to

22   Violence program here.  There is eight of us all total

23   right now.  And that's where we basically teach the

24   class, or facilitate the teaching of the class.  We

25   have volunteers that come from the outside and also

66

```
1    facilitate the class.  And I've been making inquiries
2    of trying to move this program into the juvenile system
3    as well as high schools and junior highs, where
4    specifically dealing with at risk youth.  Because to
5    experience it, it's a three day workshop to really
6    experience it and see what you get out of it,
7    especially guys in here.  Because some guys, man, I
8    don't want to spend three days.  Try it.  Believe me.
9    And most guys, after they take this particular group,
10   man when is the next one.  And it's only three -- You
11   have a basic and advanced and then training for
12   trainers.  But what it does, it builds up a certain
13   community within the -- guys that you've walked the
14   line with and you've never spoken to that may be of
15   another race, now you know this guy's first name and
16   you speak to them, and it's like I know this guy.
17   Because the exercises within this particular program
18   teach you to understand that there are a lot of
19   differences, but underneath we're all pretty much the
20   same.  Our experiences are close to the same.  Who do
21   you love?  Who do you love most in this world when you
22   were growing up?  Nine out of 10 times the person would
23   say their mother or their parents, you know.  And these
24   are some of the things that you learned in the group.
25   What it teaches also is that, okay, you'll see less --
```

1    guys are less apt to get into arguments or quicker to
2    solve arguments in a non-violent way.  And when I look
3    at the school system, we had the bullying, the gangs.
4    A lot of this stuff, I believe, can be changed if we
5    move some of this, especially AVP, into the school
6    system.  And one of the things that I have written some
7    letters, but I haven't gotten responses.  So, I don't
8    consider progress being made yet --
9            **PRESIDING COMMISSIONER ENG:**  Okay.
10           **INMATE LEWIS:**  -- until I'm able to make
11   progress.  But I do have groundwork that I'm working
12   on.
13           **PRESIDING COMMISSIONER ENG:**  Is that one of your
14   favorite programs?
15           **INMATE LEWIS:**  It is.  It's -- I haven't found a
16   group or that's like this.  It's something that's worth
17   spending your time.  When you spend this 21 hour
18   workshop, 22 hour workshop, so you're talking eight
19   o'clock in the morning until four in the afternoon for
20   three days, in the same room with 20 other guys and a
21   couple other facilitators.  Or if it's a two day
22   workshop, sometimes we squeeze a two day workshop, and
23   it's from eight in the morning until eight at night.
24   And all day long you're doing a combination of
25   different exercises.  It's one of my favorite groups

68

1    because I believe it does make a difference.  I've

2    learned a lot from it.  I've gotten a lot from it.

3         PRESIDING COMMISSIONER ENG:  Do you think you're

4    helping to get through to other inmates?

5         INMATE LEWIS:  I know I am.

6         PRESIDING COMMISSIONER ENG:  Good.  Okay.

7         INMATE LEWIS:  When I see I've walked the line

8    with for four years, and we walk by each other and

9    didn't know each other, now, hey, Sam, how are you

10   doing?  Hey, how are you doing, Alan?  It's a sincere

11   greeting.  You shake hands, you know.  Some guys might,

12   you know, I need to talk to you.  There is a problem

13   that's coming up.  How do you think I should handle

14   this, you know?  Different races.  It's not just one

15   race.  It's -- The more people we can get into it, I

16   believe, the bigger impact it will make.

17        PRESIDING COMMISSIONER ENG:  I know there is a

18   long wait list to get into it, because a lot of lifers

19   want to get in.  But very briefly tell the Panel the

20   feeling that you get from participating in this

21   particular program.  That it appears, at least to me,

22   that this is something that you have a bit of a passion

23   for.  So, you don't -- So, let me do the comparison.

24   Okay.  How do you feel knowing that you got through to

25   somebody versus how you felt when you were the 18 year

69

1   old trying to get accepted by the gang.  What's the

2   difference?

3        **INMATE LEWIS:**  I should have been doing this.

4   This is what I should have been always --

5        **PRESIDING COMMISSIONER ENG:**  Now would have,

6   should have, but what's the difference in the way you

7   feel about yourself?  You see what I'm trying to get a

8   comparison to?  You were trying so hard.  You wanted to

9   be accepted into this gang.  Alright?  Now you're doing

10  something very different and the feeling it gives you.

11  What are really the differences?

12       **INMATE LEWIS:**  This I feel good about to where I

13  want to do it as much as possible because I see a

14  difference I'm making.  Wanting to be involved in a

15  gang is you don't have the want and the desire is more

16  like, well, this is -- at least it will stop some of

17  the problems I'm having.  It's almost like you making a

18  compromise.  I do this, I'm really not into it, but if

19  I don't then I'm going to continue to go through this.

20  Whereas, with AVP and teaching people and helping

21  people realize some of their potential, I'm making a

22  difference.  I'm doing something that down the line

23  when a guy comes up to me and says, man, I'm glad you

24  got me in there, man.  I really appreciate it.  It

25  makes you want to say -- it makes you want to say,

70

1   well, make sure you come to the next one.  It makes you
2   want to keep doing it and not stop.  We've picked up,
3   by our request, a facilitator's request, we've been
4   able to do more classes.  And that's part of the
5   reason, because it's something that you want to do.
6   Whereas, when you compare it to wanting to get in a
7   gang or being involved in those things, that's not
8   something that -- You don't have to -- It's not
9   something that you really want.
10         PRESIDING COMMISSIONER ENG:  I just want you to
11  keep thinking about that, what did it give back to you.
12  Okay?  Trying to get into the gang, what did that give
13  back to you versus what participating and facilitating
14  the AVP gives back to you?  I don't expect any answers
15  right now, but it's something that you may want to keep
16  thinking about and jotting things down.  Okay?
17         INMATE LEWIS:  Yes, Ma'am.
18         PRESIDING COMMISSIONER ENG:  In terms of the
19  mindset.  And you'll figure out why.  Okay?
20         INMATE LEWIS:  Okay.
21         PRESIDING COMMISSIONER ENG:  Okay.  So, let's
22  move on here.  You even state that your wife is willing
23  to relocate and transfer employment depending on what
24  county that you would be paroled to.
25         INMATE LEWIS:  Yes, Ma'am.

71

1    **PRESIDING COMMISSIONER ENG:** Okay. And that

2   your mother, Shirley, would also provide housing. So,

3   let's take a look at some of the letters that we have.

4   We do have quite a few from your family members. This

5   one is dated August 7, 2007 from Ronnell Wade,

6   R-O-N-N-E-L-L, Wade, W-A-D-E. Lives on 3rd Avenue in

7   Los Angeles. This says -- It says you are the -- Is

8   Ronnell a male or female?

9        **INMATE LEWIS:** Male.

10        **PRESIDING COMMISSIONER ENG:** Male? Okay.

11        **INMATE LEWIS:** That's my nephew.

12        **PRESIDING COMMISSIONER ENG:** Oh, just double

13   checking.

14        **INMATE LEWIS:** Yes, Ma'am.

15        **PRESIDING COMMISSIONER ENG:** So, Ronnell is your

16   nephew. Okay. And he wrote quite a long general

17   support letter. Very, very nice. It says that:

18        "Allowing my uncle to be released would

19        be wise in that he would be able to

20        further the much needed parenting of my

21        teenage cousin, Destiny. He'd be a

22        blessing because he will have the

23        opportunity to help prevent her from

24        making bad decisions and provide her with

25        proper guidance. This will help break

72

```
1         the vicious cycle of having a fatherless
2         household.  So, please allow my uncle to
3         be released."
4         Is Destiny your daughter?
5         INMATE LEWIS:  Yes, Ma'am.
6         PRESIDING COMMISSIONER ENG:  That's what I
7    thought, because I thought I read something else.
8    Okay.  The next letter is from Tracy Franklin, also
9    living in Los Angeles.  And this is -- Is this -- This
10   is one of your brothers?
11        INMATE LEWIS:  No, that's my oldest sister.
12        PRESIDING COMMISSIONER ENG:  Oh, I'm sorry.
13   See, that's -- I shouldn't have assumed.  I should not
14   -- I apologize.  This is your older sister?
15        INMATE LEWIS:  Yes, Ma'am.
16        PRESIDING COMMISSIONER ENG:  Okay.  I'm sorry.
17   Your older sister.  Okay.  I circled my brother.  Okay.
18   And unfortunately I'm missing the second page.  And I'm
19   guessing that this is a general support letter?
20        INMATE LEWIS:  Yes, Ma'am.
21        PRESIDING COMMISSIONER ENG:  Okay.
22        INMATE LEWIS:  If you'd like, I have a copy.
23        PRESIDING COMMISSIONER ENG:  But unless there is
24   something very specific, is she offering residence or
25   financial support?
```

73

```
 1            INMATE LEWIS:  She does state financial support.

 2            PRESIDING COMMISSIONER ENG:  Okay.  Because

 3     we're missing the second page from that.

 4            ATTORNEY FOX:  From Tracy Franklin?

 5            INMATE LEWIS:  Yes.

 6            PRESIDING COMMISSIONER ENG:  Okay.

 7            ATTORNEY FOX:  I'll find it.

 8            PRESIDING COMMISSIONER ENG:  Okay.  While --

 9     Okay, let's move on for the interest of time.  The next

10     letter I have is from Joanne Brown in Gardena.  And

11     this is -- Oh, this is Joanne, your ex-wife.

12            INMATE LEWIS:  Yes, Ma'am.

13            PRESIDING COMMISSIONER ENG:  And she's the

14     mother of Destiny?

15            INMATE LEWIS:  Yes, Ma'am.

16            PRESIDING COMMISSIONER ENG:  Okay.  She states

17     that, "Samuel and I have a 19 year old daughter named

18     Destiny."  Yeah.  And she does say that even though

19     you've been incarcerated her entire life, Destiny's

20     entire life, that you continue to be a consistent,

21     positive influence on her life, and you've always

22     encouraged her to focus on her education and make

23     positive choices.  Okay.  She does state that you

24     continue to keep in touch.  Okay.  So, this is a nice

25     general support letter.  Okay.  The second page, from
```

74

```
 1   Tracy:
 2         "Samuel can look forward to receiving
 3          assistance from me and all of his family
 4          members while pursuing his dream.  I am
 5          personally available to provide him with
 6          room, board, financial assistance and
 7          transportation.  She will also assist you
 8          in any way that she can to obtain your
 9          desired goal employed as a paralegal or
10          starting his own business as a freelance
11          paralegal."
12         What does your sister do?
13         INMATE LEWIS:  She's -- As I understand it,
14   she's over at Parks and Recreation.  She's one of --
15         PRESIDING COMMISSIONER ENG:  In the County of
16   Los Angeles?
17         INMATE LEWIS:  Yes, Ma'am.
18         PRESIDING COMMISSIONER ENG:  Okay.  All right.
19   So, is she married with children?
20         INMATE LEWIS:  No, Ma'am.  Ronnell is her son.
21   That's the only son she has.
22         PRESIDING COMMISSIONER ENG:  Oh, okay.  Does
23   Ronnell live at home with her or does Ronnell live
24   somewhere else?
25         INMATE LEWIS:  Now he -- He does now, because he
```

75

1    was enrolled at Howard University, had some health

2    issues, so he came back and he's enrolled out here now

3    in Domingus, I believe.

4         **PRESIDING COMMISSIONER ENG:**  Okay.  So, Tracy

5    and her son live together in this apartment?

6         **INMATE LEWIS:**  Yes, Ma'am.  Well, no.  She just

7    got her a condominium, but the condominium came after

8    she wrote the support letter.  She just closed that.

9         **PRESIDING COMMISSIONER ENG:**  So, she doesn't

10   live on Slauson Avenue in Los Angeles?

11        **INMATE LEWIS:**  No, Ma'am.  I don't think it's on

12   Slauson no more.

13        **PRESIDING COMMISSIONER ENG:**  Because this says

14   apartment number eight.

15        **INMATE LEWIS:**  Yeah, she's not in an apartment

16   no more.

17        **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  But

18   this would not be a viable residential, would it?

19        **INMATE LEWIS:**  It would be, but I wouldn't -- I

20   would live with my mother if I was to parole back to

21   Los Angeles.

22        **PRESIDING COMMISSIONER ENG:**  Does your mother

23   live in the same place that you were growing up in --

24        **INMATE LEWIS:**  Yes, Ma'am.

25        **PRESIDING COMMISSIONER ENG:**  -- that you were

76

1   living when you had the problems?

2           INMATE LEWIS:  Yes, Ma'am.

3           PRESIDING COMMISSIONER ENG:  Okay.  And I know

4   the prior Panel discussed that with you.

5           INMATE LEWIS:  Yes, Ma'am.

6           PRESIDING COMMISSIONER ENG:  And that's why you

7   started looking at possibly paroling to another area.

8           INMATE LEWIS:  Yes, Ma'am.

9           PRESIDING COMMISSIONER ENG:  Okay.  All right.

10  So, your ex-wife, she lives down in Gardena.  Then

11  we've got another letter dated July 12, 2007 from

12  Nakista --

13          INMATE LEWIS:  Yes, Ma'am.

14          PRESIDING COMMISSIONER ENG:  -- Lewis, who lives

15  on 4th Avenue in Los Angeles.  And this is --

16          INMATE LEWIS:  Sister.  Younger sister.

17          PRESIDING COMMISSIONER ENG:  Younger sister.  I

18  didn't make that mistake again.  Your younger sister.

19  Okay.  And this was also a nice general support letter.

20  Okay.  Next letter is from Shirley Lewis on -- Is that

21  the same address?

22          INMATE LEWIS:  On is 4th Avenue.

23          PRESIDING COMMISSIONER ENG:  Forty -- No.  So,

24  one is at 4803 4th Avenue, Nakista.  And this is your

25  mother?

77

```
 1              INMATE LEWIS:  Yes, Ma'am.
 2              PRESIDING COMMISSIONER ENG:  Shirley Lewis lives
 3      at 4831 3ʳᵈ Avenue in Los Angeles?
 4              INMATE LEWIS:  Yes, Ma'am.
 5              PRESIDING COMMISSIONER ENG:  Okay.  And she
 6      states that:
 7                  "His family is prepared to ensure that
 8                  he is equipped with the tools he will
 9                  need to succeed.  He will receive
10                  personal support from me, including
11                  funding, transportation and moral
12                  support.  He has family and friends
13                  actively seeking persons or companies
14                  that are willing to hire him."
15              Okay.  And she does state, saying, "Sam whishes
16      to continue his education.  I have agreed to personally
17      finance his continued efforts for a degree in higher
18      education."  Is that how you're doing it now is your
19      mother is paying for your education?
20              INMATE LEWIS:  Yes, Ma'am.
21              PRESIDING COMMISSIONER ENG:  That's good.  "In
22      addition, Sam will reside with his new wife.  It's a
23      benefit he will not be returning to the neighborhood in
24      which he grew up and made the wrong choices."  So, your
25      mother agrees that it's not wise for you to go back to
```

78

1   the same old area.

2       INMATE LEWIS:  Yes, Ma'am.

3       PRESIDING COMMISSIONER ENG:  Okay.  But she says

4   if you cannot reside with your new wife, your mother

5   does state she's always willing and available to

6   provide you with residential and financial assistance.

7   Okay.  Okay.  The next letter is from Donald Lewis in

8   Rialto, California.  This is dated June 5, 2007.  This

9   is your uncle?

10      INMATE LEWIS:  Yes, Ma'am.

11      PRESIDING COMMISSIONER ENG:  Okay.  So, you had

12  a pretty good relationship with this uncle; is that

13  correct?

14      INMATE LEWIS:  Yes, Ma'am.

15      PRESIDING COMMISSIONER ENG:  Okay.  He says

16  he'll personally help you to be a productive, law

17  abiding citizen.  He's retired from Olson Supply

18  Company in Los Angeles.  He has his own business, and

19  he will provide you with employment.  He says, "I will

20  also provide housing for my nephew and his wife, Lisa,

21  if the parole plans he has given to you are

22  acceptable."  Where is Rialto?

23      INMATE LEWIS:  It's about 60 miles out of Los

24  Angeles near, I think it's Inland Empire.

25      PRESIDING COMMISSIONER ENG:  It's the Inland

1  Empire?

2          INMATE LEWIS:  That's right.

3          PRESIDING COMMISSIONER ENG:  Okay.  Is it a part

4  of LA County or is it San Bernardino County?

5          INMATE LEWIS:  San Bernardino County.

6          PRESIDING COMMISSIONER ENG:  Okay.  So, your

7  uncle is retired, correct?

8          INMATE LEWIS:  Yes, Ma'am.

9          PRESIDING COMMISSIONER ENG:  He owns his own

10  company, or he owns -- he has his own business.  What

11  business is that?

12          INMATE LEWIS:  I think was it Olson Supply?  He

13  distributes --

14          PRESIDING COMMISSIONER ENG:  He says he is

15  retired from Olson Supply.  He says, I have my own

16  business and I will provide you with employment.  Or is

17  that the same thing?

18          INMATE LEWIS:  I think it's the same thing,

19  because I believe he retired from Sears and Roebuck.

20          PRESIDING COMMISSIONER ENG:  Well, this thing

21  says he retired from Olson Supply Company.  Okay.  So,

22  that's not quite clear.

23          INMATE LEWIS:  Okay.

24          PRESIDING COMMISSIONER ENG:  Okay.  So, I'm just

25  giving -- I can only give you my personal, you know,

80

```
1   opinion about this letter is that it's not very firm.
2         INMATE LEWIS:  Yes, Ma'am.
3         PRESIDING COMMISSIONER ENG:  Because we don't
4   know what his business is or where it's located and
5   what he's offering to you.  Okay?  What employment is
6   he offering to you?  What's the job, and what would you
7   do, specifically, you know.  It helps to find out from
8   people what the job entails, specifically.  The more
9   information you have, the better position you're going
10  to be in to make an informed decision.  Does that make
11  sense to you?
12        INMATE LEWIS:  Yes, Ma'am.
13        PRESIDING COMMISSIONER ENG:  Okay.  So, even
14  when you're looking, and we know it's difficult finding
15  -- getting a job offer.  It's difficult for anybody on
16  the outside that has a lot of experience and has all
17  the degrees and has never been a convicted felon to get
18  solid job offers.  But it's up to you to gather as much
19  information as you can so you can make an informed
20  decision and at least find out, given your skill set.
21  Present your skill set and ask them what type of
22  positions could best utilize this skill set.  And then
23  what type of pay scale is associated with that type of
24  position.  You're not putting them on the spot, but at
25  least you're gathering information for yourself.  Okay?
```

81

1    Because I'm a little confused.  I don't know what you

2    want to do.

3            **INMATE LEWIS:**  I'd like to be --

4            **ATTORNEY FOX:**  We do have some other letters

5    from law firms here in the Salinas Area.  Some say they

6    don't have room.  Others say call us when you get out.

7    If you'd like to see those, he's made quite an effort.

8            **PRESIDING COMMISSIONER ENG:**  I'd like to take a

9    look at a couple of them, okay, just so we could get it

10   on the record.

11           **DEPUTY COMMISSIONER PEREZ:**  Probably more of the

12   positive ones, a little more firm ones.

13           **PRESIDING COMMISSIONER ENG:**  Right.

14           **INMATE LEWIS:**  What I did was, I sent out 100

15   resumes and cover letters to different law firms, and

16   also different agencies that offer ex-offenders job

17   placement.

18           **PRESIDING COMMISSIONER ENG:**  Right.

19           **INMATE LEWIS:**  I got the answer -- I think -- I

20   received two answers from One Stop Employment Agencies.

21           **PRESIDING COMMISSIONER ENG:**  Excuse me one

22   second.  Okay.  Ms. Delagarza has just arrived.  Why

23   don't you come on in, because I put on the record that

24   hopefully you might make it.  All right.  We're going

25   through the parole plans.  We're just going through

1  some letters right now.

2      **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Thank you.

3      **PRESIDING COMMISSIONER ENG:** Okay. And let me

4  tell you, as soon as you settle down then we'll have

5  you introduce yourself for the record. Sending out 100

6  letters is nothing, and getting one or two percent is

7  about right, just so you know.

8      **INMATE LEWIS:** Yes, Ma'am.

9      **PRESIDING COMMISSIONER ENG:** It's not you. It's

10  not your situation. It's -- You know, people today

11  have to send out hundreds and hundreds and hundreds,

12  and they might get one bite.

13      **ATTORNEY FOX:** Well, and there were also some

14  who did take the time to respond and say you have

15  impressive credentials --

16      **PRESIDING COMMISSIONER ENG:** Good.

17      **ATTORNEY FOX:** -- but we don't have --

18      **PRESIDING COMMISSIONER ENG:** Okay.

19      **ATTORNEY FOX:** -- the need for a paralegal. So,

20  this is the stack.

21      **PRESIDING COMMISSIONER ENG:** Okay. Yeah. The

22  Panel does note that there -- How many would you say

23  there?

24      **DEPUTY COMMISSIONER PEREZ:** About 20.

25      **PRESIDING COMMISSIONER ENG:** About 20? Okay.

83

1    **INMATE LEWIS:**  Well, it's 100.  I counted them.

2    **PRESIDING COMMISSIONER ENG:**  Well, you have 100

3    responses?

4    **INMATE LEWIS:**  No, not responses.  No.

5    **PRESIDING COMMISSIONER ENG:**  Oh, those are just

6    the letters?

7    **ATTORNEY FOX:**  These are --

8    **INMATE LEWIS:**  The letters and --

9    **PRESIDING COMMISSIONER ENG:**  Okay.

10   **INMATE LEWIS:**  -- there may be 10 responses.

11   **PRESIDING COMMISSIONER ENG:**  Okay.

12   **ATTORNEY FOX:**  Yeah.  So, 10 percent response.

13   **PRESIDING COMMISSIONER ENG:**  That's pretty good.

14   If you're getting a 10 percent response rate, that's

15   excellent.  Even though it's a rejection, it's still

16   excellent, because a lot of companies don't even

17   bother.

18   **ATTORNEY FOX:**  Yeah.

19   **PRESIDING COMMISSIONER ENG:**  You just don't ever

20   hear anything.  Okay.  So, we do have a letter that's

21   dated May 28, 2007 from Labor Ready, Inc. in Salinas

22   from Lupe Mora, customer service rep.  I got to tell

23   you, I read this and I just scratched my head.  She

24   states they're a temporary agency.  They provide

25   temporary work for people that need the opportunity to

84

1   look for a temp to hire position.  "We had many of our

2   works that have been on parole and still have the

3   opportunity.  To be hired through the best of our

4   customers --"  It's not -- I'm going to be honest with

5   you.  I read this and I said, who the heck wrote this?

6   And if this is an agency that is marketing people and

7   they can't even write a basic business letter, and this

8   is very, very basic, I'm being honest with you, I'm

9   scratching my head.  So, she states, "To be hired

10  through the best of our customers," I don't know what

11  that means, "we offered non-skilled and skilled jobs

12  every day.  We also recommend are, A-R-E, best workers

13  to our customers."  And this is signed by Lupe.  This

14  doesn't state anything about that they have your resume

15  and they have you in their database, and that these are

16  the types of positions that you qualify for, and that

17  when you're out that's giving what the openings are.

18  This just sort of tells you what they do very, very

19  briefly.  Do you understand the difference there?

20          **INMATE LEWIS:**  Yes, Ma'am.

21          **PRESIDING COMMISSIONER ENG:**  Okay.  Sloan Curtis

22  Termite Group, Inc.  The letter is dated September 12,

23  2007, signed by Jose Martinez.  This -- They are

24  licensed by the State of California, Structural Pest

25  Control Board in Sacramento for over five years.  So,

85

1    where are they --

2           INMATE LEWIS:  Southgate.

3           PRESIDING COMMISSIONER ENG:  They're located in

4    Southgate.  Where is Southgate?  What county?

5           INMATE LEWIS:  It's Los Angeles County.

6           PRESIDING COMMISSIONER ENG:  Oh, that is LA

7    County.  Okay.  Okay.  So, their reputation for quality

8    service in Los Angeles and neighboring counties has

9    awarded us several City and Countywide contracts.  So,

10   they're termite eradication.  All right.  Here we go.

11          "Based on his grasp and progress in

12          carpentry, an evaluation will be made to

13          assess his knowledge of those basic

14          skills and will be given an opportunity

15          for advancement within the company ranks.

16          Starting wages for this entry level

17          position commence at $15 per hour, 40

18          hours per week.  After a 90 day

19          probationary period, Samuel will be

20          eligible for company benefits that

21          consist of medical, dental and paid

22          vacations."

23          So, it does state that an increase in their

24   business in their second quarter of this year, they do

25   have an entry level position for Samuel Lewis upon his

86

1   release as a carpenter apprentice. Okay. So, at

2   least, see, this has more meaning because it's very

3   specific, and they basically state what they would sort

4   of expect from you. And I didn't realize that you had

5   the qualifications for this, or don't --

6        **INMATE LEWIS:** I don't have the qualifications,

7   but he knows my family and he knows that I'm a quick

8   learner. So, he said, I'll give you a chance. That's

9   not a problem.

10        **PRESIDING COMMISSIONER ENG:** I think that's --

11   So, he's a family friend?

12        **INMATE LEWIS:** Yes, Ma'am.

13        **PRESIDING COMMISSIONER ENG:** I think that's

14   excellent, because at least he made it clear what he's

15   willing to pay you. Okay. But this assumes if you

16   went back to LA County.

17        **INMATE LEWIS:** Yes, Ma'am.

18        **PRESIDING COMMISSIONER ENG:** Okay. Okay. We

19   also do have copies of some of the letters that

20   Mr. Lewis has sent out to potential employers. Okay.

21   This is, okay, from Monterey County, One Stop. It's

22   Department of Social and Employment Services, Office of

23   Employment Training. And what do they do? Just help

24   you own in terms of finding potential employers?

25        **INMATE LEWIS:** Employment and training.

1   **PRESIDING COMMISSIONER ENG:**  Okay.  So, this is
2   in response to -- Here is one from a law firm in
3   Watsonville, and they state that they are in recent of
4   your letter.  "Your credentials are quite impressive,
5   and all the more so when one considers that you have
6   obtained them, for the most part, while in prison.  We
7   commend you on your achievements."  They do have a need
8   for paralegal assistance and will consider you as an
9   applicant.  Primary concern is availability.  So, I
10  think that's really nice, though, that they would even
11  state that, that they would consider you.  Again, here
12  is another one.  Oh, this is from Katera Rutledge, who
13  is one of the State appointed attorneys.  And she's
14  asking if you're going to be paroled to Monterey
15  County.  She says:

16           "We have both represented you and would
17           like to help if we can.  We currently
18           have two lawyers and three law clerks.
19           That may change.  If you're looking for
20           work now we cannot help you, but if
21           you're planning to parole here, write
22           back when your hearing is coming up
23           within six months and we'll see if we can
24           help you find a job."

25           So, that's very nice.  Okay.  You want to take a

88

1    look at those.

2        **DEPUTY COMMISSIONER PEREZ:** Yes.

3        **PRESIDING COMMISSIONER ENG:** Okay. And we do

4    note that he has a stack. So, you have been very

5    actively seeking employment in the areas that you do

6    have degrees in --

7        **INMATE LEWIS:** Yes, Ma'am.

8        **PRESIDING COMMISSIONER ENG:** -- which is good.

9    So --

10       **ATTORNEY FOX:** And if I may, there is one last

11   letter from a local lawyer as well. And although it

12   doesn't offer a job, it does -- the last sentence, I

13   think, accurately describes his skills.

14       **PRESIDING COMMISSIONER ENG:** This is from

15   Randall Barkin, attorney at law in Pacific Grove. And,

16   again, he says, "Thank you for your letter expressing

17   interest in a paralegal position. This practice is

18   only part time." And his business does not require nor

19   would it support someone performing those kinds of

20   services. "Your letter and resume are impressive and

21   very professionally presented, and I wish you the best

22   in your job search." That's good feedback for you.

23       **INMATE LEWIS:** Thank you.

24       **PRESIDING COMMISSIONER ENG:** Okay. Is there

25   anything else, sir?

89

1        **INMATE LEWIS:**  No, Ma'am.

2        **PRESIDING COMMISSIONER ENG:**  Okay.

3        **INMATE LEWIS:**  I think we covered it all.

4        **PRESIDING COMMISSIONER ENG:**  Okay.  So, your

5    primary objective is, I just want to be sure I

6    understand this, is to -- should you parole you want to

7    parole to Monterey County, correct?

8        **INMATE LEWIS:**  Yes, Ma'am.

9        **PRESIDING COMMISSIONER ENG:**  All right.  All

10   right.  So, your employment search is concentrated

11   within the Monterey County Area, is that correct?

12       **INMATE LEWIS:**  Yes, Ma'am.

13       **PRESIDING COMMISSIONER ENG:**  Okay.  I have to

14   ask you this.  Where is a letter from your wife?

15       **INMATE LEWIS:**  There is a letter from my wife in

16   there, from my wife, my mother-in-law --

17       **ATTORNEY FOX:**  Yes.

18       **INMATE LEWIS:**  -- and --

19       **PRESIDING COMMISSIONER ENG:**  We don't have them.

20   I didn't read them into the record.  They're not in the

21   updated materials.  Wait a minute.  Did I miss these?

22   No.  This is Tracy Franklin.  I already -- Oh, that's

23   the other -- That goes back to him.  We don't have

24   those.

25       **ATTORNEY FOX:**  Well --

90

1  **PRESIDING COMMISSIONER ENG:**  I'll tell you that

2  right now.

3  **ATTORNEY FOX:**  -- they should have been.  Well,

4  there are two.  You can get started with them.  We

5  think there is a third.

6  **PRESIDING COMMISSIONER ENG:**  Okay.  Here is a

7  letter dated June 26, 2007 from Lisa Lewis, who lives

8  in Salinas.  This is Mr. Lewis' wife.  Okay.  States

9  they were married on March 19, 2005.  Okay.  She's

10  known you for close to six years through daily letters,

11  weekly visits and phone calls.  Okay.

12      "When Samuel is granted parole, we will be

13       residing in Salinas, California in my

14       house at 1621 Cadiz Circle.  I will

15       provide Samuel with love, emotional

16       support, positive encouragement, housing,

17       financial support, transportation and

18       anything else that is required by the

19       Board of Parole."

20      Okay.  So, she owns the house?

21      **INMATE LEWIS:**  I believe so.

22      **PRESIDING COMMISSIONER ENG:**  Or is she renting?

23      **INMATE LEWIS:**  I've never asked her.  I've never

24  asked because I've always -- It's near the freeway, and

25  we've always talked about moving.  And when we talk

91

1    about it then she says when we get rid of that one then

2    we'll move from the freeway.

3        **PRESIDING COMMISSIONER ENG:**  How long has she

4    lived in this house?  Six years?

5        **INMATE LEWIS:**  No, she was living in the house

6    before I met her, so it's longer than six years.

7        **PRESIDING COMMISSIONER ENG:**  Okay.  But you have

8    no idea if she owns it or rents it?

9        **INMATE LEWIS:**  I've never asked.

10       **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

11   All right.  Does she have any children?

12       **INMATE LEWIS:**  Yes, Ma'am.

13       **PRESIDING COMMISSIONER ENG:**  Living at home?

14       **INMATE LEWIS:**  Yes, Ma'am.

15       **PRESIDING COMMISSIONER ENG:**  How many?

16       **INMATE LEWIS:**  One.

17       **PRESIDING COMMISSIONER ENG:**  Okay.  How old is

18   that child?

19       **INMATE LEWIS:**  Twenty-three.

20       **PRESIDING COMMISSIONER ENG:**  Does that child

21   work?

22       **INMATE LEWIS:**  Yes, Ma'am.

23       **PRESIDING COMMISSIONER ENG:**  Okay.  So, that's

24   that letter.  Let me take a look at that one.  We have

25   another letter from Jessica Salinas on Cadiz Circle.

92

1    That's not the same address, is it?

2         **INMATE LEWIS:**  That's the same Circle.  That's

3    her daughter.

4         **PRESIDING COMMISSIONER ENG:**  Oh, this is her

5    daughter?

6         **INMATE LEWIS:**  Yes, Ma'am.

7         **PRESIDING COMMISSIONER ENG:**  Okay.  I was

8    wondering.  How many people are living in this house?

9         **INMATE LEWIS:**  Three.  Or four, because of with

10   the daughter, the daughter's daughter, Allea, the

11   granddaughter.

12        **PRESIDING COMMISSIONER ENG:**  You have -- There

13   is four people right now living in the house, and if

14   you were to be released there would be five.  And how

15   big is this house?

16        **INMATE LEWIS:**  Three bedroom, two baths.

17        **PRESIDING COMMISSIONER ENG:**  Okay.  And you know

18   for a fact that all of these people that are living in

19   this house, none of them have any felony records?

20        **INMATE LEWIS:**  I know that for a fact.  We have

21   discussed that.

22        **PRESIDING COMMISSIONER ENG:**  Okay.  That's

23   pretty critical.  Yeah.  Okay.  So, this is a support

24   letter from the daughter, correct?

25        **INMATE LEWIS:**  Yes, Ma'am.

93

1    **PRESIDING COMMISSIONER ENG:** And then Catalina
2    Cushman is who?
3    **INMATE LEWIS:** Mother-in-law.
4    **PRESIDING COMMISSIONER ENG:** So, the mother-in-
5    law lives there too?
6    **INMATE LEWIS:** Yes, Ma'am.
7    **PRESIDING COMMISSIONER ENG:** Okay. Does your
8    wife -- Well, see, you don't even know who owns the
9    house, do you? Does your mother-in-law own the house?
10   **INMATE LEWIS:** I don't think so because she is
11   -- she asked us -- On a visit one day she asked would
12   we prefer for her to stay or to go to a retirement
13   home. And I told her I would prefer for you to stay.
14   I wouldn't, you know -- If it was my mother, I wouldn't
15   want my mother to go to a retirement home.
16   **PRESIDING COMMISSIONER ENG:** Okay.
17   **INMATE LEWIS:** I'm not going to ask you to do
18   it. I want you to stay.
19   **PRESIDING COMMISSIONER ENG:** Well, that's nice.
20   Okay. So, there is another support letter from your
21   mother-in-law.
22   **INMATE LEWIS:** Yes, Ma'am.
23   **PRESIDING COMMISSIONER ENG:** I think we had this
24   one from Donald. Yeah, we already had this one. Okay.
25   Okay. Anything else?

94

1      **INMATE LEWIS:**  My updated trust.

2      **PRESIDING COMMISSIONER ENG:**  You had quite a bit

3  of money in there, didn't you?

4      **INMATE LEWIS:**  Yes, Ma'am.  Twenty Thousand --

5      **PRESIDING COMMISSIONER ENG:**  Was it Twenty

6  Thousand?  Twenty Thousand Dollars?  Okay.

7      **INMATE LEWIS:**  -- Seven Hundred and some change

8  now since the last CD came -- matured.

9      **PRESIDING COMMISSIONER ENG:**  Okay.

10  Commissioner, take a look.  Twenty Thousand Dollars

11  goes by very, very quickly in today's world, just so

12  you know.

13      **INMATE LEWIS:**  Yes, Ma'am.

14      **PRESIDING COMMISSIONER ENG:**  Okay.  The other

15  thing to -- Well, I won't go over that.  Okay.  All

16  right.  Sir, we also send out Penal Code Section 3042

17  Notices.  Those notices go to agencies and individuals

18  that have a direct interest in your case.  And I do

19  believe we have a letter, we do, from the Los Angeles

20  Police Department dated September 12, 2007, from

21  William Bratton, B-R-A-T-T-O-N, Chief of Police.

22      **ATTORNEY FOX:**  Commissioner, if I --

23      **PRESIDING COMMISSIONER ENG:**  Yes.

24      **ATTORNEY FOX:**  -- may at this time interpose an

25  objection to that letter.  We did not receive it within

95

1   the 10 day rule.  It was just given to me today.

2       **PRESIDING COMMISSIONER ENG:**  With the updated

3   information, but it is dated September 12th, and it was

4   received into the institution.  So, I understand, but I

5   also believe this -- And we'll double check.  I think

6   there have been previous prior letters from the Los

7   Angeles Police Department that are probably in the

8   Central File.

9       **ATTORNEY FOX:**  I would also note that it's an

10  unsigned letter.

11      **PRESIDING COMMISSIONER ENG:**  Exactly.  Could you

12  please check, Sir, in the Central File to see if there

13  was a letter from 2006.  So --

14      **DEPUTY COMMISSIONER PEREZ:**  Regarding -- This is

15  from --

16      **PRESIDING COMMISSIONER ENG:**  The LAPD?

17      **DEPUTY COMMISSIONER PEREZ:**  The LAPD.

18      **PRESIDING COMMISSIONER ENG:**  Yeah.

19      **DEPUTY COMMISSIONER PEREZ:**  Let me see if it's

20  -- Okay.

21      **PRESIDING COMMISSIONER ENG:**  In any event, your

22  objection is noted, because we didn't -- this

23  institution, as well as many of the institutions do not

24  send out all of the documents on a timely manner, even

25  though they're received in a timely manner.  So, as you

1  know, the Panel can consider all documents that we have

2  at our disposal. So -- And I do know the LAPD is

3  pretty consistent in sending letters. And, basically,

4  they're just stating that -- And, again, this is also

5  from N. Young, captain, and it does not have a

6  signature, as noted. But they do basically state that

7  Mr. Lewis -- And they state a known Blood gang member

8  armed himself with a shotgun and shot the victim

9  because the victim was associated with a rival gang.

10  And they basically go on in just a couple sentences

11  summarize the life crime. They go on to state that,

12  "We recommend this parole be denied. It's the

13  Department's position to adamantly oppose a release of

14  this inmate back into the community. Lewis should

15  remain segregated from society." We also have present

16  with us now a representative from the District

17  Attorney's Office of Los Angeles County, who I'm sure

18  will be making a statement before we take a recess.

19  And at this point I will ask Ms. Delagarza to go ahead

20  and introduce herself into the record.

21      **DEPUTY DISTRICT ATTORNEY DELAGARZA:** Thank you.

22  Alexis Delagarza, D-E-L-A-G-A-R-Z-A, deputy district

23  attorney, Los Angeles County.

24      **PRESIDING COMMISSIONER ENG:** Okay. Thank you.

25  All right. While he's looking through that, I'm just

97

1   going to see if there is any follow up questions that

2   the Panel might have for Mr. Lewis.  I don't have any

3   right now.  I'm going to ask Commissioner Perez, as

4   he's scanning the letters he has, anything else he

5   would like to add?

6        **DEPUTY COMMISSIONER PEREZ:**  No, I think we've

7   covered everything.

8        **PRESIDING COMMISSIONER ENG:**  Okay.

9        **DEPUTY COMMISSIONER PEREZ:**  And in the meantime

10  I am looking to see if there is a last letter from

11  LAPD, just --

12        **PRESIDING COMMISSIONER ENG:**  All right.

13        **DEPUTY COMMISSIONER PEREZ:**  -- that we received.

14        **PRESIDING COMMISSIONER ENG:**  Ms. Delagarza, it's

15  a little difficult, because you've missed most of the

16  hearing.  So, we hate to be repetitive, but is there

17  anything specific that you --

18        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  If I make

19  it brief, may I ask -- And I apologize if they're going

20  to be repetitive, but I do have just a couple questions

21  of the inmate.

22        **PRESIDING COMMISSIONER ENG:**  Why don't you go

23  ahead and pose them to the Panel, and then --

24        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Of course.

25        **PRESIDING COMMISSIONER ENG:**  -- we'll go from

98

1   there.

2         **DEPUTY DISTRICT ATTORNEY DELAGARZA:** The first

3   one is, how many people were on the porch when the

4   inmate -- that the inmate shot at.

5         **PRESIDING COMMISSIONER ENG:** Okay. And we had

6   discussed that earlier, and you want to just briefly go

7   over -- How many people do you recall?

8         **INMATE LEWIS:** I think it was five.

9         **PRESIDING COMMISSIONER ENG:** That's right.

10   That's exactly what he had stated to the Panel earlier.

11         **DEPUTY DISTRICT ATTORNEY DELAGARZA:** And how

12   many times did he shoot. And, again, I realize --

13         **PRESIDING COMMISSIONER ENG:** That's All right.

14         **DEPUTY DISTRICT ATTORNEY DELAGARZA:** -- that

15   this probably already asked.

16         **PRESIDING COMMISSIONER ENG:** Because, actually,

17   I didn't ask that detail, but how many times do you

18   recall that you discharged that shotgun?

19         **INMATE LEWIS:** I recall no more than three

20   times.

21         **PRESIDING COMMISSIONER ENG:** No more than three

22   times?

23         **INMATE LEWIS:** Yes, Ma'am.

24         **PRESIDING COMMISSIONER ENG:** Okay.

25         **DEPUTY DISTRICT ATTORNEY DELAGARZA:** And did he

99

1    know any of the people that were on the porch?

2        **PRESIDING COMMISSIONER ENG:**  Okay.  And, again,

3    just very briefly, did you know any of the people, the

4    approximately five people that were on the porch, did

5    you know any of them?

6        **INMATE LEWIS:**  I didn't actually know them, but

7    I had seen Marcus around in the neighborhood.

8        **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

9        **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  And as to

10   the other four, is the inmate saying that he did not

11   know them?

12       **PRESIDING COMMISSIONER ENG:**  Okay.

13       **INMATE LEWIS:**  I did not know them.  No, Ma'am.

14       **PRESIDING COMMISSIONER ENG:**  Okay.  Yes,

15   Mr. Lewis stated that he didn't know them at all.

16       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Okay.  And

17   with respect to his status, reviewing the records, my

18   information is that the inmate has been married four

19   times, is that correct, since he's been in prison?

20       **PRESIDING COMMISSIONER ENG:**  That's what he did

21   state to us, yes.

22       **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  And was --

23   Again, as to the first marriage, it was in 1988.  Was

24   the inmate already in custody when he got married the

25   first time?

100

```
1              PRESIDING COMMISSIONER ENG:  Sir, were you --
2              INMATE LEWIS:  Yes, Ma'am.
3              PRESIDING COMMISSIONER ENG:  Okay.
4              INMATE LEWIS:  I was.
5              PRESIDING COMMISSIONER ENG:  So, you were
6      already in custody with the first -- So, every one of
7      your marriages was -- you were in custody?
8              INMATE LEWIS:  Yes, Ma'am.
9              PRESIDING COMMISSIONER ENG:  Okay.
10             DEPUTY DISTRICT ATTORNEY DELAGARZA:  Thank you.
11             INMATE LEWIS:  We were together prior to.
12     That's Destiny's mother.
13             PRESIDING COMMISSIONER ENG:  Right.  Okay.  So,
14     Destiny's mother, which is Joanne --
15             INMATE LEWIS:  Yes, Ma'am.
16             PRESIDING COMMISSIONER ENG:  -- you had been
17     together with her prior to all of this happening?
18             INMATE LEWIS:  Yes, Ma'am.
19             PRESIDING COMMISSIONER ENG:  Okay.
20             DEPUTY DISTRICT ATTORNEY DELAGARZA:  Then he was
21     married to her two years; is that correct?
22             PRESIDING COMMISSIONER ENG:  Two year marriage,
23     right?
24             INMATE LEWIS:  Yes, Ma'am.
25             PRESIDING COMMISSIONER ENG:  Okay.  Yes.
```

101

| | |
|---|---|
| 1 | **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Thank you. |
| 2 | No other questions. |
| 3 | **PRESIDING COMMISSIONER ENG:**  Okay.  Ms. Fox, any |
| 4 | follow up questions? |
| 5 | **ATTORNEY FOX:**  No.  No questions. |
| 6 | **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you. |
| 7 | Then let's move into final statements, then. |
| 8 | Ms. Delagarza. |
| 9 | **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Based on my |
| 10 | review of the file, and what I know of this inmate, I |
| 11 | would start out by saying that he is to be commended |
| 12 | for the positive steps that he has taken since he has |
| 13 | been in prison.  He did have a rocky start, however, |
| 14 | and before I get to -- With respect to the life crime, |
| 15 | it is the position of the District Attorney's Office to |
| 16 | oppose the granting of parole, in part because of the |
| 17 | life crime and the fact that there were multiple |
| 18 | victims involved in this particular case.  Based on the |
| 19 | inmate's statements today, clearly, there were five |
| 20 | people on that porch, at least four of them, by his own |
| 21 | admission, he didn't even know.  Despite that, he took |
| 22 | a shotgun and fired repeatedly into the crowd.  The |
| 23 | inmate says he shot three times.  It's miraculous that |
| 24 | each one of those shots was able to strike one of the |
| 25 | victims.  But we do have three victims who were shot on |

102

1   that porch.  The inmate had several times that he could

2   have basically desisted in his behavior.  First of all,

3   it appears that he and Marcus, the one victim, had an

4   altercation, and Marcus' brother basically broke it up.

5   The inmate at that point left, came back with gang

6   members to get into a fight.  And at this point --

7          **ATTORNEY FOX:**  I would submit that there was a

8   prior opposition.  It's in the decision from the LAPD.

9          **DEPUTY COMMISSIONER PEREZ:**  All right.

10         **ATTORNEY FOX:**  So, I would admit --

11         **DEPUTY COMMISSIONER PEREZ:**  Thank you, very

12  much.

13         **ATTORNEY FOX:**  Sorry about that.

14         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  That's

15  okay.  I'll interrupt you.

16         **ATTORNEY FOX:**  I'm sorry.

17         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  That's

18  okay.

19         **ATTORNEY FOX:**  It would stop you looking.

20         **DEPUTY DISTRICT ATTORNEY DELAGARZA:**  Anyway, so

21  he had many opportunities to stop what he was doing.

22  Instead, he was the one who kept escalating to the

23  point of going back, getting a shotgun, going to that

24  location, going to the area of the porch and repeatedly

25  firing.  In fact, killing one person and injuring two

103

```
 1   other individuals.  After coming to prison, as I
 2   indicated, he did start off -- had a bad start.  He has
 3   two, four, seven CDC 115s, fairly serious ones.  One
 4   for -- Two of them are physical altercations and the
 5   others are disobeying orders, contraband.  So, we have
 6   serious 115s.  It appears that since 1999 he is now
 7   making very strong efforts in terms of basically
 8   becoming a suitable candidate.  Of concern to the
 9   Panel, also, is his, I guess, unstable social history.
10   It says something about a man being in prison he has
11   been married four times; the first time two years, the
12   next time three years, the next time two years, and now
13   we have a recent marriage again.  So, again, with
14   respect to his marital situation, although normally you
15   say, well, it's a very positive thing the person is
16   married.  However, there is some concern for
17   instability because of the numerous and short-lived
18   relationships that he has had, short-lived marriages.
19   However, the basic opposition from the District
20   Attorney's Office is the life crime itself, the fact
21   that there were numerous victims, the inmate is the one
22   who actually escalated this to the point where one life
23   was lost and two other people were seriously injured.
24   And with respect to his time in prison, he's to be
25   commended.  However, the gains, we believe, are still
```

104

1   recent.  Yes, they're, I guess at this point, would be,

2   I can't remember, about eight years since his last 115.

3   However, given the fact that he had many years of

4   committing CDC 115s and the other violence, that being

5   the life crime, it is our position to oppose parole at

6   this point.  Thank you.

7          **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

8   Ms. Fox, final statement.

9          **ATTORNEY FOX:**  Thank you.  I respectfully

10  disagree with my colleague from Los Angeles.  It would

11  be appropriate to find Mr. Lewis suitable for parole,

12  because he is.  Turning to the crime of commitment, we

13  can't change that.  The immutable facts are like a wasp

14  trap, forever in amber.  And they're not going to

15  change, and nothing Mr. Lewis does or says is going to

16  change them.  The Board report is consistently

17  supportive as is.  The psychological evaluation, which

18  places Mr. Lewis' Global Assessment of Functioning at

19  95, and concludes that he has an excellent prognosis

20  for a successful parole.  So, those are two

21  professional people who, over the years -- two sets of

22  professional people over the years who have found

23  Mr. Lewis to be a compliant inmate.  He's demonstrated

24  maturity and empathy and insight as he sat here today

25  discussing the crime of commitment and the difference

105

```
1    between trying to get into a gang and giving back to
2    his community through AVP.  He has changed himself.
3    Before he came into the institution he had stable
4    employment.  His parole plans are realistic.  He enjoys
5    the consistent, sustained support of his family and
6    friends, and he's given, I think it was apparent to the
7    Board, a very thoughtful consideration to where he will
8    be and what he will do once he does come out.  I'd like
9    to read briefly from a chrono dated September 21st of
10   this year, and just the last two sentences, from
11   Correctional Officer G.S. Taylor.  And quote, "During
12   my 13 years I have never written a laudatory chrono.
13   It is my professional opinion that Inmate Lewis will be
14   a productive citizen in society when given the
15   opportunity."  End quote.  And then also turning to one
16   dated July 17th of this year, and I'll just read the
17   last two sentences.  This is from L.J. Rodriguez,
18   Correctional Officer, Y Wing Security.  Quote, "In
19   addition, I have observed his ability to remain clam,
20   C-L-A-M."  I'm sure it means calm, but like the
21   employment typos, it does say clam.  "-- and
22   professional during stressful situations, potential
23   confrontations.  In my opinion, I believe his
24   determination to succeed, and his positive attitude,
25   will carry into his life when he is released."  End of
```

106

1    quote.  So, these are people who have been exposed to
2    Mr. Lewis on a daily basis for a number of years.  And
3    this is, I think, valid to be considered -- and to be
4    considered by the Board.  In contrast with the letter
5    from the LAPD, which is not signed, and fails to
6    consider Mr. Lewis' transition from a scared young man
7    looking to be accepted in a gang into a responsible
8    person who has accepted leadership roles in the
9    institution.  I don't think in my 15 years of doing
10   this work I've seen anyone amass a greater resume as
11   far as paralegal skills, which he has used.  And he has
12   great organizational skills.  So, if one embraces the
13   concept of rehabilitation and a second chance, Samuel
14   Lewis is a poster child for that.  So, in closing, it
15   would be appropriate to find him suitable and to set a
16   date today, because he is suitable.  And I will submit
17   based on that, unless there is anything Samuel wants to
18   add.
19        **INMATE LEWIS:**  I'm kind of -- I wrote a
20   statement, but I'm not sure if I should read it because
21   I --
22        **ATTORNEY FOX:**  Go ahead.
23        **INMATE LEWIS:**  -- mean -- Okay.
24        **PRESIDING COMMISSIONER ENG:**  It's up to you,
25   sir.  You don't have to, but you can.

107

1       **INMATE LEWIS:**  Each year when I come here the

2   Panel asks me why do I think I'm suitable, and I answer

3   just what I think.  And when I read back the

4   transcripts I often find that I haven't covered

5   everything.  So, I decided this year that I would write

6   a statement.

7       **PRESIDING COMMISSIONER ENG:**  Okay.

8       **INMATE LEWIS:**  I believe I'm suitable for parole

9   today because I'm no longer a threat to society.  I

10  take full responsibility for the crime I committed.  I

11  understand just how much pain and suffering I've caused

12  Shavonne, family -- Shavonne's family and my family.  A

13  lot of people when they approach their Board hearings

14  they look at as it's just about parole.  But more than

15  anything it's about the families of the victims and the

16  victim.  And as we talked about earlier, how did -- you

17  asked me how would I feel if it was my daughter, and I

18  can't honestly say that I would be forgiving as -- I

19  would be as forgiving as I want to be forgiven.  I

20  understand that life is precious, beyond words.  I

21  really understand that.  I can't change what I did.  I

22  wish I could.  I prayed that I could, but I know that's

23  a prayer that can never be answered because I can't

24  change that.  But what I can do, and what I have done,

25  is change me and the person that I am.  I understand

108

1   that, as I said earlier, not just while in prison or
2   during parole, but after that, I have to continue to
3   give back, because what I took was a life, and this
4   person had the potential to become, for all we know,
5   the person who would solve social ills that we've
6   searched the answers for for many years.  I don't know
7   what Shavonne would have done, but I have given it a
8   lot of thought what she may have done.  I've worked
9   hard to change myself, to rehabilitate myself.  I take
10  it serious the courses that I enrolled in, and I use
11  them and I apply them every day.  In this environment,
12  to me it's on the job training, because you always run
13  into situations where you have to remain calm, you have
14  to address the situation as best you can.  And often
15  times you'll come across situations that are volatile.
16  And you can put yourself in the position of solving it
17  and stopping it and de-escalating it, or you can
18  escalate it.  And I found my place is to be the
19  peacekeeper more often than not.  And these come from
20  skills that are offered here, but you have to pursue
21  those skills.  As mentioned earlier, yes, I have seven
22  115s, seven 128s.  I haven't received a 128 in 13
23  years.  I haven't received a 115 in over eight years.
24  Most of my 115s were stupid because I wanted to open my
25  mouth up, disagree with somebody and argue and cause

109

1    the situation to be more than what it was most of the
2    time.  Since then, as I've grown and matured, one of
3    the things Ms. Fox read a number of -- a couple of
4    laudatory chronos.  I think I got maybe seven, eight of
5    them.  But that reflects who I am today, not the person
6    that I was.  These are people who see me five, six,
7    seven days a week, eight to 16 hours a day, on good
8    days and bad days.  They've seen my bad days.  They've
9    seen my good days.  And it's difficult to get
10   correctional staff to write chronos.  Some offer
11   because they see what I do every day, all day.  It
12   doesn't change.  When I leave out of this Board room I
13   continue.  I told Commissioner Biggers last year, I
14   said, regardless of what the Board decides to do, I'm
15   going to continue to move in a positive manner.  And he
16   said he hoped I meant that.  I told him I did, and I
17   believe I've demonstrated that I did.  And I will
18   continue to do that.  Prison is not easy on a
19   relationship.  And I know looking at that I've been
20   married four times is something that you could judge a
21   person for, but taking into consideration this is the
22   first year that one of my ex-wives hasn't written.  And
23   it was an understanding between me and her husband, she
24   would appreciate it if she wouldn't.  Out of respect,
25   you know, if I was that bad of a person they'd write

110

1   and send letters of support, they know how to write and

2   send a letter of, you know, this guy, this is a bad

3   guy.  They know the address, you know.  I can't change

4   what I did, but I believe if you really look you'll see

5   that I have changed the person that I am.  And I

6   believe I have a lot to offer to our society, and more

7   importantly, or most importantly, to our kids.  Because

8   I believe I can tell a lot of kids that walking down

9   the street that I walk down, tell them, look, I've been

10  in those shoes before.  Let me tell you where that

11  leads you to.  But let me tell you a better way to do

12  things.  If given the opportunity, that's what I plan

13  to do, and when given the opportunity, that's what I

14  will do.  I leave it at that, and I leave it in your

15  hands.  And I thank you for your time.

16      **PRESIDING COMMISSIONER ENG:**  Thank you for your

17  comments.  We'll now recess for deliberations.  The

18  time is 3:08 p.m.

19      **ATTORNEY FOX:**  Commissioner, just one point.

20  There was the name of a lay person mentioned by

21  Mr. Lewis early on as part of the victim statement, and

22  it might be appropriate to strike that person's name

23  from the record for privacy issues.

24      **INMATE LEWIS:**  The Impact Program, the lady who

25  lost her son to gang violence.

111

1      **ATTORNEY FOX:** Because she didn't, you know,

2  agree to have her name used here.

3      **INMATE LEWIS:** It was --

4      **ATTORNEY FOX:** We're talking about somebody who

5  has --

6      **PRESIDING COMMISSIONER ENG:** That's been

7  recording.

8      **ATTORNEY FOX:** Okay.

9      **PRESIDING COMMISSIONER ENG:** There is nothing we

10 can do about it.

11     **ATTORNEY FOX:** Okay.

12     **DEPUTY COMMISSIONER PEREZ:** But, certainly, your

13 concerns are noted for the record.

14     **PRESIDING COMMISSIONER ENG:** Yes.

15     **ATTORNEY FOX:** Okay. Just so --

16     **PRESIDING COMMISSIONER ENG:** But I think that

17 that's commendable that you would think about that.

18 So, but there is nothing we can do about it because it

19 has already been recorded.

20     **ATTORNEY FOX:** Okay.

21     **PRESIDING COMMISSIONER ENG:** We can't --

22     **ATTORNEY FOX:** Redact it.

23     **PRESIDING COMMISSIONER ENG:** -- do anything.

24 What do you think?

25     **DEPUTY DISTRICT ATTORNEY DELAGARZA:** I don't

112

1  think so.

2       PRESIDING COMMISSIONER ENG:  Okay.

3       ATTORNEY FOX:  Thank you.

4       PRESIDING COMMISSIONER ENG:  Okay.  3:08 p.m.

5       DEPUTY COMMISSIONER PEREZ:  We're going off

6  record.

7       PRESIDING COMMISSIONER ENG:  Okay.

8                    R E C E S S

9                    --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

113

```
1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          PRESIDING COMMISSIONER ENG:  I should have

4    known.

5          ATTORNEY FOX:  If you had been there.

6          PRESIDING COMMISSIONER ENG:  Okay.  Let's go.

7          DEPUTY COMMISSIONER PEREZ:  Okay.  We're back on

8    record.

9          PRESIDING COMMISSIONER ENG:  Okay.  The time is,

10   what is that, 3:19 p.m.  All parties that were present

11   prior to our recess for deliberation have since

12   returned.  In the matter of Samuel Lewis, CDC Number

13   E05524 the Panel has reviewed all the information

14   received from the public and relied on the following

15   circumstances in concluding that the prisoner is not

16   suitable for parole and would pose an unreasonable risk

17   of danger to society or a threat to public safety if

18   released from prison.  One of the many factors that was

19   considered does go back to the commitment offense.  I

20   mean, this was really a cruel, cold-blooded killing

21   that we had multiple victims. involved.  There were

22   approximately five people sitting on that porch that

23   were attacked that were -- and were lucky that -- or

24   were not so lucky, because one person did end up losing

25   SAMUEL LEWIS   E-05524    DECISION PAGE 1    10/1/07
```

114

```
 1  their life, one 17 year old girl.  But two others were
 2  also hit, and thank God the other person or persons
 3  were not injured.  But there was a potential there to
 4  have a lot more than one death.  So, again, you know,
 5  all in the same incident.  It truly was done in a
 6  calculated manner.  This inmate had -- this was the
 7  third time returning to the scene where these victims
 8  were.  There was plenty of time earlier in the day when
 9  this argument first started off to just back away and
10  not bother, but, no, he ended up leaving only to return
11  with some of his gang buddies to have another
12  confrontation later on.  Then that wasn't enough.  They
13  left, and then later on in the evening some of his gang
14  member friends ended up providing to Mr. Lewis a sawed
15  off shotgun, showed him how to load it, got it all
16  ready together and went back for a third time to
17  confront these people.  Except this time when Mr. Lewis
18  approached, per our discussions today, he stated that
19  he didn't say anything, he just pulled up that shotgun,
20  closed his eyes and shot.  According to the probation
21  officer's report, he discharged that shotgun five or
22  six times.  Then he stated that after he discharged it
23  he took off and ran and was arrested about 45 minutes
24  later.  So, it really shows an exceptionally callous
25  SAMUEL LEWIS  E-05524    DECISION PAGE 2    10/1/07
```

115

1    disregard for human suffering and human life and the
2    way that this crime was carried out and the manner that
3    this was done.  And the motive is really inexplicable.
4    It appears that -- It appears to this Panel that
5    Mr. Lewis was really interested in trying to get
6    accepted into the gang, into this Van Ness Gangsters
7    faction of the Bloods.  But, in any event, it's very
8    trivial in relation to the results of this offense.
9    And these conclusions are drawn from the Statement of
10   Facts that I had read into the record earlier from the
11   probation officer's report.  And, again, this all
12   occurred on February 18, 1988, where Mr. Lewis had
13   returned a third time to where this Mr. Villegas and a
14   number of other teenagers were sitting.  He -- Five or
15   six shots -- rounds were shot.  Lavelle Bullard was
16   shot in the arm, Shavonne Perry was shot in the back,
17   and April Purcell was also shot.  Villegas was shot at
18   by Lewis but was not hit, and Villegas was really the
19   targeted person that Mr. Lewis had been having these
20   altercations with since earlier in the day.  But
21   Mr. Lewis was later identified by witnesses as the
22   shooter, and stated that he was accompanied by his
23   friend, Leon Milton.  Regarding a prior record, this
24   prisoner does have an escalating pattern of criminal
25   **SAMUEL LEWIS   E-05524    DECISION PAGE 3   10/1/07**

116

1   conduct.  After all, and all we have really -- We've

2   got a couple arrests as a juvenile.  The first one was

3   in January of 1987 for grand theft auto, but we do know

4   the disposition that that was dismissed, as Mr. Lewis

5   did provide the Panel with official documents showing

6   that that was dismissed.  Then he was later arrested in

7   March of '87 for carrying a concealed weapon.  And

8   this, I believe, he did receive probation for and was

9   -- And then as an adult he was arrested on February 5th

10  of 1988 for carrying a concealed weapon again in a

11  vehicle.  But this one he was released, and no

12  disposition.  However, shortly after that, on the 18th

13  of the same year, we had the instant offense occur.  He

14  has failed previous grants of probation.  Again, he was

15  on juvenile probation for the first arrest as a

16  juvenile for carrying a concealed weapon.  He also

17  stated that he believes he did about two days in

18  juvenile hall.  Regarding his institutional behavior,

19  we find that his misconduct while incarcerated does

20  include seven 128(a) counseling chronos, the last one

21  being in February of 1994 for being out of bounds.  And

22  he has seven more serious 115 disciplinaries, the last

23  one being in August of 1999 for refusing a direct

24  order.  We find that the most recent psychological

25  **SAMUEL LEWIS   E-05524    DECISION PAGE 4    10/1/07**

117

1    evaluation from April of 2006 by Dr. Macomber,

2    M-A-C-O-M-B-E-R, is somewhat supportive.  Regarding

3    parole plans, this inmate did provide the Panel with a

4    letter -- a few letters -- Well, the specific letter

5    was from his current wife, which is his number one

6    choice to parole to here in Monterey County,

7    specifically, in Salinas.  However, he didn't -- And he

8    did provide acceptable employment, you know, documented

9    evidence of employment plans.  However, the job offer

10   was back down in Los Angeles County.  The temp one

11   really wasn't an offer.  Sir, because you're not

12   getting a date, I wanted to recommend something to you.

13   Of particular concern, and the Panel Members did

14   discuss this, you've never lived with any of your wives

15   before.  You had been living at home when the instant

16   offense occurred, and you've been in prison for 18, 19

17   years.  And, yes, you've been married four times, but

18   you've been incarcerated the whole time.  So, it's not

19   your typical marriage.  You may want to consider,

20   because you've never -- you haven't been out there on

21   your own and living in a relationship ever before, you

22   may want to consider being a little selfish regarding

23   parole and thinking of 100 percent your success on the

24   outside, and you may want to consider the possibility

25   **SAMUEL LEWIS   E-05524    DECISION PAGE 5    10/1/07**

118

```
 1    of going into a residential transitional housing
 2    situation where there is a lot of services offered to
 3    you and it helps you to transition back into society so
 4    that you wouldn't be going into such a foreign
 5    situation where there might be a lot of expectations
 6    that you have of yourself and that they might have of
 7    you that you really wouldn't be concentrating on your
 8    success enough.  So, it's just a thought, because we
 9    have a lot of prisoners that can parole to their
10    families, and they've chosen to go into these
11    residential facilities for six months or 12 months
12    because you're going into such a structured environment
13    out into the free world and it's good to do a gradual
14    transition.  So it's just something for you to think
15    about possibly having that as a primary set of parole
16    plans, and then the secondary would be to parole to
17    your wife.  And it is a concern, because you're talking
18    about all of a sudden it wasn't just your wife, but
19    you've got, you know, two or three other folks living
20    there, and you don't even know who owns the house or
21    anything.  So, these are things that you should
22    probably firm up a bit.  Okay?  Hearing Panel does note
23    regarding 3042 responses that the representative from
24    the District Attorney's Office of Los Angeles County
25    SAMUEL LEWIS   E-05524   DECISION PAGE 6   10/1/07
```

119

1    was present and did state their opposition to parole,

2    along with a letter from the Los Angeles Police

3    Department that also stated their opposition to parole.

4    However, this Panel feels that this prisoner should be

5    commended for a variety of things.  Your educational

6    endeavors really need to be commended.  You have done

7    exceptionally well considering that you dropped out of

8    school when you were in the 11th grade.  Since you've

9    come into prison you set a goal for yourself,

10   apparently, and you went after it.  And you're -- you

11   know, you're attaining those.  You've got -- You

12   received a GED.  You've gotten two AAs, and now you're

13   close to getting your Bachelor's degree.  You -- And

14   not just that, but your active participation in our

15   discussion about the Alternatives to Violence program

16   and how you have a bit of a passion for that.  And I

17   hope you continue with that, because I know it's an

18   excellent program, and the fact that you are a

19   facilitator in that really says something about you.

20   You've also -- Even though, you know, we sort of

21   touched upon it, and I did some research in the

22   documents about any substance abuse background, you

23   really didn't.  I mean, you experimented with it, but

24   you weren't an addict in any way, whether that be an

25   **SAMUEL LEWIS   E-05524    DECISION PAGE 7    10/1/07**

120

1  alcoholic or a drug addict. And, yet, you have been

2  consistently involved with the substance abuse

3  programming here, I believe it's AA and NA, since 1991.

4  And even though we didn't ask you any direct questions

5  about it, you spoke very freely about how certain steps

6  have helped you, and you explained to the Panel in what

7  ways. And that's very, very commendable. You have

8  been really an excellent prisoner, a superb prisoner.

9  And I think you had a wake up call coming in for what

10  you did. I hope that you -- when things calm down that

11  you read over the transcript, and I hope you start

12  asking yourself certain questions about things. But

13  you've also obtained -- You've got two vocations. You

14  participated in the VRAG program recently, the Father's

15  Behind Bars. And, again, you've been doing a lot of

16  good things, and you seem to have a desire to want to

17  give back and do something with at risk youth. And I

18  don't think they have anything like the Squire's

19  program here like they do at San Quentin, and I don't

20  know how familiar you are with it.

21          INMATE LEWIS: Actually, I'm involved with We

22  Care.

23          PRESIDING COMMISSIONER ENG: Okay.

24          INMATE LEWIS: That's where they bring kids, and

25  SAMUEL LEWIS   E-05524    DECISION PAGE 8   10/1/07

121

1    it's --

2    **PRESIDING COMMISSIONER ENG:**  So, it's very

3    similar to the Squires that they have at San Quentin.

4    So, I hope, as what Commissioner Biggers told you

5    before, that what you present to the Panel is what you

6    believe and that you're being truthful.  You're the one

7    that has to look at yourself in the mirror everyday.

8    We don't.  Okay?  So, it's -- it doesn't gain you

9    anything trying to fool the Panel.  It really doesn't.

10   It's going to hurt you.  But this Panel believes that

11   you mean what you stated to us, and that I hope that no

12   matter what, sir, whether you're in prison or you're

13   out of prison, I hope that you continue in your quest

14   to continually give back.  And you can do some good

15   things.  And you have been.  And I hope that you

16   continue with that.  So, don't get discouraged.  This

17   is a one year denial.  Okay?  And that, again, we do

18   recommend that you've got to get some more distance

19   with those disciplinaries, even though, you know, still

20   eight years having a <u>serious disciplinary</u> is still a

21   bit soon.  So, no 128s, no 115s.  Continue in your

22   educational quest.  Continue to upgrade yourself in any

23   way you can, and continue with your self-help because

24   you never know how you're going to become even more

25   **SAMUEL LEWIS    E-05524    DECISION PAGE 9    10/1/07**

122

```
 1   enlightened than you already are.  So, we wish you the
 2   best of luck.  You presented very, very well.  And,
 3   again, stay on track because I think you're doing well.
 4   And I think we'll see some -- a lot more positive
 5   things from you in the future.  Okay?  That concludes
 6   the reading of the decision.  I'm going to ask my
 7   fellow Commissioner if he has anything to add.
 8          DEPUTY COMMISSIONER PEREZ:  Yeah.  Just seen as
 9   we're on -- and what you might consider including in
10   Plan B -- or Plan A, Plan B is those self-help groups
11   that are located in the community that -- Because NA
12   and AA is going to be something that's going to be with
13   you for the rest of your life.  So, knowing that, it
14   might not be a bad idea to identify those resources in
15   the community to see that -- and locate it close to
16   your house that you may consider being involved with.
17   Actually, not consider, but that you should get
18   involved with when you get out.  And I wish you the
19   best of luck.
20          PRESIDING COMMISSIONER ENG:  Okay.
21          INMATE LEWIS:  Could I share something with you,
22   something that I noticed last year.  I subscribe to
23   Forbes, and every year they come out with a list of the
24   400 richest people, you know.  And I was looking over
25   SAMUEL LEWIS  E-05524    DECISION PAGE 10  10/1/07
```

123

1    it, and what I did, I found something interesting just

2    dealing with marriage.  Of the 400 richest people in

3    America, nine have been married more than three times.

4    Of the 400 richest people in America, 16 have been

5    married more than twice.  And I was curious if it would

6    be the -- I got the magazine again this year and found

7    that it was -- the trend was the same.  The only

8    difference that I saw is that I'm incarcerated and I'm

9    not rich, but -- But maintaining a relationship in

10   here, believe me, we talked about all those things.  We

11   talked about how I would deal with my mother-in-law

12   because she fusses.  I said, you haven't heard my

13   mother.  My mother when she gets upset she can cuss

14   like a sailor.  But being in here it's difficult to

15   maintain a relationship.  And I understand how it's

16   viewed by many in administration and in society, but

17   we've discussed these things in depth as far as what

18   are the expectations.  She expects me to lean more on

19   her when I come home, and I expect of myself -- One of

20   the things that I learned a long time ago, if I set a

21   high level of expectation for myself and I meet it, I

22   can pretty much meet or exceed anyone else's

23   expectations, because I -- Most people, including

24   myself, if you set a high standard for yourself, it's

25   **SAMUEL LEWIS  E-05524    DECISION PAGE 11  10/1/07**

124

1    higher than what most other people would set for you.

2    And I'm saying this just to say this one is going to

3    work because, one, she knows the situation as far as

4    going to the Board.  Everybody knows what time I'm

5    going today.  Won't be able to get out until count

6    clears.  If it's good news, I'll have Ms. Fox call.  If

7    it's not, then I'll be calling.  It's not something

8    that we approached lightly when we got married, and I

9    told her I had been married three times before and the

10   circumstances that surrounding each marriage.  As I

11   said in the closing, if I was that bad of a person or

12   that bad of a husband, just as they've written support

13   letters they could also write letters that would end up

14   in my file saying this guy is no good, you know.  But

15   those letters are not in my file because that's not the

16   type of person I am.  But I do understand.  And as I

17   said to Commissioner Biggers last year, and as I will

18   say to both Commissioner Eng and Deputy Commissioner

19   Perez, I will continue to move forward in a positive

20   manner.

21        **PRESIDING COMMISSIONER ENG:**  I believe you will.

22   But I just want to clarify something.  From my

23   perspective, I can't speak for my fellow Commissioner,

24   I didn't consider the four marriages as any major

25   **SAMUEL LEWIS   E-05524    DECISION PAGE 12   10/1/07**

125

1    thing.  The biggest concern is that you have never

2    lived with a woman yet.  And you can't imagine -- you

3    don't know because you've never done it.  Living with

4    your mother is different than living with someone that

5    you've married and then part of her family.  And that

6    is very stressful.  It's stressful enough just having a

7    regular roommate and dealing with the idiosyncrasies of

8    just having another person and sharing the space.  But

9    there is obligations.  There is our own personal

10   thoughts and how we were raised about the male and

11   female role in the marriage.  So, these are things that

12   are going to add a lot of stresses to you that all we

13   were stating is you may want to think long and hard

14   that for your success that you may be better off

15   transitioning into something else first instead of

16   jumping in with both feet.  But it is something that,

17   sir, you do not know.  You cannot imagine.  Everything

18   sounds good.  Talking about things is one.  It's

19   something very different than actually living on a

20   daily basis.  I just want you to think about that.  So,

21   good luck.  Stay on track.  That concludes this

22   hearing.  The time is 3:37 p.m.

23          **ATTORNEY FOX:**  Thank you.

24          **DEPUTY COMMISSIONER PEREZ:**  Thank you.

25   **SAMUEL LEWIS   E-05524    DECISION PAGE 13   10/1/07**

126

1     **PRESIDING COMMISSIONER ENG:** Does he have the

2   pink sheet?

3         **ATTORNEY FOX:** Yes.

4         **PRESIDING COMMISSIONER ENG:** Okay. Good.

5                     A D J O U R N M E N T

6                         --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   PAROLE DENIED ONE YEAR    .

22   THIS DECISION WILL BE FINAL ON:_____JAN 2 9 2008_____

23   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24   DATE, THE DECISION IS MODIFIED.

25   SAMUEL LEWIS  E-05524    DECISION PAGE 14  10/1/07

127

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, DEBRA AUBERT, a duly designated transcriber, WPU, INC., do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which covers pages numbered 1 - 126, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of SAMUEL LEWIS, CDC No. E-05524, on OCTOBER 1, 2007 and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 30, 2007 at Sacramento County, California.


_Debra Aubert_

_____
Debra Aubert
Transcriber
WPU, INC.

EXHIBIT 2

INMATE COPY

# MENTAL HEALTH EVALUATION FOR
# THE BOARD OF PRISON HEARINGS
## May, 2006 Lifer Calendar

## CORRECTIONAL TRAINING FACILITY SOLEDAD
## APRIL, 2006

**NAME:** LEWIS, SAMUEL
**CDC#:** E-05524
**DOB:** 3/23/69
**OFFENSE:** PC 187 MURDER, SECOND DEGREE
**DATE OF OFFENSE:** 2/18/88
**SENTENCE:** 15 YEARS TO LIFE
**MEPD:** 3/21/98
**EVALUATION DATE:** 4/8/06

## I.    IDENTIFYING INFORMATION:

Mr. Samuel Lewis is a 37 year old, first term, African-American, married male from Los Angeles County. He has served 18 years on his sentence. He is a Christian.

## SOURCES OF INFORMATION:

This evaluation is based upon a single 2 hour interview plus review of the central and medical files.

The Psychological Evaluation prepared for the BPT on 11/16/01, by Dr. Reed, at CTF-Soledad, is still current and valid. This includes a Psychosocial Assessment that is still current and valid. As a result, this information will not be repeated at this time.

LEWIS, SAMUEL
E-05524
4/8/06
PAGE 2


## CLINICAL ASSESSMENT

**XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS**

Mr. Lewis related during the interview in a serious, open, friendly and cooperative manner. His mental status was within normal limits. There are no mental or emotional problems in this case. Hygiene and grooming were good. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. Affect was appropriate. There was no evidence of anxiety or of depression. Intellectually, he was functioning in the high average range. His eye contact was good. His memory was intact. His judgment was intact. His insight and self-awareness were good.

There is no significant drug or alcohol use in this case. Mr. Lewis used marijuana on occasion on an experimental basis. He was never dependent upon it. Alcohol has never been a problem. Drugs or alcohol were not related to his behavior in the commitment offense. There is no need for him to attend Alcoholics Anonymous or Narcotics Anonymous. However, he has been voluntarily attending these two programs on a regular basis over the years.

Mr. Lewis has achieved significant accomplishments while in prison. He has not only obtained his GED, he also has continued his college education. He has received an AA Degree in Business in 1999, and then after that he obtained another AA Degree in Paralegal Studies, which he earned in the year 2000. He is working on his Bachelor of Arts Degree at this time. He is close to finishing this program. In addition, he has finished 6 Federal Emergency Management Agency Courses, in order to learn how to handle emergencies. These achievements are very commendable, and they are very rare in the prison setting.

He also has attended numerous self-help programs over the years. He has attended Alcoholics Anonymous and Narcotics Anonymous since 1991; Alternatives to Violence in 1991; Breaking Barriers Program, a 16 week course in 1992; Hands of Peace Creative Conflict Resolution Workshop in 1995; Introduction to Meditation, 1995; Morals and Values Class, 1996; Breaking Barriers, 1996; Life Plan for Recovery, 1996; another Life Plan for Recovery, 1996; Hands of Peace Workshop, Training in Non-Conflict Resolution, 1996; Life Plan for Recovery, 1996; Breaking Barriers Program, 1997; Creative Conflict Resolution Course, 1997; Hands of Peace Workshop for Training in Non-Violence, 1997; RAPHA Christian Prison Fellowship Workshop, 1997; Hands of Peace Workshop for Training in Non-Violence, 1998; Certification for Facilitator

LEWIS, SAMUEL
E-05524
4/8/06
PAGE 3

Training, 1998; another Facilitator Training in Hands of Peace Workshop in 1998; Christian Prison Fellowship Seminar, 1998; Parenting Program, 1998; Christian Prison Fellowship Seminar, Preparing for Employment, 1998; Walk-A-Thon for Child Abuse Prevention, 1998; Christian Workers Bible Study, 1998; Christian Living Bible Study, 1998; Christian Living II Bible Study, 1998; Inmate Peer Education Program in Communicable Disease, 1999; Entrepreneur Development Class, 1999; Creative Non-Fiction Writing, 2000; Anger Management, 2002; Impact Workshop Victim's Awareness, 2002; Righting Wrong Relationships Christian Prison Fellowship, 2003; The Birth of Christ Bible Study, 2004; Anger Management Course and Family Effectiveness Training, 2005; Anger Management and Fatherhood, 2005; Anger Management, 2005; Healing the Angry Heart Anger Management Program, 2006.

There is no evidence of mental or emotional problems in this case. In the past, he has been given a diagnosis of Antisocial Personality Disorder, significantly improved. This diagnosis is based upon the fact that as a juvenile and as an adult, he was involved in illegal activities. Although this label may be of interest for historical reasons, there is no evidence at this time in his life of features of Antisocial Personality Disorder. Mr. Lewis does have concern for others, empathy towards others, and concern towards others who are suffering; and his values are solidly pro-social. There is no evidence of any antisocial thinking or values at this point in his life. In the absence of these characteristics, the diagnostic label of Antisocial Personality Disorder is no longer evident and no longer appropriate. Therefore, this will not be listed as a current diagnostic problem.

## CURRENT DIAGNOSTIC IMPRESSION

Axis I:      No mental disorder
Axis II:     No personality disorder
Axis III:    No physical disorder
Axis IV:     Life term incarceration
Axis V:      Current GAF: 95

## XIII.  REVIEW OF LIFE CRIME

Mr. Lewis accepts full responsibility for his commitment offense. At the time of this offense he was accompanied by others who were gang members. He was motivated to act out violently in order to obtain peer approval and gain status. Unfortunately, a 17 year old, innocent female was killed and others were wounded.

LEWIS, SAMUEL
E-05524
4/8/06
PAGE 4

Mr. Lewis fully accepts his need for being punished for this crime. There is no evidence of resentment or of criticism towards the sentence that he is serving. He does have a good attitude, and he is willing to serve as much time as necessary. He noted that prison has been in many ways a blessing for him. His prison experience has shown him how to be constructive and successful in life. He is participating in self-improvement activities by taking advantage of the opportunity to acquire higher education and to participate in Bible studies. As a result, he has learned how to stand alone, do that which is right, and not yield to peer pressure, make positive choices in the middle of a crisis situation, and act in a way that is helpful and constructive towards others, rather than being self-centered and destructive in his responses. He commented that living in prison gives an inmate a daily workshop experience in handling confrontations, hostility in others, and abuse from others in a positive, calm and constructive manner.

Mr. Lewis is very aware of the damage that he has done to his victims, to the victims' families, as well as his own family. He spoke at length about how his own daughter, who is now 18, but last year was only 17, comes to visit him, and how he realized that if he were to lose her, due to someone killing her as he did to the victim in the commitment offense, how terrible and disastrous this would be. He does have deep feelings of concern and empathy towards his victims and their families. He speaks openly about how important it is to do the right thing, not just simply to do whatever thing the peers around him expect.

Mr. Lewis has come a long way during the 18 years of his incarceration. The last panel asked that the psychologist give an opinion as to Mr. Lewis' ability to maintain his current gains. In my opinion, his gains are now solidly a part of his thinking and personality. This is not something that he has recently acquired. In my opinion, he will continue to maintain his gains in the future.

## XIV.    ASSESSMENT OF DANGEROUSNESS

    A.  In considering potential for dangerous behavior in the institution, he has not had a serious disciplinary since 1999. His last cell fight was in 1994. This was 12 years ago. He is no longer the irresponsible 19 year old that he was at the time of the commitment offense. In comparison to other inmates, potential for dangerous behavior is below average.

    B.  In considering potential for dangerous behavior when released to the community, I agree with the previous two psychological evaluations that stated that his potential for violence is no greater than the average citizen

LEWIS, SAMUEL
E-05524
4/8/06
PAGE 5

in the community. This conclusion is supported by the administration of the Level of Service Inventory-Revised, which is an actuarial measure that assesses criminal history, substance abuse history, academic achievements and social factors to determine the risk level on parole. His score on this assessment is 4.2 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 95 of them. This is a very low risk level. He no longer poses a risk to society.

C. There are no significant risk factors in this case.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with parole planning. Mr. Lewis has not only achieved 2 Associate of Arts Degrees while in custody, he has also completed Vocational Dry Cleaning and Vocational Fork Lift Operator. He also has a degree as a paralegal. In addition, he is certified to prepare income taxes. With these skills, employment will not be an issue in this case. He also has the support of his wife who lives in Salinas, California. He also has job offers in the Monterey County area. In addition to these factors that would indicate a positive prognosis on parole, he has strong family support in the community that will ensure that he has all of the resources necessary to do very well on parole. The prognosis for successful adjustment in the community is excellent.

*M. Macomber, PhD*

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

*B. Zika, PC.D.*

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    4/8/06

# EXHIBIT 3

**LIFE PRISONER EVALUATION REPORT**
**SUBSEQUENT PAROLE CONSIDERATION HEARING**
**OCTOBER 2005 CALENDAR**


**LEWIS, SAMUEL**                                                        E-05524


I.    **COMMITMENT FACTORS:**

    A.    **Life Crime:** Murder 2nd (PC 187) Count 1, Los Angeles County Case #A964645. Sentence: 15 to Life. MEPD: 3/21/98. Victim: Shivone Perry, age unknown. Received by CDC on 1/4/89.

        1.    **Summary of Crime:** All relevant documents from the previous hearings including the transcripts have been considered and the information appears valid and the writer has no further information to add.

        2.    **Prisoner's Version:** Remains the same as stated in the previous hearing.

        3.    **Aggravating/Mitigating Circumstances:**

            a.    **Aggravating Factors:** Remains the same as stated in the previous hearing.

            b.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

    B.    **Multiple Crime(s):** None.

        1.    **Summary of Crime:** None.

        2.    **Prisoner's Version:** None.

**INMATE COPY**

II.    **PRECONVICTION FACTORS:**

    A.    **Juvenile Record:** Remains the same.

    B.    **Adult Convictions:** Remains the same.

    C.    **Personal Factors:** Remains the same.

COPY TO INMATE ON
July 16, 2005


LEWIS, SAMUEL              E-05524              CTF-SOLEDAD              OCT/2005

LIFE PRISONER EVALUATI~~ON~~ ~~R~~EPORT
PAROLE CONSIDERATION ~~HE~~ARING
OCTOBER 2005 CALENDAR

**2**

## III.   POSTCONVICTION FACTORS:

A.   **Special Programming/Accommodations:** None.

B.   **Custody History:** Documents from the previous hearings have been considered and that information remains valid. During the period of time since the last hearing (10/28/04), Lewis' behavior has been positive in that he has remained disciplinary free and maintained a stable work program at his assignment as a wing laundry clerk. He is enrolled in an Independent Study Program through Coastline Community College and FEMA courses.

C.   **Therapy and Self-Help Activities:** Lewis attends Alcoholics/Narcotics Anonymous meetings, completed Dr. Thomas Gordon's Family Effectiveness Training/Harmony in the Home self-help program and the leadership course.

D.   **Disciplinary History:** Lewis has received seven CDC 128A's and seven CDC 115's. See disciplinary sheet for details.

E.   **Other:** A Subsequent Hearing was held on 10/28/04. The BPT denied parole for an additional one year.

Recommendations:

1.  Get self help.
2.  Stay disciplinary free.

## IV.   FUTURE PLANS:

A.   **Residence:** Since Lewis' last Board hearing he has married. His wife, Lisa Cushman, resides at 1621 Cadiz Circle in Salinas, California (831) 443-6791. Lewis wishes to parole to Monterey County to reside with his wife who is manager of a Rite Aide Drug Store in Salinas. His wife is willing to relocate to another county if the Board does not approve his release to Monterey County.

B.   **Employment:** Lewis plans to seek employment as a forklift operator or dry-cleaner as he developed these skills while incarcerated. He has sent resumes and has applications on file at the following companies: Enterprise Rent-A-Car, Salvation Army, Monterey/Salinas Transit as well as others (see Lewis' parole plans on file).

C.   **Assessment:** Lewis married Lisa Cushman on 3/19/05. She will provide a home as well as emotional and financial support until Lewis is able to secure employment and become a product member of his community. Lewis has a valid residence and viable work skills. He has met the BPT recommendations and

LEWIS, SAMUEL                 E05524                 CTF-SOLEDAD              **OCT/2005**

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
OCTOBER 2005 CALENDAR

should have a successful parole. This writer has witnessed his growth and maturity over the years. He has been a positive example to his peers, his daughter and his nephew.

V.    **USINS STATUS:** No holds.

VI.    **SUMMARY:**

A.    Prior to release, Lewis could benefit by updating his support letters, developing resources for employment and continuing his positive behavior.

B.    This report is based upon a personal interview, incident contact in the housing unit and a thorough review of the Central File.

C.    Lewis was afforded the opportunity to review the Central File. See CDC 128B dated 6/17/05.

D.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
OCTOBER 2005 CALENDAR

4

_M. Rubio_ _7-1-05_
M. Rubio                         Date
Correctional Counselor I


_[signature]_ _7-1-5_
J.L. Sareli                        Date
Correctional Counselor II


_[signature] Clancy_ _7·1·05_
J.L. Clancy                       Date
Facility Captain


_[signature] C&PR_ _7·5·05_
D. S. Levorse                     Date
Classification and Parole Representative


LEWIS, SAMUEL            E05524            CTF-SOLEDAD            OCT/2005

BOARD OF PRISON TERMS

**LIFE PRISONER: POSTCONVICTION PROGRESS REPORT**                    STATE OF CALIFORNIA

☐    DOCUMENTATION HEARING

☒    PAROLE CONSIDERATION HEARING

☐    PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/04 to Present | | | **PLACEMENT**: CTF. <br> **CUSTODY**:  Medium A. <br> **VOC. TRAINING**:  None. <br> **ACADEMICS**:  Enrolled in Coastline Community College (see CDC 128b 12/15/04), A leadership course (see grade report 11/23/04) and FEMA (see certificates 11/8/04, 11/18/04, 12/2/04, 2/25/05, 5/2/05). <br> **WORK RECORD**:  Assigned as a laundry clerk with exceptional work reports. <br> **GROUP ACTIVITIES**:  Attends AA/NA meeting and completed Family Effectiveness Training (see CDC 128B's 4/18/05, 3/15/05, 1/31/05, 12/22/04, 10/1/04 and 2/24/05). <br> **PSYCH. TREATMENT**:  None. <br> **PRISON BEHAVIOR**:  Remained positive and disciplinary free. <br> **OTHER**:  None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

*M. Rubio CCI*                                    DATE   7-1-05

LEWIS            E05524              CTF-SOLEDAD        OCT/2005

## DISCIPLINARY SHEET

### CDC 128A's:

| | | |
|---|---|---|
| 02/27/94 | RJD | Out of Bounds. |
| 04/23/93 | RJD | Unissued Property. |
| 11/13/92 | RJD | Delaying Count. |
| 07/21/92 | RJD | Obeying Orders. |
| 03/24/91 | SCC | Failure to Report. |
| 05/19/90 | CTF | Unauthorized Property. |
| 01/12/90 | CTF | Failure to Report. |

### CDC 115's:

| | | | |
|---|---|---|---|
| 08/10/99 | CTF | 3005(b) | Refusing a Direct Order: Guilty, assessed 25 hours extra duty. |
| 09/14/95 | RJD | 3015 | Out of Bounds: Guilty, assessed 30 days loss of privileges and 40 hours extra duty. |
| 12/08/94 | RJD | 3006 | Contraband: Guilty, assessed 40 hours extra duty. |
| 03/10/94 | RJD | 3005(c) | Fighting: Guilty, assessed 90 days credit loss, 30 days loss of privileges and 40 hours extra duty. |
| 07/29/93 | RJD | 3005(b) | Disobeying Orders: Guilty, assessed 30 days loss of credit, 90 days loss of privileges. |
| 10/27/91 | RJD | 3006(a) | Possession of Tattoo Gun; Guilty, assessed 40 hours extra duty. |
| 04/07/90 | CTF | 3005(c) | Physical Altercation with Another Inmate: Guilty assessed 90 days loss of credits, 10 days CTQ. |

LEWIS, SAMUEL                E05524                    CTF-SOLEDAD            OCT/2005

# EXHIBIT 4

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**APRIL 2004 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**FEBRUARY 25, 2004**

This is a psychological evaluation update for the Board of Prison Terms on inmate Samuel Lewis, CDC# E-05524. This report is based on a personal clinical interview of the inmate on 02/25/04. Additionally, in preparation for this report, the Central file, unit health records, and the previous BPT assessment completed by Dr. J. Reed in 2001 were reviewed. This clinical interview and the review of all pertinent documents were for the express purpose of preparing this report.

Inmate Lewis is a 34-year-old, divorced, African-American male whose date of birth is 03/23/69. No obvious unusual physical characteristics were observed, and he denied the use of any nicknames or aliases.

Since his last BPT psychological evaluation in 2001, inmate Lewis has continued to program well within the institutional framework, with no 115s on file. Since 1998, he has been employed in the laundry services, and continues his NA and AA programming.

Inmate Lewis has already served 16 years of a 15-year to life term, and during this time, he has continued to pursue both academic and vocational goals. In 1999, he obtained an associate degree in business management, followed by a paralegal degree in 2001. Currently, he is enrolled in a correspondence program with Indiana Institute of Technology, working toward a Bachelor's degree in business administration.

During the clinical interview, inmate Lewis presented as an articulate, mature, and responsible individual with a clear sense of goals and direction. He has no mental health or drug-related issues which would impede his success in the community. In a previous psychological assessment by Dr. J. Reed, inmate Lewis's risk potential in a community setting is documented as being low, with no significant changes in circumstances since the last evaluation. Currently, inmate Lewis has a risk potential no greater than the average citizen, and is a suitable candidate for release consideration.

If released into the community, inmate Lewis plans to reside with his mother, a registered nurse living in Los Angeles, California. He has strong family support, facilitating reintegration into a community setting.

**E. W. Hewchuk, Ph.D.**
**Staff Psychologist**
**Correctional Training Facility, Soledad**

LEWIS, SAMUEL
CDC NUMBER: E-05524
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO


B. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

EWH/gmj

D:  02/25/04
T:  03/03/04

# EXHIBIT 5

**MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
MARCH 2001 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD
NOVEMBER 15, 2001**

This is a mental health evaluation for the Board of Prison
Terms for inmate Samuel Lewis, CDC# E-05524.  This report is
based upon a personal clinical interview of the inmate,
conducted on 11/15/01, as well as a review of his Central
file and unit health record.  This clinical interview and a
review of all pertinent documents were for the express
purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

I.   **IDENTIFYING INFORMATION:**

Inmate Lewis is a 32-year-old, divorced, African-
American male whose date of birth is 03/23/69.  He is
an American citizen.  His stated religious preference
is Protestant.  He has no obvious unusual physical
characteristics and denied the use of any nicknames or
aliases.

II.  **DEVELOPMENTAL HISTORY:**

Inmate Lewis denied any significant developmental
history.  He denied any childhood history of physical
or sexual abuse as either a perpetrator or a victim.

III. **EDUCATIONAL HISTORY:**

Inmate Lewis stated that he attended public school and
completed the eleventh grade.  In 1990, he said he
received his GED while at Richard J. Donovan
Correctional Facility.  In 1999, he reported receiving
his AA degree in business, and in 2000, he reported
receiving his AA degree in paralegal studies.

In 1990, his measured grade point level was 12.9 TABE.
He has no history of special education or behavioral
problems in school.  He is currently taking a tax
correspondence course.

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE TWO


IV.   **FAMILY HISTORY**:

   Inmate Lewis denied any significant substance abuse or
   criminal history in his family.  He described his
   current relationships with his family members as warm
   and supportive, that he receives monthly visits and
   weekly telephone calls.  He stated there is no history
   of abuse with his family members.

V.   **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION**:

   Inmate Lewis stated that he is a heterosexual male.  He
   denied any history of sexual aggression or high-risk
   sexual behavior.

VI.   **MARITAL HISTORY**:

   Inmate Lewis stated that he been married twice.  His
   first marriage began in 1988 and ended in 1990 due to
   incarceration-related problems.  He has one child from
   this relationship who is 13 years of age.

   His second marriage began in 1991 and ended in 1994,
   again due to incarceration-related problems.  He said
   that there is no history of abuse in any of these
   relationships.

   He has maintained some contact with both of his
   previous wives.  He stated that he has maintained a
   warm and supportive relationship with his 13-year-old
   daughter.  They communicate through visits, letters and
   telephone calls.  He said there is no history of abuse
   in this relationship.

VII.  **MILITARY HISTORY**:

   This inmate has no record of military history.

VIII. **EMPLOYMENT/INCOME HISTORY**:

   Inmate Lewis' preincarceration work history includes
   working two years in an Altadena dairy as a stock
   person and cashier.

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE THREE

His incarceration work history includes becoming
certified in 1997 in vocational dry cleaning, and
becoming certified as a forklift operator in 1998.  He
is currently on the waiting list for data processing.

IX.    **SUBSTANCE ABUSE HISTORY:**

Inmate Lewis denies having a significant substance
abuse history.  He did acknowledge having used
marijuana in the past on occasion.

Notably, in 1997, a psychological report by Dr. Calix
suggests continued monitoring for drug and alcohol
abuse upon parole.  A parole evaluation in 1997 by
Rodriguez also indicates a possible history of drug
abuse.  However, in this writer's opinion, the record
does not indicate a significant history of drug abuse.

To his credit, the inmate has attended Alcoholics
Anonymous and Narcotics Anonymous since 1991, and he
currently attends these groups.  In 1996, he attended a
Basic and Advanced Life Plan for Recovery From
Substance Abuse.

X.    **PSYCHIATRIC AND MEDICAL HISTORY:**

Inmate Lewis has a previous psychiatric diagnosis of
Antisocial Personality Disorder.  He does not have a
history of prior hospitalizations.  He has no history
of suicidal behavior.

He has no significant history of serious accidents,
including head injuries.  He does not have a history of
seizure or other neurological conditions.  He has no
significant impairments or illnesses.  He is currently
not taking any significant medications.

XI.    **PLANS IF GRANTED RELEASE:**

If granted parole, this inmate plans to live in Los
Angeles County with his mother, who has agreed to this
arrangement.  Alternatively, he prefers to parole to
New Orleans and live with his uncle, who has agreed to

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE FOUR

this arrangement.  His financial and vocational plans
include working in dry cleaning, as a warehouseman or
in labor jobs.  Also, his uncle promised him a job at
his trucking company located in New Orleans.

## CLINICAL ASSESSMENT

### XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Lewis was alert
and oriented to person, place and time.  He was well
dressed and groomed.  His speech was articulate and
contextually meaningful.  His mood and affect were
within normal limits and his behavior was appropriate
to the setting.  No evidence of a mood or thought
disorder was demonstrated.  His estimated level of
intellectual functioning was within the average range.

### CURRENT DIAGNOSTIC IMPRESSIONS:

**AXIS I:**     No Contributory Clinical Disorder.
**AXIS II:**    Antisocial Personality Disorder,
                significantly improved.

In addition to attending Alcoholics Anonymous and
Narcotics Anonymous groups, inmate Lewis has attended a
number of other self-help groups.  He attended Breaking
Barriers from 1996 to 1997.  In 1996, he attended the
Morals and Values class.  In 1995, he completed
Conflict Resolution class, and he reports also having
worked as a teacher in this subject.  In 1992, he
attended Breaking Barriers, and in 1991, he attended
the Alternatives to Violence class.  The inmate further
states that he has attended numerous other self-help
groups.  He does appear to have profited significantly
from his participation in these self-help groups.

### XIII. REVIEW OF LIFE CRIME:

Inmate Lewis described the circumstances surrounding
his commitment offense, involving Second Degree Murder

LEWIS, SAMUEL
CDC NUMBER:   E-05524
BPT MENTAL HEALTH EVALUATION
PAGE FIVE


with a Firearm.  He admitted full responsibility for
the death of the victim, a 17-year-old girl.

He recalled how he got into an argument with someone
and later returned with four other gang members of the
Van Ness Gangsters.  He reported using his shotgun,
firing at a group of teenagers, and killing the
17-year-old girl and wounding three others.

Inmate Lewis discussed the damage done to the victims,
to the victims' families, and to his own family.  He
has gained increased understanding of the damage done
and he appears genuinely penitent for his crime.

XIV.  ASSESSMENT OF DANGEROUSNESS:

A.   His violence potential within a controlled setting
     is considered to be below average relative to this
     Level II inmate population.  This conclusion is
     based upon several factors.

     On the one hand, he has a juvenile criminal
     history, involving a 1987 arrest for grand theft
     auto, and being convicted of having a concealed
     hand gun.  As a juvenile, he also admits to having
     associated with members of the Van Ness Gangsters,
     with the Crips and with the Bloods for
     approximately three years.

     While in CDC, he has obtained seven CDC-115
     violations and seven CDC-128 disciplinaries.

     On the other hand, however, he has not received a
     significant disciplinary for violent behavior in
     approximately seven years.  He shows significant
     improvement over the last six years, and he appears
     to have profited from his participation in numerous
     self-help groups.  He has
     shown consistent goal attainment ability by
     obtaining his AA degrees in 1999 and 2000.
     Moreover, his achievements indicate, over the last
     six years, good acceptance of responsibility, good
     behavioral controls, and a strong pattern of

LEWIS, SAMUEL
CDC NUMBER:  E-05524
BPT MENTAL HEALTH EVALUATION
PAGE SIX


prosocial behavior.  No further association with gangs was found.

Therefore, in light of these.factors, his violence potential is considered to be below average relative to this Level II inmate population.

B.   There are no significant risk factors which may be precursors to violence for this individual.

XV.  **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS**:

A.   This inmate is competent and responsible for his behavior.  He has the capacity to abide by institutional standards.

B.   This inmate does not have a mental health disorder which would necessitate treatment either during his incarceration period or following upon parole.

C.   This inmate does not appear to have a significant drug or alcohol problem, and there are no recommendations in this area.

*Joe Reed*

JOE REED, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JR/gmj

D:  11/15/01
T:  11/16/01

# EXHIBIT 6

**LIFE PRISONER EVALUATION REPORT**
**SUBSEQUENT PAROLE CONSIDERATION HEARING**
**APRIL 2004 CALENDAR**


LEWIS, SAMUEL                                                          E05524


I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Murder, 2nd Degree, 187 PC, count 1, Case #LA A964645.
      Sentence 15 years to Life. Victim: Shivone Perry, age: unknown. MEPD:
      3/21/98. Received by CDC on 1-4-89.

      1.    **Summary of Crime:** On 2/18/88; Samuel Lewis and Marcus Villegas
            engaged in a dispute over gang territory. Villegas was then challenged by
            Lewis to a fight, but this did not occur due to the disapproval of Villegas'
            brother. After stating that he would be back with his "home boys", Lewis
            left and returned with his friends. Another argument arose at which time it
            was stated that it was their neighborhood and he was going to get them
            both. Later that evening Lewis, carrying a sawed-off shotgun, approached
            the front porch where Villegas and a number of teenagers were sitting.
            Five or six rounds were shot, Levelle Bullard was shot in the arm, Shivone
            Perry was shot in the back, and April Purcell was also shot. Villegas was
            shot at by Lewis but was not hit. Lewis was later identified by witnesses
            as the shooter and stated that he was accompanied by Leon Milton. This
            information was taken from page two and three of the Probation Officer's
            Report dated 11/16/88.

      2.    **Prisoner's Version:** Regarding his version of the crime, Lewis stated,
            "On February 15, 1988, I was driving down Tenth Avenue when Marco
            Villegas and I made eye contact. We began staring at each other. Marcus
            said something I took as a challenge. I said something in return. I then
            stopped the car got out, and challenged Marcus to a fight. His brother
            would not allow Marcus to fight me. His brother was bigger than me, so I
            left and went and got some guys I knew who were gang members. At this
            time I was not a gang member, but I wanted to join. We went back to
            Tenth Avenue, and Marcus' brother wanted to fight me. I did not want to
            fight him, because he was bigger than me.

            As we were leaving Tenth Avenue Leon told me that we would deal with
            this. Later that night they came and got me from my Mother's house and

INMATE COPY

LEWIS, SAMUEL            E05524            CTF-SOLEDAD            APR/2004

SENT TO I/M ON  4·20·04

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
APRIL 2004 CALENDAR

2

told me let's go handle this. I drove to Ninth Avenue. When I got out of
the car, Leon handed me a shotgun and told me I have to handle this. We
then walked from Ninth Avenue to Tenth Avenue. Leon told me which
porch they were sitting on. I walked up to the porch, closed my eyes, and
began shooting. We then ran back to Ninth Avenue and drove away. We
were stopped about an hour later and arrested."

3. **Aggravating/Mitigating Circumstances:**

    a. **Aggravating Factors:**

        1..   The crime involved great violence, great bodily harm, and
acts disclosing a high degree of cruelty, viciousness and
callousness.

        2..   The defendant was armed with a weapon at the time of the
crime (shotgun).

        3.   The crime involved multiple victims.

        4.   The manner in which the crime was committed created a
potential for serious injury to persons other that the victims
of the crime.

    b. **Mitigating Factors:** None noted.

B. **Multiple Crime(s):** None.

    1. **Summary of Crime:** None.

    2. **Prisoner's Version:** None.

## II.   **PRECONVICTION FACTORS:**

A. **Juvenile Record:**
    1.   On 1/24/87, Lewis was arrested by LAPD for Grand Theft Auto
(487.3PC). Disposition: unknown.
    2.   On 3/13/87, Lewis was arrested by LAPD for Carrying a Concealed
Weapon (12025(B) PC). Disposition: unknown. This information was
taken from page #6 of the POR dated 11/15/88.

B. **Adult Convictions:**
    1.   On 2/5/88, Lewis was arrested by LAPD for Carrying a Concealed
Weapon, in a Vehicle (12025(A)PC). Disposition: Released, insufficient
evidence. All information regarding arrest and dispositions were obtained

from the Department of Justice Bureau of Criminal Identification Report
dated 3/18/89, and POR page #11 dated 11/5/88.

**C.** **Personal Factors:** Samuel Lewis was born to the union of Samuel Lewis and
Shirley Lewis on 3/23/69, in Los Angeles, California. He has three sisters and
three brothers. When he was seven years old, his parents were divorced. Lewis
has prior work experience with Altadena Dairy. He attended Reseda and Dorsey
High School and he was active in sports. Lewis received his GED in 1992 and his
second Associate of Arts Degree in 2002. In 1988, Lewis married Joan Moore.
One child was born from this union. The couple was divorced in
1990. On 5/16/96, Lewis married Tracee Steele Lewis and he has two step-
daughters from that relationship. Lewis and Tracee were divorced in 1997. He
used alcohol and marijuana at the age of 18 years. He never served in the
military.

## III.   POSTCONVICTION FACTORS:

**A.** **Special Programming/Accommodations:** None.

**B.** **Custody History:** Documents from the previous hearings have been considered
and that information remains valid. During the period of time since the last
hearing (4-30-02) Lewis' behavior has been positive, in that he has remained
disciplinary free and received exceptional work reports in his assignment as a
wing laundry clerk. Lewis is enrolled in an Independent Study Program and has
completed courses in Federal Individual Income Tax and California State Income
Tax. He is currently enrolled in the Indiana Institute of Technology majoring in
Business.

**C.** **Therapy and Self-Help Activities:** Lewis has completed the thirteen week
Impact Workshop. He has participated as an active member of
Alcoholics/Narcotics Anonymous.

**D.** **Disciplinary History:** Lewis has received sever CDC 128A's and seven CDC
115's. See disciplinary sheet for details.

**E.** **Other:** A Subsequent Parole Consideration Hearing was held on 4-30-02. The
Board recommended:

1.    Become disciplinary free.
2.    Upgrade vocationally.
3.    Participate in self-help and therapy.

Parole was denied for an additional two years.

IV.    **FUTURE PLANS:**

    A.    **Residence:** Lewis plans to reside with his mother, Shirley Lewis, 4831 3rd Avenue, Los Angeles, CA. (213) 292-1305.

    B.    **Employment:** Lewis plans to seek employment in dry cleaning or as a fork lift operator as he has certificates in these fields. He also hopes to continue his education and work as a paralegal.

    C.    **Assessment:** Lewis has attempted to meet the BPT recommendations and the writer believes he would have a successful parole. He has obtained marketable skills and has the support of his family.

V.    **USINS STATUS:** No holds.

VI.    **SUMMARY:**

    A.    Considering the commitment offense, prior record and prison adjustment, the writer believes Lewis would probably pose a low degree of threat to the public at this time, if released from prison.

    B.    Prior to release Lewis could benefit from: continuing to remain disciplinary free, continuing his studies and participate in Alcoholics/Narcotics Anonymous.

    C.    This report is based upon a one hour interview, incidental contact in the housing unit and a thorough review of the Central File lasting four hours.

    D.    Lewis was afforded an opportunity to examine his Central File. See chrono dated 12-12-03.

    E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

BOARD OF PRISON TERMS                                                                                STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                   ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| April 2002 to March 2003 | | | **PLACEMENT**: CTF<br>**CUSTODY**: Med A<br>**VOC. TRAINING**: None.<br>**ACADEMICS**: Enrolled in an Independent Study Program and completed courses in Federal and California State Income Taxes (see certificates dated 7-1-02 and 8-1-02).<br>**WORK RECORD**: Assigned as a Wing Laundry Clerk (see CDC 101 4-3-02). Lewis received a Laudatory Chrono from his supervisor (See CDC 128B 6-6-02).<br>**GROUP ACTIVITIES**: Lewis completed the Impact workshop (see CDC 128B 12-16-02) and participated in Alcoholics and Narcotics Anonymous (see CDC 128B's 4-1-02, 4-11-02, 6-26-02, 10-2-02, 10-24-02, 1-6-03).<br>**PSYCH. TREATMENT**: None.<br>**PRISON BEHAVIOR**: No disciplinaries.<br>**OTHER**: None. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                          DATE

*M. Reulio CCI*                                                            4-15-04

LEWIS, SAMUEL          E05524              CTF-SOLEDAD          APR/2004

BPT 1004 (REV 7/86)                        Page __1__

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
| YEAR | BPT | PBR | REASONS |
| --- | --- | --- | --- |
| APRIL 2003 to Present | | | **PLACEMENT:** CTF<br>**CUSTODY:** Med A<br>**VOC. TRAINING:** None.<br>**ACADEMICS:** Enrolled in an Independent Study Program with Indiana Institute of Technology majoring in Business.<br>**WORK RECORD:** Assigned as a Wing Laundry Clerk.<br>**GROUP ACTIVITIES:** Participate in Alcoholics/Narcotic Anonymous (see CDC 128B's 4-2-03, 4-25-03, 6-13-03, 10-7-03).<br>**PSYCH. TREATMENT:** None.<br>**PRISON BEHAVIOR:** No disciplinaries.<br>**OTHER:** None. |

ORDER:
- ☐  BPT date advanced by          months.        ☐  BPT date affirmed without change.
- ☐  PBR date advanced by          months.        ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐  Previously imposed  conditions affirmed.
- ☐  Add or modify

- ☐  Schedule for Progress Hearing on appropriate institutional calendar

LEWIS, SAMUEL                    E05524                    CTF-SOLEDAD                    APR/2004

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

## DISCIPLINARY SHEET

**CDC 128A's:**

| | | |
|---|---|---|
| 02/27/94 | RJD | Out of Bounds. |
| 04/23/93 | RJD | Unissued Property. |
| 11/13/92 | RJD | Delaying Count. |
| 07/21/92 | RJD | Obeying Orders. |
| 03/24/91 | SCC | Failure to Report. |
| 05/19/90 | CTF | Unauthorized Property. |
| 01/12/90 | CTF | Failure to Report. |

**CDC 115's:**

| | | | |
|---|---|---|---|
| 08/10/99 | CTF | 3005(b) | Refusing a Direct Order:  Guilty, assessed 25 hours extra duty. |
| 09/14/95 | RJD | 3015 | Out of Bounds:  Guilty, assessed 30 days loss of privileges and 40 hours extra duty. |
| 12/08/94 | RJD | 3006 | Contraband:  Guilty, assessed 40 hours extra duty. |
| 03/10/94 | RJD | 3005(c) | Fighting:  Guilty, assessed 90 days credit loss, 30 days loss of privileges and 40 hours extra duty. |
| 07/29/93 | RJD | 3005(b) | Disobeying Orders:  Guilty, assessed 30 days loss of credit, 90 days loss of privileges. |
| 10/27/91 | RJD | 3006(a) | Possession of Tattoo Gun:  Guilty, assessed 40 hours extra duty. |
| 04/07/90 | CTF | 3005(c) | Physical Altercation with Another Inmate:  Guilty, assessed 90 days loss of credits, 10 days CTQ. |

_M. Rubio_     4-15-04

M. Rubio          Date
Correctional Counselor I


_L.R. Baker_     4-15-04

L.R. Baker         Date
Correctional Counselor II (A)


_J. Clancy_     4-16-04

J. Clancy          Date
Facility Captain


_D. S. Levorse_     4-19-04

D. S. Levorse       Date
Classification and Parole Representative


LEWIS, SAMUEL       E05524       CTF-SOLEDAD       APR/2004

# EXHIBIT 7

**LIFE PRISONER EVALUATION REPORT**
**SUBSEQUENT PAROLE CONSIDERATION HEARING**
**MARCH 2001 CALENDAR**


**LEWIS, SAMUEL**                                                    **E-05524**


I.    **COMMITMENT FACTORS:**

    A.    **LIFE CRIME:**  Murder 2nd (PC 187) Count 1, Los Angeles County Case #
        A964645. Sentence: 15 to Life. MEPD: 03/21/98. Victim: Shivone Perry, age
        unknown. Received by CDC on 01/04/89.

        1.    **Summary of Crime:**  All relevant documents from the previous hearings
            including the transcripts have been considered and the information appears
            valid and the writer has no further information to add.

        2.    **Prisoner's Version:**  Remains the same as stated in the previous hearing.


    B.    **AGGRAVATING/MITIGATING CIRCUMSTANCES:**

        1.    **Aggravating Factors:**  Remains the same as stated in the previous
            hearing.

        2.    **Mitigating Factors:**  Remains the same as stated in the previous hearing.


II.   **PRECONVICTION FACTORS:**

    A.    **Juvenile Record:**  Remains the same.

    B.    **Adult Convictions:**  Remains the same.

    C.    **Personal Factors:**  Remains the same.


III.  **POSTCONVICTION FACTORS:**

    A.    **Special Accommodations/Disability:**  None noted.

    B.    **Custody History:**  Documents from the previous hearings have been considered
        and that information remains valid. During the period of time since the last
        hearing, Lewis' behavior has remained the same. Lewis is assigned as the Y-
        Wing Laundry attendant and has received above average to exceptional work

LIFE PRISONER EVALUATION REPORT                                                2
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 2001 CALENDAR

reports. Lewis received certificate from College for Professional Studies in Paralegal Studies, Kaplan College in Legal Research Specialty, Real Estate Law

Specialty, Law Office Management Specialty and Litigation Assistantship Specialty and he received a degree of Associate in Specialized Business.

C.    **Therapy & Self-Help Activities:**  Lewis attends Alcoholics Anonymous and Narcotics Anonymous programs.

D.    **Disciplinary History:**  Lewis has received seven CDC 115's and seven CDC 128A's. See Disciplinary Sheet for details.

IV.    **FUTURE PLANS:**

A.    **Residence:**  Lewis plans to reside with his mother, Shirley Lewis, at 4831 3rd Ave., in Los Angeles, CA. (213) 292-1305.

B.    **Employment:**  Lewis plans to seek employment in dry cleaning or as a fork lift operator as he has certificates in these fields. He also hopes to continue his education and work as a paralegal.

V.    **USINS STATUS:**  No holds noted.

VI.    **SUMMARY:**

A.    Considering the commitment offense, prior record, and prison adjustment, the writer believes Lewis would probably pose a moderate to low degree of threat to the public at this time, if released from prison.

B.    Prior to release, Lewis could benefit from remaining disciplinary free, maintaining a stable work record and participating in a self-help program.

C.    This Board report is based upon a one hour interview, incidental contact in the housing unit and a thorough review of the Central File.

D.    Lewis reviewed his Central File on 08/07/01.

LEWIS, SAMUEL            E-05524            CTF-SOLEDAD            MAR/2001

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MARCH 2001 CALENDAR                                                    3


_M. Rubio_

M. Rubio
Correctional Counselor I



_J. Sisk_

J. Sisk
Correctional Counselor II



_R. Pope_

R. Pope
Facility Captain



_D. Levorse_     C &P R

D. Levorse
Classification and Parole Representative



LEWIS, SAMUEL          E-05524          CTF-SOLEDAD          MAR/2001

# DISCIPLINARY SHEET

## CDC 115's:

| 08/10/99 | CTF | 3005(b) | Refusing a Direct Order: <u>Guilty</u>, assessed 25 hours extra duty. |
| 09/14/95 | RJD | 3015 | Out of Bounds: <u>Guilty</u>, assessed 30 days loss of privileges and 40 hours extra duty. |
| 12/08/94 | RJD | 3006 | Contraband: <u>Guilty,</u> assessed 40 hours extra duty. |
| 03/10/94 | RJD | 3005(c) | Fighting: <u>Guilty,</u> assessed 90 days credit loss, 30 days loss of privileges and 40 hours extra duty. |
| 07/29/93 | RJD | 3005(b) | Disobeying Orders: <u>Guilty,</u> assessed 30 days loss of credit, 90 days loss of privileges. |
| 10/27/91 | RJD | 3006(a) | Possession of Tattoo Gun: <u>Guilty,</u> assessed 40 hours extra duty. |
| 04/07/90 | CTF | 3005(c) | Physical Altercation with Another Inmate: <u>Guilty,</u> assessed 90 days loss of credits, 10 days CTQ. |

## CDC 128-A's:

| 02/27/94 | RJD | Out of Bounds |
| 04/23/93 | RJD | Unissued Property |
| 11/13/92 | RJD | Delaying Count |
| 07/21/92 | RJD | Obeying Orders |
| 03/24/91 | SCC | Failure to Report |
| 05/19/90 | CTF | Unauthorized Property |
| 01/12/90 | CTF | Failure to Report |

LEWIS, SAMUEL                    E-05524                    CTF-SOLEDAD        MAR/2001

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
      TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
      TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
           ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 04/97 to 03/98 | | | **PLACEMENT**: R.J. Donovan Correctional Facility. **CUSTODY**: Medium A. **CLASSIFICATION SCORE**: 18 points. **ACADEMIC**: Lewis was taking correspondence courses in Business Management from the center for Degree Studies. **WORK**: Assigned to Textiles with average to above average work reports (see CDC 101 01/26/98). **VOCATION**: Assigned to Vocational dry cleaning. **GROUP ACTIVITIES**: Completed the "Breaking Barriers" Program (see CDC 128B 05/12/97). Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 06/30/97, 10/06/97, 12/97 and 03/98). Completed "Hands of Peace" workshop (see CDC 128B 03/24/98) **PSYCH TREATMENT**: None during this period. **PRISON BEHAVIOR**: No disciplinary problems. |

CORRECTIONAL COUNSELOR'S SIGNATURE     _m. Rubio cci_     DATE   _10-25-01_

LEWIS, SAMUEL      E-05524        CTF-SOLEDAD       MAR/2001

BPT 1004 (REV 7/86)               Page __1__

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 04/98 to 03/99 | | | **PLACEMENT**:  Transferred from R.J. Donovan to the Correctional Training Facility on 07/08/98. **CUSTODY**:  Medium A. **CLASSIFICATION SCORE**:  10 points. **ACADEMIC**:  Lewis was taking correspondence courses in Business Management from the Center for Degree Studies (see CDC 128B dated 08/17/98). **WORK**:  Assigned to Textiles and received average to above average work reports (see CDC 101's 04/26/98 and 07/07/98). **VOCATION**:  Received a training certificate of completion for fork lift operator (see certificate dated 04/13/98). **GROUP ACTIVITIES**:  Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 06/98, 11/12/98 and 07/07/98).  Attended Parenting Program (see certificate 04/14/98). **PSYCH TREATMENT**:  None during this period. **PRISON BEHAVIOR**:  No disciplinary problems. |

ORDER:
- ☐ BPT date advanced by _____ months.    ☐ BPT date affirmed without change.
- ☐ PBR date advanced by _____ months.    ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed  conditions affirmed.
- ☐ Add or modify

- ☐ Schedule for Progress Hearing on appropriate institutional calendar

LEWIS, SAMUEL            E-05524              CTF-SOLEDAD            MAR/2001

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 09/99 to 03/00 | | | **PLACEMENT**:  Correctional Training Facility.<br>**CUSTODY**:  Medium A.<br>**CLASSIFICATION SCORE**:   2 points.<br>**ACADEMIC**:  Received a degree in Specialized Business (see certificate dated 07/12/99).<br>**WORK**:   Assigned the wing laundry clerk and received above average to exceptional work reports (see CDC 101's 06/23/99, 10/11/99 and 01/18/00).<br>**VOCATION**:   None during this period.<br>**GROUP ACTIVITIES**:   Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 05/06/99, 05/29/99, 09/08/99, 10/08/99, 01/13/00, 01/20/00, 02/10/00 and 02/23/00).<br>**PSYCH TREATMENT**:   None during this period.<br>**PRISON BEHAVIOR**:   Received a CDC 115 for refusing a direct order. |

ORDER:
- ☐  BPT date advanced by          months.
- ☐  PBR date advanced by          months.
- ☐  BPT date affirmed without change.
- ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐  Previously imposed  conditions affirmed.
- ☐  Add or modify

- ☐  Schedule for Progress Hearing on appropriate institutional calendar

LEWIS, SAMUEL                    E-05524                    CTF-SOLEDAD                    MAR/2001

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 04/00 to 03/01 | | | **PLACEMENT:** Correctional Training Facility. <br> **CUSTODY:** Medium A. <br> **CLASSIFICATION SCORE:** Zero points. <br> **ACADEMIC:** Received Certificates of completion in Paralegal Studies (see Certificates from Kaplan College dated 12/12/00, 01/15/01, 02/09/01 and Associates degree college of Professional Studies 03/27/01). <br> **WORK:** Assigned as a wing laundry clerk and received exceptional work reports (see CDC 101 02/12/01). <br> **VOCATION:** None during this period. <br> **GROUP ACTIVITIES:** Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 05/26/00, 06/07/00, 09/28/00, 12/26/00 and 02/13/01). <br> **PSYCH TREATMENT:** None during this period. <br> **PRISON BEHAVIOR:** No disciplinary problems. |

ORDER:
- ☐ BPT date advanced by _____ months.
- ☐ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

- ☐ Schedule for Progress Hearing on appropriate institutional calendar

| LEWIS, SAMUEL | E-05524 | CTF-SOLEDAD | MAR/2001 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 04/01 to Present | | | **PLACEMENT**:  Correctional Training Facility.<br>**CUSTODY**:  Medium A.<br>**CLASSIFICATION SCORE**:  Zero Points.<br>**ACADEMIC**:  Received a Certificate of Completion from Kaplan College in Paralegal Studies (see Certificate dated 04/06/01).<br>**WORK**:   Assigned as a wing laundry clerk.<br>**VOCATION**:   None during this period.<br>**GROUP ACTIVITIES**:  Attended Alcoholics/Narcotics Anonymous meetings (see CDC 128B's 04/05/01, 04/27/01, 06/27/01 and 07/10/01).<br>**PSYCH TREATMENT**:   None during this period.<br>**PRISON BEHAVIOR**:   No disciplinary problems. |

ORDER:

☐  BPT date advanced by       months.       ☐  BPT date affirmed without change.
☐  PBR date advanced by       months.       ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐  Previously imposed  conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

LEWIS, SAMUEL       E-05524       CTF-SOLEDAD       MAR/2001

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

BPT 1004 (REV 7/86)       Page  _5_

# EXHIBIT 8

# LIFE PRISONER EVALUATION REPORT
# PAROLE CONSIDERATION HEARING
# OCTOBER 2007

Name    **LEWIS, SAMUEL**                                   CDC#    E05524

## I. COMMITMENT FACTORS:

    **A.**    **Life Crime**: Murder 2nd (PC 187) Count 1, LA County Case #A964645. Sentence: 15 to Life. MEPD: 3-21-98. Victim: Shivone Perry, age unknown.

        **1.**    **Summary of Crime**: All relevant documents from the previous hearings have been considered, and that information appears valid. The writer has no further information to add.

        **2.**    **Prisoner's Version**: In an interview for this report, Inmate indicated that his version remains the same as stated in the previous hearings.

        **3.**    **Aggravating/Mitigating Circumstances**:

            **a.**    **Aggravating Factors**: Remains the same as stated in the previous hearings.

            **b.**    **Mitigating Factors**: Remains the same as stated in the previous hearings.

    **B.**    **Multiple Crime(s)**: None

        **1.**    **Summary of Crime**: N/A

        **2.**    **Prisoner's Version**: N/A

## II. PRECONVICTION FACTORS:

    **A.**    **Juvenile Record**: Remains the same as stated in the previous hearings.

    **B.**    **Adult Convictions and Arrests**: Remains the same as stated in the previous hearings.

    **C.**    **Personal Factors**: Remains the same as stated in the previous hearings.

## III. POSTCONVICTION FACTORS:

    **A.**    **Special Programming/Accommodations**: No special programming or accommodation needs are noted

    **B.**    **Custody History**: Remains housed at CTF-Soledad in the general population. Lewis is currently employed as the Laundry Attendant in his housing unit. He continues to receive exceptional work reports from his supervisors. Lewis has

Sent to Inmate on *10-25-07*

received 3 laudatory chronos since the last hearing from 5 separate Correctional employees. It is very difficult to get staff to write these laudatory chronos. Lewis is to be commended on his positive attitude , excellent behavior, and consistent role modeling to have compelled CDCR staff to write the chronos. See CDCR 128B's dated 08-17-05, 08-20-05, 05-04-06, 09-26-06, 02-01-06. Lewis continues his Men's Advisory Council membership per CDCR 128B dated 09-14-05, more current chrono's are forthcoming.

C.    **Therapy and Self-Help Activities**:  Lewis has continued his participation in AA/NA with numerous CDCR 128B's dated from 09-21-05 through 10-18-06 with the more recent CDCR 128B's forthcoming. Lewis has completed a number of courses dealing with Anger and the Management of it see CDCR 128B's dated 12-08-05, 02-23-06. Lewis is a Facilitator of AVP, which is the Alternatives to Violence program, see CDCR 128B dated 09-13-06 where he was interviewed by George Ramos, the Regional AVP Liaison to CTF. Lewis continues to facilitate the AVP groups per CDCR 128B's dated 10-24-06, 02-23-07(2), 09-25-06. Currently, Lewis is being considered as a co-facilitator for the Victim Offender Education Group (VOEG) Facilitated by this writer, CCI Mitchell. Lewis possesses an insight into himself and the impact his crime has had on Shivone Perry, her family, his family and society. He will be an excellent Co-facilitator. Lewis has completed some Religious based self-help course Facilitated by Judge Lindsey per CDCR 128B's dated 03-27-07(2), 04-12-07.

D.    **Disciplinary History**: Disciplinary free this period.

E.    **Other**:  Lewis appears very involved in self help groups with in the institution. Lewis demonstrates this by facilitating AVP for fellow inmates as well as working on Business plans to develop AVP type groups for our society's youth on the outside. Lewis can articulate himself clearly and is very goal oriented. He has multiple AA degrees and is currently working on his BS degree. Lewis also continues his learning by participating in Educational Video courses and doing book reports on them. Please see CDCR 128B's dated 09-12-06, and 03-01-07.


IV.    **FUTURE PLANS**:


A.    **Residence**:  **Residence plan #1**: Lewis plans to reside with his wife, Lisa Lewis at 1621 Cadiz Circle, Salinas, Ca. Mrs. Lewis is currently employed at Longs Drug store in Carmel, Ca. Mr. and Mrs. Lewis has both worked extensively on their relationship through self-help, books such as Men are from Mars and Women are from Venus, as well as others. Lewis states he knows the transition into society with be an adjustment, but the transition to actually living with his wife he knows will be challenging. Lewis states that he and his wife are aware of this and are currently working on the potential difficulties they may face within the relationship.

**Residence plan #2**: Lewis plans to live with his mother, Shirley Lewis should the Parole Board find he needs to parole to LA County, which was his last place of legal residence. Mrs. Lewis's address is 4831 3rd Ave. LA, Ca. 90043. Mrs. Lewis will allow temporary housing to her son and his wife until they are able to begin anew on their own. Lisa Lewis will relocate through Longs Drug to which ever county her husband paroles.

**B.**   **Employment**: Employment plan #1: Through the assistance of his wife, Lisa, Lewis has been able to secure Part-time employment with Labor Ready. This part-time employment will lead to full-time employment. Lewis will consistently seek other employment opportunities as a paralegal, forklift operator, drycleaner, and with various other companies who can utilize his marketable skills.

**Employment plan #2**: Lewis related to me that he has written a business plan for the implementation of a program that would assist Parolees with the transition to re-integrate back into society. This would be a city program, but subsidized through the Federal Government. Please ask Mr. Lewis about this as he is very passionate about the implementation of it. He knows the dollar figures involved and other pertinent information as he has done extensive research. Lewis has a passion to give back to the community and has developed a way to not only give back, but earn a living while doing it.

**Employment plan #3**: Lewis has a trust account set up in his name to supplement his income for living expenses and such until full-time employment can be procured.

**C.**   **Assessment**: Lewis has very viable parole plans. He has support of his family and friends as well as income to assist him through the difficult transition into society and marriage. Lewis appears to have the ability to parole to where ever the Parole Board wants him and should adjust with out difficulty. Lewis has demonstrated an incredible ability to get involved with self-help programs, facilitate them and help his fellow inmates. He also has ideas and viable plans to start up new programs or facilitate existing self-help groups for fellow Parolees and our At-Risk youth. Lewis appears passionate about giving back to society and assisting At-Risk youth in turning their lives around.

**V.**   **USINS Status**: N/A

**VI.**   **SUMMARY**:

**A.**   Prior to release, the prisoner could benefit from: Continuing exactly in the same path he is currently on. Lewis has many accomplishments while incarcerated for the past 20 years. He is focused, determined, compassionate, self-aware, and mature.

**B.**   This report is based upon an interview with the prisoner on 09-05-07 and a complete review of the central file lasting 3 hours.

**C.**   Prisoner was afforded an opportunity to review his central file, per the Olson Decision, on 09-05-07.

**D.**   No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

_____ 10/11/07
S. Mitchell                    Date
Correctional Counselor I


_____ 10-12-07
F. DeGuzman                    Date
Correctional Counselor II


_____ 10-17-07
C.B. Tucker                    Date
Facility Captain


_____ 10/18/07
D. S. Levorse                  Date
Classification and Parole Representative


LEWIS, SAMUEL          E05524          CTF-SOLEDAD          OCT/2007

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA
## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐   DOCUMENTATION HEARING

☐   PAROLE CONSIDERATION HEARING

☐   PROGRESS HEARING          **(Life term started          )**

INSTRUCTIONS
   TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
   TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
      ESTABLISHED, ie., 0-2 MONTHS FOR PBR and 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 09-2006 to 09-2007 | | | **PLACEMENT**: Housed at CTF-Soledad in the general population. |
| | | | **CUSTODY**: Med A |
| | | | **VOCATION**: None this period. |
| | | | **ACADEMIC**: None this period. |
| | | | **WORK**: Central First Watch Clerk. |
| | | | **GROUP ACTIVITIES**: Lewis has continued his participation in AA/NA with numerous CDCR 128B's dated from 09-21-05 through 10-18-06 with the more recent CDCR 128B's forthcoming. Lewis has completed a number of courses dealing with Anger and the Management of it pleas see CDCR 128B's dated 12-08-05, 02-23-06. Lewis is a Facilitator of AVP, which is the Alternatives to Violence program, see CDCR 128B dated 09-13-06 where he was interviewed by George Ramos, the Regional AVP Liaison to CTF. Lewis continues to facilitate the AVP groups per CDCR 128B's dated 10-24-06, 02-23-07(2), 09-25-06. |
| | | | **PSYCH TREATMENT**: None this period. |
| | | | **PRISON BEHAVIOR**: Disciplinary free this period. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                    DATE  10/05/07

LEWIS                          E05524              CTF-SOLEDAD              SEP/07

BPT 1004 (REV 7/86)                        Page _1_

# EXHIBIT 9

STATE OF CALIFORNIA

**NAME and NUMBER**    LEWIS, S.

DEPARTMENT OF CORRECTIONS
CDC-128(8-87)

Inmate Lewis, E05524, YW-322L, is to be commended for his positive attitude and behavior. While working various posts I have observed Inmate Lewis since his arrival at CTF in 1998. Since July 2006, I have observed Inmate Lewis more closely while working in Y-Wing as a Tier Officer. I have observed him to be receptive and cooperative to the change in Staff members and their different style of management. His knowledge of Y-Wing and institutional operations has been an invaluable asset to Y-Wing Staff members as well as assisting other inmates. I have observed him to be tenacious and sincere in working towards and achieving his goal of rehabilitation. During my thirteen years I have never written a laudatory chrono. It is my professional opinion that Inmate Lewis will be a productive citizen in society when given the opportunity.

E05524    YW-322L

ORIG. : C-File
cc    : Unit File
      : CC-I
      : Writer
      : Inmate

**DATE    9/21/07**

G. S. TAYLOR
Correctional Officer
Y-Wing Tier

**LAUDATORY CHRONO**    **CTF-C    INFORMATIVE CHRONO**

---

STATE OF CALIFORNIA

**NAME and NUMBER    LEWIS**    E05524    YW-322L

Inmate LEWIS, E05524, YW-322L, has been assigned as the Y-Wing Laundry Attendant since December 1998. Since being assigned Y-Wing Security in June 2006, I have closely worked with Inmate LEWIS. I have observed Inmate LEWIS to be professional and courteous at all time toward staff and inmates alike. LEWIS has demonstrated to be consistent and dependable in his job assignment. In addition, I have observed his ability to remain clam and professional during stressful situations, potential confrontations. In my opinion I believe that his determination to succeed and his positive attitude will carry into his life when he is released. **TABE Score: Not Listed**

ORIG. : C-File
cc    : Work Supervisor
      : CC-I
      : Writer
      : Inmate

**DATE    7/19/07**

L. J. RODRIGUEZ
Correctional Officer
Y-Wing Security

**LAUDATORY CHRONO**    **INFORMATIONAL CHRONO**

---

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

**NAME and NUMBER    LEWIS**    E-05524    YW-322L

It should be noted that I have observed inmate LEWIS, E-05524, overall efficiency for a period of (17) years since he has been housed here at Correctional Training Facility. Over the years inmate LEWIS has demonstrated the ability to conform to existing /established policies and procedures. I am persuaded by LEWIS' ability to maintain close family ties over this long period of incarceration, his participation in group therapy and his continuing effort to upgrade educationally. He has chosen to use his free time in the pursuit of positive endeavors. His attitude towards staff and inmates is always appropriate. Inmate LEWIS has programmed in an extremely positive way and should be commended for his commitment to change. It is my formal judgment that inmate LEWIS could be a productive citizen in society if given the opportunity to do so.

A. Ramos
Correctional Officer, 2/W
CTF-Central Facility

ORIG : C-File
cc    : Unit File
      : CC-I
      : Inmate
      : Writer



STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128 B (8-87)

**NAME and NUMBER:   LEWIS**              **E05524**                         **YW-332L**

Inmate Lewis has been assigned as the Y Wing laundry attendant for a number of years and who is also a member of the Men's Advisory Counsel (MAC). I have been the Unit II Sergeant and now Lieutenant for the past three years. During this time, I have been able to observe Inmate Lewis's work ethics and his interaction with staff and inmates. I have observed him to be professional, courteous and outgoing with everyone. Lewis never hesitates to be of assistance and takes the initiative when needed. This type of conduct makes him a very reliable worker and a role model for other inmates. His attitude and behavior are positive. In my opinion Inmate Lewis is a work orientated and well behaved individual, who continually strives through his actions and demeanor toward receiving a parole date.

Orig.:   C-File
cc:      CCI
         Inmate

**S.R. VASQUEZ**
Correctional Lieutenant
UNIT II, CTF-Central Facility

**DATE**   09/26/06          **LAUDATORY CHRONO**          **CTF-C**          **INFORMATIVE CHRONO**

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

**NAME and NUMBER**      LEWIS                    E-05524                  YW-322-L

Inmate Lewis, S., E-05524 has been assigned as the Y-Wing Laundry Attendant since December 1998. Since being assigned as the Laundry Officer for the Central Facility Laundry in October 1998, I have observed inmate Lewis several times a week. I have observed him to be professional and courteous. I have observed his ability to remain calm and professional when faced with stressful situations or potential confrontations. His attitude and behavior are positive, and he has shown himself punctual and responsible in his assigned duties. Inmate Lewis has been consistent in pursuing a higher education and attaining marketable skills in preparation for his release. I believe his sincere desire to succeed and his positive attitude will carry into his life when he is released.

ORIG   :   C-File
Cc     :   Writer
           Inmate

**D. OSBURN**
Laundry Officer
CTF-Central Laundry Room

**DATE**   5/4/06          **(LAUDATORY CHRONO)**                    **CTF-C**

**NAME and NUMBER   LEWIS**                    E05524                   YW322L

Inmate LEWIS, E05524, YW322L, is to be commended for his ongoing participation as a Y Wing, Men's Advisory Counsel (MAC) member. Through his care and concern regarding issues which arise in Y Wing and Unit II in general, Inmate LEWIS has actively assisted his peers and the unit staff in maintaining a tension free, environment of cooperation. I take this opportunity to congratulate Inmate LEWIS for a job well and done and anticipate his continued hard work in the MAC.

ORIG.  :   C-File
cc     :   CC-I
           Inmate

**J.L. Clancy**
Facility Captain
Unit II, CTF - Central

**DATE**   9/14/05          **LAUDATORY**                    **CTF-C**          **INFORMATIVE CHRONO**

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

**NAME and NUMBER**    **LEWIS**    E-05524    **YW-322-L**

I have known inmate Lewis, S., E-05524 for more than thirteen (13) years. I have watched him change from an immature confused young man into a mature adult who is respectful and responsible. Inmate Lewis has been in Central Facility for the past seven (7) years and I have always observed his behavior to be positive. I have observed him many times as he interacts with uniformed and free staff easily, always maintaining a professional demeanor even when faced with stressful situations or potential confrontations. Inmate Lewis is devoted to attaining his marketable skills in preparations for his release. I believe that his determination to succeed and his positive attitude will carry into his life when he is released.

ORIG : C-File
Cc    : Writer
       : Inmate

**S. ROTHMAN**
2nd Watch Yard Officer
CTF-Central Facility

**DATE**  8/20/05        **(LAUDATORY CHRONO)**        **CTF-C**

---

NAME and NUMBER    LEWIS    E-05524    Y-322L        CDC-128-B (Rev. 4/74)

<u>LAUDATORY CHRONO</u>

Inmate LEWIS, E-05524, Y-322L, has been assigned as the Y-Wing Laundry Attendant since 1998. Since being assigned as the Laundry Supervisor II, I have worked with and observed Inmate LEWIS. Consistently I have observed him to be courteous and respectful both to staff and inmates. His attitude and behavior are always positive, and he has always shown himself punctual and responsible in his assigned duties.

orig:  C-File
  CC:  Assignment Office
       CCII
       Counselor
       Inmate
       File

C. DIAZ    *LSII*
LAUNDRY SUPERVISOR II
LAUNDRY ROOM
CTF-CENTRAL

DATE        August 17, 2005        GENERAL CHRONO

---

**NAME and NUMBER**    **LEWIS**    **E05524**    **YW-322L**        CDC-128 B (8-87)

Inmate LEWIS, E05524, YW-322L, has been assigned as the Y-Wing Laundry Attendant since December 1998. Since being assigned to Y-Wing, first as Entrance & Security Officer, and then as a Tier Officer in 2000, I have closely worked with and observed Inmate LEWIS. Inmate LEWIS has consistently demonstrated excellent communication and diplomatic skills. While observing Inmte LEWIS, I have found him to be consistent and dependable in his job assignment. He is always polite and respectful when communicating with staff or inmates. His attitude and behavior have cosistently positive during the time in which I have observed him.

ORIG : C-File
cc   : Writer
       : Inmate

**J. BROWN**
Correctional Officer, Y-Wing
CTF-Central Facility

**DATE**  11/04/04        CTF-C    **INFORMATIONAL CHRONO**

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B (8-87)

**NAME and NUMBER** **LEWIS** **E05524** **YW-322L**

Inmate LEWIS, E05524, has been assigned as the Y-Wing Laundry Attendant since December 1998. Since being assigned as Y-Wing Tier Officer in 1999, I have closely worked with Inmate LEWIS. I have obeserved Inmate LEWIS to be professional and courteousness at all times toward staff and inmate alike. Being a Y-Wing Laundry Attendant requires exceptional communication and diplomatic skills in dealing with the complaints and needs of Y-Wing inmates regarding their laundry and bedding. Inmate LEWIS has consistently demonstrated those skills over the years. LEWIS has also been very instrumental in the successful and efficient operations of the Y-Wing housing unit, ranging from assisting with the smooth conversion of Y-Wing into a housing unit designated for Prison Industry Authority inmate workers in 2002, to assisting in solving daily housing conflicts arising from inmates requiring special housing needs. I have no doubt that Inmate LEWIS' exceptional work and personal ethics will allow him to be a productive member of society when released from custody.

ORIG : C-File
cc : CC-I
: [redacted]
: Writer

**L.J. RODRIGUEZ**
Correctional Officer, Y-Wing (2nd Watch)
CTF-Central Facility

**DATE** 04/13/04 **LAUDATORY CHRONO** **CTF-C**

**NAME and NUMBER** **LEWIS** **E-05524** **Y-322L**

CDC-128 B (8-87)

As an eighteen (18) year employee of the Department of Corrections, I have been asked by numerous Inmates to write a laudatory
chrono for their C-File in preparation for their Parole Board hearings. I have always refused because I believe that laudatory chronos
should be given based on merit and not because it "looks good for the Board." To date, I have written only one other chrono. Inmate
LEWIS has rightfully deserved this one. I have closely supervised and worked with Inmate LEWIS for the past two and a half (2 1/2 )
years. Inmate LEWIS holds the position of Y-Wing Laundry man, a position that requires diplomacy, tact, patience, and most of all a
degree of compassion due to the needs of the CCCMS inmates. He has demonstrated all of those traits admirably and tirelessly. He
interacts with uniformed and free staff easily, yet maintains a professional demeanor when faced with stressful situations or potential
confrontations. Inmate LEWIS is totally devoted to attaining his educational goals and enhancing his marketable work skills in
preparation for his release into society. He is widely known by the inmate population to hold a vast amount of legal knowledge which
he doesn't hesitate to share by helping inmate's of all races in their court cases or appeals. This he does freely, receiving no
compensation for services rendered, which is almost unheard of in this prison environment. I have witnessed his many high grade (A,
B+ averages) test scores, essays and college transcripts. There are many inmates who also have similar traits and a will to succeed;
LEWIS is the first that I have witnessed to strive so hard and doggedly to achieve his life, educational and work goals. I feel that Inmate
LEWIS"S determination to succeed and his positive attitude will carry into his life once attains his release.

ORIG : C-File
cc : Unit File
CC-I
: Inmate
: Writer

**C.A. AGUILAR**
Correctional Officer, Y-Wing, 2/W
CTF-Central Facility

**DATE** 06/06/02 **LAUDATORY CHRONO** CTF-C **INFORMATIVE CHRONO**

# EXHIBIT 10

STATE OF CALIFORNIA
CDC 101 (1/92)                    **WORK SUPERVISOR'S REPORT**                    DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS: FROM: $ 20.00  TO: $ 20.00  FROM: JOB NO. PTRCC. 302 P  TO: JOB NO. PTRCC. 302P

TOTAL # Hours Assigned: 32.5  TOTAL # Hours Worked: 32.5

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| Y-Wing Porter | 12-12-98 | Laundry Attendant / Porter   Janitorial | Nov 12 2006 TO Jan 12 200? |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE   INMATE'S INITIALS KL

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)    CODE OF SAFE PRACTICES REVIEWED SUPVS INITIALS    INMATE'S INITIALS
OUTSTANDING worker

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. Rodriguez | 3 months | 2nd Watch | BLK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| Lewis, S. | E05524 | CTF-C | JAN. 12, 2007 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)                    **WORK SUPERVISOR'S REPORT**                    DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS: FROM: $ 20.00  TO: $ 20.00  FROM: JOB NO. PTRCC.302P  TO: JOB NO. PTRCC.302P

TOTAL # Hours Assigned: Full Time  TOTAL # Hours Worked: 32.5 hours wkly

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| Y-Wing Laundry | 12/12/98 | Janitorial duties includes collecting/sorting linen & laundry | Feb, March, April 2007 |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE   INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)    CODE OF SAFE PRACTICES REVIEWED SUPVS INITIALS    INMATE'S INITIALS

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| C/O L. Rodriguez | 3 month | 2nd / W | BLK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| Lewis | E-05524 | CTF-C | April 12, 2007 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)                    **WORK SUPERVISOR'S REPORT**                    DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

PAY STATUS: FROM: $ 20.00  TO: $ 20.00  FROM: JOB NO. PTRCC 302 P  TO: JOB NO. PTRCC 302P

TOTAL # Hours Assigned: 32.5 hrs  TOTAL # Hours Worked: 32.5 hours

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| Y-Wing Laundry | 12/12/98 | Laundry Attendant / Janitorial duties | MAY-June-July 2007 |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE   INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE)    CODE OF SAFE PRACTICES REVIEWED SUPVS INITIALS    INMATE'S INITIALS
OUTSTANDING worker - Positive Attitude towards staff

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. Rodriguez | 3 months | 2nd/W | BLK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| Lewis | E-05224 | CTF-C | July 1, 2007 |

STATE OF CALIFORNIA
CDC 101 (1/92)                           WORK SUPERVISOR'S REPORT                    DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

| PAY STATUS:  FROM: $ | | TO: $ | | FROM: JOB NO. | | TO: JOB NO. | |
|---|---|---|---|---|---|---|---|
| TOTAL # Hours Assigned: | | | TOTAL # Hours Worked: | | | | |

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PTRCC.302 | 12/5/98 | COLLECTING, SORTING & DISTRIBUTING INMATES' LAUNDRY | APRIL 2002--MARCH 2004 |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE    INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) *Very dependable, excellent worker*    CODE OF SAFE PRACTICES REVIEWED    SUPV'S INITIALS:    INMATE'S INITIALS:
*Displays positive attitude, even under Duress*

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ, C/O (EXT. 4490) | FIVE YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CTF-C | 4/1/2004 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)                           WORK SUPERVISOR'S REPORT                    DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

| PAY STATUS:  FROM: $ | | TO: $ | | FROM: JOB NO. | | TO: JOB NO. | |
|---|---|---|---|---|---|---|---|
| TOTAL # Hours Assigned: | | | TOTAL # Hours Worked: | | | | |

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PTRCC.302 | 12-05-98 | COLLECTING, SORTING, & DISTRIBUTING INMATES' LAUNDRY | APR 2004-JULY 2004 |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE    INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE, EXCELLENT WORKER, DISPLAYS POSITIVE ATTITUDE, EVEN UNDER DURESS    CODE OF SAFE PRACTICES REVIEWED    SUPV'S INITIALS:    INMATE'S INITIALS:

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ  C/O (EXT. 4490) | FIVE YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CTF-CENTRAL | 4-01-2004 |

---

STATE OF CALIFORNIA
CDC 101 (1/92)                           WORK SUPERVISOR'S REPORT                    DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | / | A. DEMONSTRATED SKILL AND KNOWLEDGE | / | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | / | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | / | G. LEARNING ABILITY |
| 3 = SATISFACTORY | / | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | / | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | / | D. INTEREST IN ASSIGNED WORK | / | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | / | E. EFFORT DISPLAYED IN ASSIGNED WORK | / | J. QUANTITY OF WORK |

| PAY STATUS:  FROM: $ | | TO: $ | | FROM: JOB NO. | | TO: JOB NO. | |
|---|---|---|---|---|---|---|---|
| TOTAL # Hours Assigned: | | | TOTAL # Hours Worked: | | | | |

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PTRCC.302 | 12-05-98 | COLLECTING, SORTING, DISTRIBUTING, INMATES' LAUNDRY | AUG 2004-NOV 2004 |

RECOMMENDED FOR:  ☐ REASSIGNMENT  ☒ RETAIN  ☐ PAY INCREASE  ☐ PAY DECREASE    INMATE'S INITIALS

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE, EXCELLENT WORKER, DISPLAYS POSITIVE ATTITUDE, EVEN UNDER DURESS    CODE OF SAFE PRACTICES REVIEWED    SUPV'S INITIALS:    INMATE'S INITIALS:

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ  C/O  (EXT. 4490) | FIVE YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CTF-CENTRAL | AUG-01-2004 |

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS
CDC 101 (1/92)
**.K SUPERVISOR'S REPORT**

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | | A. DEMONSTRATED SKILL AND KNOWLEDGE | | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | | G. LEARNING ABILITY |
| 3 = SATISFACTORY | | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | | D. INTEREST IN ASSIGNED WORK | | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | | E. EFFORT DISPLAYED IN ASSIGNED WORK | | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $          TO: $          FROM: JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PIROC. 302 | 12-05-98 | COLLECTING, SORTING, & DISTRIBUTING INMATES' LAUNDRY | DEC 2004–MAR 2005 |

INMATE'S INITIALS:

RECOMMENDED FOR:  [ ] REASSIGNMENT  [X] RETAIN  [ ] PAY INCREASE  [ ] PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE
EXCELLENT WORKER, DISPLAY POSITIVE ATTITUDE EVEN UNDER DURESS

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:          INMATE'S INITIALS:

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ  C/O  (EXT. 4490) | SIX YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CIF-CENTRAL | DEC-01-2004 |

---

STATE OF CALIFORNIA
**WORK SUPERVISOR'S REPORT**
CDC 101 (1/92)

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | | A. DEMONSTRATED SKILL AND KNOWLEDGE | | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | | G. LEARNING ABILITY |
| 3 = SATISFACTORY | | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | | D. INTEREST IN ASSIGNED WORK | | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | | E. EFFORT DISPLAYED IN ASSIGNED WORK | | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $          TO: $          FROM: JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PIROC. 302 | 12-05-98 | COLLECTING, SORTING, & DISTRIBUTING INMATES' LAUNDRY | APR 2005–JUN 2005 |

INMATE'S INITIALS:

RECOMMENDED FOR:  [ ] REASSIGNMENT  [X] RETAIN  [ ] PAY INCREASE  [ ] PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE
EXCELLENT WORKER, DISPLAYS POSITIVE ATTITUDE, EVEN UNDER DURESS

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:          INMATE'S INITIALS:

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ  C/O  (EXT. 4490) | SIX YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CIF/CENTRAL | APRIL 01, 2005 |

---

CDC 101 (1/92)
**WORK SUPERVISOR'S REPORT**
DEPARTMENT OF CORRECTIONS

| GRADES | GRADE | | GRADE | |
|---|---|---|---|---|
| 1 = EXCEPTIONAL | | A. DEMONSTRATED SKILL AND KNOWLEDGE | | F. TEAMWORK AND PARTICIPATION |
| 2 = ABOVE AVERAGE | | B. ATTITUDE TOWARD FELLOW INMATES AND WORKERS | | G. LEARNING ABILITY |
| 3 = SATISFACTORY | | C. ATTITUDE TOWARD SUPERVISORS AND STAFF | | H. USE OF TOOLS AND EQUIPMENT |
| 4 = BELOW AVERAGE | | D. INTEREST IN ASSIGNED WORK | | I. QUALITY OF WORK |
| 5 = UNSATISFACTORY | | E. EFFORT DISPLAYED IN ASSIGNED WORK | | J. QUANTITY OF WORK |

PAY STATUS:  FROM: $          TO: $          FROM: JOB NO.          TO: JOB NO.

TOTAL # Hours Assigned:          TOTAL # Hours Worked:

| INMATE ASSIGNED TO | DATE ASSIGNED | ACTUAL WORK CONSISTS OF | PERIOD COVERED BY REPORT |
|---|---|---|---|
| PIROC. 302 | 12-05-98 | COLLECTING, SORTING, DISTRIBUTING INMATES' LAUNDRY | JULY 2005–SEPT 2005 |

INMATE'S INITIALS:

RECOMMENDED FOR:  [ ] REASSIGNMENT  [X] RETAIN  [ ] PAY INCREASE  [ ] PAY DECREASE

COMMENTS (IF MORE SPACE REQUIRED, USE REVERSE SIDE) VERY DEPENDABLE
EXCELLENT WORKER, DISPLAY POSITIVE ATTITUDE, EVEN UNDER DURESS

CODE OF SAFE PRACTICES REVIEWED
SUPV'S INITIALS:          INMATE'S INITIALS:

| SUPERVISOR | LENGTH OF SUPERVISION | WORK DETAIL | ETHNICITY |
|---|---|---|---|
| L. RODRIGUEZ C/O  (EXT. 4490) | SIX YEARS | LAUNDRY ATTENDANT | BLACK |

| INMATE'S NAME | CDC NUMBER | INSTITUTION | DATE |
|---|---|---|---|
| LEWIS | E-05524 | CIF/CENTRAL | JULY 01 2005 |

# EXHIBIT 11

76

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER ESTRADA:  We're on.

4          PRESIDING COMMISSIONER BIGGERS:  Okay.  Let

5    the record reflect that everyone that was in the room

6    prior to us going into deliberations are now back in

7    the room.  Mr. Lewis, this was an extremely difficult

8    decision for us to do and I will tell you the reasons

9    why we came to the decision we did, before I explain

10   everything in detail.  The biggest problem that we

11   have is the fact that there was multiple victims

12   involved, as well as the fact that your last 115 was

13   in '99.  And you have six 115's and we realize that

14   the last one was administrative and I've got to tell

15   you, it was stupid.  But what you have, those can hurt

16   you.  And even though you're programming very well and

17   you're away, I'll go through the whole thing for you.

18   At this point, we reviewed all the information and

19   relied on the following circumstances to conclude that

20   you are not suitable for parole and pose an

21   unreasonable risk of danger to society or threat to

22   public safety if released from prison at this time.

23   This is going to be a one-year denial again and I'd

24   like to explain this to you.  I want you to listen to

25   everything very carefully because even though I agree

26   that -- with some of the things that the last Panel

27   SAMUEL W. LEWIS  E-05524    DECISION PAGE 1   10/12/06

77

1   said, there are certain things that I'm going to try

2   to amplify.  That I think will make you be an even

3   stronger candidate the next time you come up, okay?

4           INMATE LEWIS:  Yes, sir.

5           PRESIDING COMMISSIONER BIGGERS:  All right.

6   Let's start with your commitment offense.  You realize

7   that the commitment offense is not going to go away,

8   however, the fact of the matter is that this was

9   carried out in an extremely cruel, brutal, cold and

10  vicious manner, in that as part of a gang initiation,

11  which you mentioned to us today.  And also primarily

12  because of (indiscernible) of an incident that took

13  place prior to that time, you got into an altercation

14  with -- after getting into an altercation with a

15  Mr. Villega, V-I-L-L-E-G-A.  He challenged you to a

16  fight.  The fight did not occur because his brother

17  stepped in.  You left the area, went and got some of

18  your homeboys and returned.  And even though you were

19  not a "gang member" at the time, you were still

20  associated with the gang members.  You went back, got

21  some of your homeboys and came back and they convinced

22  you that this was going to be part of your initiation,

23  so that you can in fact join the gang.  This is what

24  you told me.  You then -- you returned later that

25  evening carrying a sawed off shotgun.  You approached

26  the front door, where Mr. Villega and a number of

27  SAMUEL W. LEWIS  E-05524   DECISION PAGE 2   10/12/06

78

1    teenagers were sitting.  You fired five or six rounds
2    in their direction.  At that point, a Mr. Lovel Bllard
3    was shot in the arm, Shevon Perry was shot in the back
4    and April Purcel was also shot.  The young lady, who
5    was shot in the back -- in the -- there was one person
6    shot in the -- let me go back to my notes here.  Okay.
7    Mr. Perry was (indiscernible) was shot in the back.
8    Mr. Bllard was shot in the arm.  The victim was -- she
9    was shot in the back and April Purcel was also shot.
10   This -- these crimes, as I said, with multiple victims
11   indicated that this was a -- definitely a
12   (indiscernible) and calculated manner.  In that you
13   thought about this.  You went over with the weapon
14   itself.  And even though your intentions may not have
15.  been to kill anyone, it was definitely to hurt
16   someone, because of the fact that you fired multiple
17   rounds.  You -- this offense was carried out in a
18   manner, which demonstrated exceptionally callous
19   disregard for human life and suffering and the motive
20   for the crime itself was -- it's actually revenge,
21   although it turned out to be gang retaliation.  These
22   conditions -- these conclusions (indiscernible) from
23   the Probation Officer's Report.  The bottom line is
24   that this could have easily been avoided if you would
25   have just stopped.  The fact that you did not get into
26   an argument with this -- once you got -- when you
27   SAMUEL W. LEWIS  E-05524   DECISION PAGE 3   10/12/06

79

1    left, you should have just stayed away from this and

2    not go back over there.  The mere fact that you went

3    back over there, got some of your homeboys and they in

4    turn gave you a shotgun to do this act, and put it in

5    your own words, was in fact stupid.  All right.  We

6    know that's not going to ever go away and you are --

7    and I can say on record that I believe that you have

8    accepted remorse and that you are in fact a changed

9    man at this time.  You are not the 18-year-old that

10   you were at -- during that time.  These conclusions

11   were drawn from the Statement of Fact from the

12   Probation Officer's Report.  Your -- you did quit

13   school so there's somewhat of an unstable history.

14   You had two juvenile arrests, one for Grand Theft Auto

15   and the other one for Carrying a Concealed Weapon.  As

16   an adult, you were also arrested for Carrying a

17   Concealed Weapon, however, you did indicate that you

18   were released the next day when it was determined that

19   the weapon belonged to the owner of the vehicle in

20   which you were driving.  The mere fact that you were

21   still associated with those type of people, even

22   though you may not have known that, is still something

23   that you're going to have to watch when you do

24   eventually get a date.  There's no doubt in my mind

25   that you will eventually get a date.

26            INMATE LEWIS:  Yes, sir.

27   SAMUEL W. LEWIS   E-05524   DECISION PAGE 4   10/12/06

80

1          DEPUTY COMMISSIONER ESTRADA:  As for

2     institutional behavior, you have programmed

3     exceptionally well.  Just since your last hearing,

4     you've been a co-facilitator of Alternatives to

5     Violence mini workshop.  You have completed 25 video

6     reports.  You've got certificates for 25 of those.

7     You've got another certificate for ten additional

8     ones.  You were co-facilitator of a 21-hour, two-day

9     Alternatives to Violence Project Workshop.  You did a

10    Bible correspondence course, Hope at Will.  You've

11    done a -- several anger management courses called

12    (indiscernible) The Heart video series.  You currently

13    have two AA degrees.  You have got two vocations and

14    one of them is forklift and the other one is dry

15    cleaning.  You also, and this has gone on since you've

16    been incarcerated.  You've got a -- you probably have

17    more self-help courses in the things that you have

18    accomplished in self-help than all the inmates I've

19    seen this week and you should be commended for that.

20          INMATE LEWIS:  Thank you.

21          PRESIDING COMMISSIONER BIGGERS:  And I will

22    talk to you a little bit more about that a little

23    later on.  But you have done extremely well.  Those

24    FEMA courses will come to help you and I'll talk a

25    little about that when I talk about parole plans in a

26    few minutes.  Because I do not buy the fact that it's

27    SAMUEL W. LEWIS   E-05524   DECISION PAGE 5   10/12/06

81

1    very difficult to get a job unless you have a date and

2    I will tell you why in a minute.  But you have seven

3    128's and seven 115's since you've been incarcerated

4    and you've been incarcerated going on 18 years.

5    That's a lot.  And I realize that you have matured

6    since and actually, you went four years before you got

7    that one in '99 and you haven't had a fight, per se,

8    since 1994.

9              INMATE LEWIS:  1994.

10             PRESIDING COMMISSIONER BIGGERS:  But that

11   still shows a pattern, you see what  mean?  So we need

12   to make sure that you stay away from those 115's.  The

13   Psychological Report from Dr. Macomber was totally

14   supportive, as well as the last two psychological

15   evaluations.  They were also supported.  And speaking

16   on your parole plans, they are viable and I will go on

17   record to say to the next panel that you should

18   probably be paroled to Monterey County so that you can

19   in fact be in Salinas with your spouse.  That you back

20   to L.A. would probably be a problem for you and in

21   concur with the previous Board determinations that

22   probably you should be assigned when you get a date to

23   Monterey County.  The -- on your employment, sir, I

24   realize that it's very difficult to get employment and

25   I know that your wife is out there working very

26   diligently.  It's obvious because in the letter that

27   SAMUEL W. LEWIS   E-05524    DECISION PAGE 6   10/12/06

82

1    we got from the culinary, they indicated that they had

2    talked to your wife about the possibility of you -- of

3    using you for different functions.  Now, that's all

4    well and good but your -- you say that you want to

5    work with kids, you want to do a lot of other things.

6    There's a lot of other programs that are available in

7    this area and a couple come to mind.  There's one in

8    San Jose.  There's a lot of them that have satellite

9    offices that would love to have your talent if you are

10   serious about that.  Rather than going out there and

11   living off your trust fund and trying to get a job at

12   a -- an on-call job in the culinary area or an on-call

13   job with a temp service, it would probably not be in

14   your best interests to do that.  Because you sit

15   around the house and things can develop.  What I'm

16   telling you is that don't go --

17           DEPUTY COMMISSIONER ESTRADA:  Okay.

18           PRESIDING COMMISSIONER BIGGERS:  Okay.  What

19   I'm telling you is don't set up there and say to any

20   panel before you that it's very difficult.  We are

21   aware of how difficult it is but you can do certain

22   things.  But you -- and you have shown efforts in that

23   you're mailing things out to different people.  But

24   utilize those skills that you have, i.e., dry

25   cleaning, i.e., business, i.e., you know, your

26   facilitator, to get something.  Because those are the

27   SAMUEL W. LEWIS  E-05524   DECISION PAGE 7   10/12/06

83

1   type of jobs that people will say when you're out of

2   jail we'll do that.  Do you understand what I'm

3   telling you?

4           **INMATE LEWIS:**  Yes, sir.

5           **PRESIDING COMMISSIONER BIGGERS:**  Okay.

6   Because -- and then your wife is out there.  Like I

7   said, she's being -- she's just trying to get

8   employment period.  But you need to be -- you need to

9   firm them up a little bit, is basically what I'm

10  telling you.  We cannot deny you parole simply because

11  you don't have employment because you do have that

12  $20,000 trust fund.  But what we're trying to do is

13  when you take on the whole picture, I'm trying to make

14  sure that when you come back before the Panel, you've

15  got everything in a nice, neat, little package.  So

16  that you can, in fact, be looked upon even stronger

17  than what you did today.  We did note that the -- on

18  the 3042 responses, that the District Attorney of L.A.

19  Count, as well as the Los Angeles Police Department

20  both indicated an opposition of parole suitability.  I

21  also agree with the previous Panel in saying that you

22  are moving in an extremely positive area but you just

23  need more time, due to the nature of the crime itself,

24  which involved multiple victims and a 16-yar-old girl

25  being killed.  And also, you need some time from the

26  115 that you got in '99.  Those are the two primary

27  SAMUEL W. LEWIS  E-05524   DECISION PAGE 8   10/12/06

84

1     things that I think that the Deputy Commissioner and I

2     discussed, which is really -- well, the driving force

3     we got to today.  You -- as I said before, you have

4     programmed exceptionally well and I hope this will not

5     be a disappointment to you.  I know it's a

6     disappointment but I hope that it won't change the way

7     that you have programmed up to this point.  Now, you

8     did indicate to us that you -- if you didn't get a

9     date today, you'd continue to move in a positive

10    direction.  I hope you meant that.

11            **INMATE LEWIS:**  I meant that, sir.

12            **PRESIDING COMMISSIONER BIGGERS:**  Because I

13    think and as I said before, I went back to the 2004

14    Report and I commented to Deputy Commissioner Estrada

15    that I think these are some very strong words that

16    were used by -- and I'm going to quote them for you.

17    It was Deputy Commissioner Smith and they're found on

18    page 50 of the previous transcript.  And he indicated:

19                "On the positive side, you are to be

20                commended for the apparent turn-around that

21                you made (indiscernible) in the two -- you

22                achieved in the last two and three years.

23                And in my opinion, you're becoming -- you

24                appear very close to becoming a very, very

25                strong candidate to get a parole date.  You

26                need to keep doing what you're doing and

27    SAMUEL W. LEWIS  E-05524     DECISION PAGE 9    10/12/06

85

1              I think in a relative short time, you'll be
2         granted a date."
3    And I just wanted to put that on the record, as well.
4    That was -- that came from Mr. Smith in 2004 and I'm
5    going to concur with that.  That I think you've done
6    well but you're going to need some more time.  How
7    much time, I don't know but I think you are -- if you
8    continue to go along this well, you should have any
9    problems at some time to get a date.  The Panel wants
10   to commend you for getting your two AA degrees, your
11   two vocations and for participating in the, since the
12   last hearing, the Bible correspondence course, the
13   anger management, Hearing the Angry Heart video
14   series.  You've been a co-facilitator in an
15   Alternative to Violence mini workshop, as well as in
16   an Alternative to Violence basic workshop.  And for,
17   you know, the positive manner in which you approached
18   this thing today.  I think you're getting pretty near.
19   I see that -- I see the disappointment in your face
20   and I know it's disappointing for you but you've got
21   to keep in mind, you had multiple victims and one
22   16-year-old girl was killed and that's a terrible,
23   terrible thing.  Good luck to you and I want to ask
24   Deputy Commissioner, do you have any additional
25   comments?
26             DEPUTY COMMISSIONER ESTRADA:  Good luck to
27   SAMUEL W. LEWIS  E-05524   DECISION PAGE 10   10/12/06

86

1   you, Mr. Lewis.

2           PRESIDING COMMISSIONER BIGGERS:  We're going

3   to recommend that you remain disciplinary free,

4   continue to move in the positive manner that you are

5   into right now.  I don't see a need to continue with

6   self-help.  I don't see a need for another

7   psychological evaluation because this one is very,

8   very supportive.  So keep going down the path that

9   you're going down and you'll be fine.  And I also want

10  to comment on the District Attorney, that I thought

11  that it was very positive of the District Attorney to

12  also recognize and commend you for all the work that

13  you've done.  And also to tell Ms. Fox that we have --

14  we did consider all the evidence and all avenues

15  because that's part of our -- under Title XV, is to

16  consider all of the relevant information.  Thank you.

17  Keep going the way you're going and you'll be fine.

18          INMATE LEWIS:  Yes, sir.

19          PRESIDING COMMISSIONER BIGGERS:  That

20  concludes the hearing.  The time is now

21  (indiscernible).

22          ATTORNEY FOX:  Thank you.

23          PRESIDING COMMISSIONER BIGGERS:  Good luck

24  to you, sir.

25          INMATE LEWIS:  Thank you.

26                      --o0o--

27  SAMUEL W. LEWIS  E-05524  DECISION PAGE 11  10/12/06

87

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  PAROLE DENIED ONE YEAR

24  THIS DECISION WILL BE FINAL ON:___FEB 0 9 2007___

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,

26  THE DECISION IS MODIFIED.

27  SAMUEL W. LEWIS  E-05524  DECISION PAGE 12  10/12/06

88

## CERTIFICATE AND DECLARATION

## OF TRANSCRIBER

I, TAMA BRISBANE, the owner of House of Scribes, have designated ANNA E. McGAUGHY, a duly designated transcriber with House of Scribes residing in the State of Pennsylvania, to prepare the foregoing transcript. With my signature I do hereby declare and certify, under penalty of perjury, that I have directed her to transcribe audio files that total one in number and cover a total of 90 pages. The recording was duly recorded at CALIFORNIA DEPARTMENT OF CORRECTIONS, CORRECTIONAL TRAINING FACILITY, SOLEDAD, and the foregoing pages constitute a true, complete and accurate transcription of the aforementioned tape to the best of her ability.

I hereby certify that House of Scribes and its designated transcribers are disinterested parties in the above-captioned matter and have no interest in the outcome of the proceeding.

Dated November 14, 2006 in Stockton, California.


_Tama Brisbane_
Owner, House of Scribes

EXHIBIT 12

2007

PAROLE PLANS

Lewis, Samuel

Upon my release from incarceration, I will live with my wife Lisa Lewis at 1621 Cadiz Circle in Salinas California. Lisa is presently employed in the Pharmacy Department in Longs Drug Store in Carmel California. Lisa and I have discussed in depth my reintegration into society. Lisa and our family make up my support network and will provide me with positive encouragement, emotional support and transportation upon my release.

Lisa and I have been, and continue to submit my resume to various companies in the Salinas / Monterey area. We have been able to secure part time employment with Labor Ready. This part time employment can lead to full time employment. We will continue to seek employment opportunities as a paralegal, forklift operator, drycleaner, and with various companies which can utilize my marketable skills. As financial support, a Trust Fund has been established for me, and until I have secured full time employment I will be able to use these finances if necessary.

I will continue to pursue my Bachelor's Degree at Indiana Institute of Technology through Correspondence and Online courses. The completion of this degree will enable me to seek and obtain employment which offers a higher wage. While pursuing my degree and after completing my degree I will spend most of my free time as a volunteer counseling and / or mentoring at-risk youth. I will share my personal experience of what can happen when a person makes bad choices, and allows peer pressure to control his decision making.

Lisa and I have discussed the possibility that these parole plans may not be acceptable to the Board of Parole Hearings. In the event that this does occur, Lisa is willing to relocate and transfer her employment to the county I am paroled to.

Should the Board determine that these parole plans are not acceptable, my Mother Shirley Lewis will provide housing in Los Angeles for both Lisa and I and any necessary assistance we may need to secure housing in order to ensure a smooth transition.

In closing, I humbly submit to the Board of Parole Hearings that I will apply the same focus, commitment, dedication, and determination to my reintegration into society as I have to advancing my education and rehabilitation while incarcerated. I will be a positive and productive member of society.

Respectfully

Samuel Lewis

# EXHIBIT 13

Samuel Lewis
E-05524 (Y-322-L)
P.O. Box: 689
Soledad, California
93960-0689

**OBJECTIVE:**

-To obtain a rewarding career opportunity that will promote professional growth.

**EDUCATION:**

**Associates Degree Program:**

March of 2001:   Associate Degree in Paralegal Studies,
Specializing in Legal Research, Real Estate Law, Law Office Management and Litigation Assistantship,
College for Professional Studies

July of 1999:    Associate Degree in Specialized Business,
Center for Degree Studies

**Certifications: (Completed)**

October of 2006: Certification in Animals in Disaster, Awareness and Preparedness,
Emergency Management Institute, Department of Homeland Security

May of 2005:     Certificate in Radiological Emergency Management and Certification in Introduction to Mitigation,
Emergency Management Institute, Department of Homeland Security

December of 2004: Certification in Professional Emergency Management;
Certification in Basic Command Systems; Certification in Developing and Managing Volunteers; Certification in Emergency Planning,
Emergency Management Institute, Department of Homeland Security

August of 2002:  Certification in Federal and State Income Tax Education
National Tax Training School

April of 1998:   Certification in Forklift Operation
Prison Industry Authority (P.I.A.)

March of 1997:   Certification in Vocational Dry Cleaning
Otay Mesa Adult School

**EMPLOYMENT HISTORY:**

7/98-present:      <u>Laundry Attendant:</u>
                   Soledad Correctional Facility-Soledad, CA
                   -Collecting, sorting, and distribution of laundry and linen
                     for large population of inmates.

5/97-5/98:         <u>Weaving Operator:</u>
                   Prison Industry Authority, P.I.A. Textile Mill
                   San Diego, CA
                   -Operation and maintenance of multiple fabric weaving machines
                   (looms).

7/95-11/96:        <u>Laundry Operator:</u>
                   Prison Industry Authority (P.I.A.) Laundry-San Diego, CA
                   Continuous Batch Washer Operator; Washer / Extractor & Dryer
                   Operator.

**SKILLS AND QUALIFICATIONS:**

-Eligible for Federal Bonding, Sponsored by the U.S.
 Department of Labor, Contact Ron Rubbin, P.D. 1-800-233-2258.
-Marketing and Public Relations Skills.
-Shipping and Receiving Experience - processing inventory,
 ordering, maintaining proper inventory levels for high volume
 production.
-Basic knowledge of computer operations
-Excellent communication skills and motivated to learn

**REFERENCES:** See attached

**REFERENCES:**

1.   Kerry Davenport
     High School Teacher
     Lock High School
     Los Angeles, California
     Years known:  25 yr.
     Contact #:  (626) 810-7281

2.   Nicole Newble
     Middle School Counselor
     Years known:  24 yr.
     Contact #:  (323) 753-2051

3.   Johnny Williams
     Workmen's Compensation Claims Examiner
     Years known:  24 yr.
     Contact #:  (909) 355-9061



5756 Taft Ave.
Southgate, CA 90280
Toll Free: (866) 517.6751
Office: (562) 633.4100
Fax: (562) 633.4108

September 12, 2007


Executive Officer
Board of Parole Hearings
3336 Bradshaw Rd. # 225
Sacramento, CA 95827


Dear Sir or Madam:

Our company has been licensed by the State of California Structural Pest Control Board in Sacramento for over 5 years. Our reputation for quality service in Los Angeles and neighboring counties has awarded us several city and county wide contracts.

Our Company specializes in termite eradication by means of chemical treatments, tent fumigation as well as structural repairs in and around Los Angeles County.

An increase in business in our 2nd quarter of this year has presented an entry level position for Samuel Lewis upon his release as a carpenter apprentice. In this entry level position, Samuel will be trained on basic Mathematics associated with wood working, framing and repair of residential structures. Based on his grasp and progress in carpentry, an evaluation will be made to assess his knowledge of those basic skills and will be given an opportunity for advancement within the company ranks. Starting wages for this entry level position commence at $15.00 per hour 40 hours per week. After a 90 day probationary period, Samuel will be eligible for company benefits that consist of medical, dental and paid vacations.

Should you have any questions or need further information concerning this matter, please call my office.

Sincerely,

Jose Martinez

President

Operator Lic #OPR11169


*"Call Someone YOU can trust"*

# ALLEN & ALLEN LLP

### Attorneys and Counselors

Richard H. Allen                    Of Counsel: P.W. Bachan                    Robert H. Allen

240 Westgate Drive, #241
Watsonville, California 95076
Tel.: (831) 768-7215
Fax.: (831) 722-0347

September 11, 2007

Samuel Lewis
E-05524 (Y-322-L)
P.O. Box 689
Soledad, CA 93960-0689

Re:  Employment

Dear Mr. Lewis:

My office is in receipt of your letter, dated August 24, 2007, to P.W. Bachan, who serves of counsel to my firm. Your credentials are quite impressive, and all the more so when one considers that you have obtained them for the most part while in prison. We commend you on your achievements.

Our office does have a need for paralegal assistance, and we would consider you as an applicant. However, the primary concern I have is your availability. Forgive me for being blunt, but your letter does not mention whether you are currently in confinement and, if so, how long it will be until you get out. Though my office needs paralegal assistance, hopefully on an independent contractor basis, we need someone who can pick up and drop off work projects at our office, and I am unclear if you have that capability presently. If you do not, please contact us again when you do.

Thank you again for your well-written letter of interest and curriculum vitae.

Sincerely,

Rob Allen
ALLEN & ALLEN LLP

# *Labor Ready Inc.*

911 N. Main St
Salinas, Ca 93906
Phone: (831) 755-1555
Fax: (831) 755-1572

Monday, May 28, 2007

To:    Whom it May Concern

From:  Lupe Mora

Re:    Samuel Lewis

We are a temporary Agency that provides temporary work for people that need the opportunity to look for a temp- to hire position. We had many of our workers that have been in parole and still have the opportunity to be hired thru our best of our Customers. We offer non skilled and skilled jobs everyday, we also recommend are best workers to our Customers.

Thank you,

Lupe Mora
Customer Service Rep.

**Labor Ready**
**831-755-1555**
**Labor Ready**
**911 North Main Street**
**Salinas, CA 93905**



# MONTEREY COUNTY

---

**Department of Social and Employment Services**
Office for Employment Training
Harry F. Gamotan, Management Analyst

P.O. Box 2265
Salinas, California  93902
(831) 796-3354
Fax (831) 757-7639

**SAMUEL LEWIS**

E-05524 (Y-322-L)
P.O. Box 689
Soledad, California 93960-0689

Re: Employment

Dear Mr. Lewis:

I am in receipt of your letter dated March 29, 2007. Monterey County One Stop consist of three main organizations dedicated to assisting Dislocated Workers and Under skilled Workers become employed through direct placement with an employer or through training. Training maybe through one of our training partners example: Central Coast College, Hartnell, MPC, Heald Business College and the list goes on. We are currently looking to apply for a Grant to better assist parolees make the transition from incarceration to the work force. We recognize that this transition can sometimes be most difficult and would like to be in a better position to assist. I would be happy to meet with you upon your release and determine how we can best assist you. In reviewing your resume you have some very good experience, education and training that will greatly enhance your opportunities to gainful employment. Please feel free to contact me before or upon your release.

Sincerely,

Harry F. Gamotan
Business Services Analyst
Office for Employment Training
One Stop Career Center of Monterey County
730 La Guardia St.
Salinas, Ca. 93905
831-796-3354
Fax: 831-757-7639
Email: gamotanh@co.monterey.ca.us

*"Working Towards a Better Future"*



A Division of Goodwill

# SHORELINE
Workforce Development Service

*Our Business is Changing Lives!*

# Salinas Neighborhood Career Center

## Assistance in the following:

- Resume Development/Critiquing
- Cover Letter Development
- Interview Preparation
- Job Readiness Counseling and Career Information
- Computer Skills Assessment

### Comprehensive Career Services

Serving Monterey County

## Resources for Job Seekers:

- Free Internet Access
- Phone, Fax, Copier, Resume Paper
- Occupational Information
- Career Interest Testing

contact us at

# (831) 443-5432

Salinas Neighborhood Career Center
1252 No. Main Street. Salinas CA 93906
Open Mon. - Fri.  8am - Noon by appointment and 1pm - 5pm

www.shorelineworks.org

*Just give us a Call when you get out — No referral necessary. + Free*

*Tracy*

*Ask for Lilly Ext 200*



June 16, 2006

Samuel Lewis
E-05524 (Y-322-L)
PO Box 689
Soledad, Ca. 93960-0689

Dear Samuel Lewis:

HPC is contacting you because we received a request to send information to your attention in regards to employment resources.

HPC is an employment solutions company in Carson, California. We have a few different program options. In some instances we assist individuals with pre-employment preparation and job placement, regardless of their criminal background.
If you parole to this area, we may be able to help you. All of HPC's community programs have eligibility criteria, however, you may want to contact us once your discharged to see if you would be eligible. If HPC is unable to assist you, we can refer you to an agency that may better address your specific needs.

If you parole to another County, check with your local "One Stop Career Centers." The Centers often have programs that aid in job placement assistance, resource referrals, and possible funding for vocational training.

In addition, some Parole Complexes have designated Parolee Employment Programs. Once discharged, you have to check with your assigned Parole Agent to see what is being offered. Those programs are another great opportunity to be connected directly to employers that hire ex-offenders.

Good luck to you in your future endeavors and we appreciate the inquiry of our program services!

Mrs. D. Norville, MSW
Director of Operations & Management
(310)756-1560
www.hpcemployment.org



**HPC**
HUMAN POTENTIAL CONSULTANTS, LLC
*"Your link to a Better Future"*

# COMMUNITY
# EMPLOYMENT & EDUCATION
# RESOURCES

Youth & Young Adults Programs (12-20 years old)
> Job Readiness, Life Skills Education, and Individual Job Placement Assistance
> - ILP Program - Foster Youth residing in South Bay Area
> - CARE Program - Youth w/Substance Abuse Challenges / In Recovery Program
> - WIA Program - 19-20 yrs old-Must reside in Compton
> - Anger Management Program – Certifed / Court Approved
> - DeAnza Community College Tutoring & Vocational Program:
>   - Earn a Certificate in Computer Aided Drafting
>   - Earn High School/College Credits
>   - Receive Math Tutoring to improve grades

Adults
> Job Readiness and Individual Job Placement Assistance
> - Dislocated Worker Program –via Compton Career Link
> - Anger Management Classes – Certified / Court Approved
> - Temp to Perm Work – via HPC's Business Division

Temp to Perm Employment - Professional Staffing Services - via HPC's Business Division
<u>NOW HIRING</u> for the positions below . . .
> - Administrative Assistants & Customer Service Representatives
> - Call Center Representatives
> - Light Industrial Workers
> - Information Technology
> - Positions are Long Term, Include Employee Benefits, and Direct Deposit
> - Skills Testing & Background Testing is Required

## CALL FOR MORE INFORMATION
## (310) 756-1560
HPC HEADQUARTERS OFFICE
454 E. CARSON PLAZA DRIVE—STE#102
CARSON, CA 90746
POSITION INFORMATION LISTED ON WEBSITE
WWW.HPCEMPLOYMENT.ORG

HPC facilitators are degreed, Vocational Teachers are DeAnza Community College Instructors and Social Workers are MSW's
HPC seminars and workshops are registered with the California Bureau for Private Postsecondary and Vocational Edcuation

*Employment Solutions*

# HPC'S TRACK RECORD. . .

Since 1997, HPC has provided service to more than 1850 adult and youth throughout California at various stages of their employment, academic and social skill levels.

HPC's performance levels have been consistent . . .

- 89% of the customers completed soft skills and pre-employment preparation training

- 77% of the customers obtained unsubsidized employment and work experience

- 73% of the customers employed retain employment for one to three years and earned a minimum hourly wage of $7.50 to $15.00.

## HPC OFFICES

**Carson Office**
**454 E. Carson Plaza Dr.**
**Suite #102**
**Carson, CA 90746**
**Phone (310) 756-1560**
**Fax (310) 756-1562**

**Inglewood Office**
**101 N. La Brea Avenue**
**Suite #307**
**Inglewood, CA 90301**
**Phone (310) 674-4024**
**Fax (310) 674-4401**

**Web site:**
**hpcemployment.org**



HUMAN POTENTIAL CONSULTANTS, LLC
"Your Link to a Better Future"

EMPLOYMENT
SOLUTIONS COMPANY



Hometown Heroes

# Garnett NEWCOMBE

The job market today is tough for even the most qualified applicants. Imagine the obstacles facing a youth from a broken home or a parolee recently released from prison. And yet if the job market rejects these individuals, many are destined to a life of misery and crime. Thank goodness for Carson's Garnett Newcombe and her company, Human Potential Consultants (HPC), which is dedicated to giving the most disadvantaged a second chance.

Following the lead of a friend in Detroit, Newcombe opened the Carson office of HPC in 1997. The office has since helped more than 1,350 clients, more than 100 a month. It provides job preparation skills for at-risk youth, the long-term unemployed and individuals with criminal backgrounds or minimal work experience. Her results speak for themselves: 100% of clients completed pre-employment preparation training, 85% of clients obtained jobs or work experience, and 75% of clients held onto a job for one to three years, earning between $7.50 and $15.00 an hour. She credits her tailored approach.

"It's about the individual," Newcombe said. "To take the time to understand is key. Once clients learn to identify their interests and skills, they are more likely to find and stay in jobs."

Newcombe and her staff also strive to instill a sense of responsibility in their clients so they have a better chance of keeping a job. They get a crash course in preparing a resume and in standards of professional dress and behavior. That includes a briefing on such basics as the importance of showing up for work on time. After assessment and training, HPC contacts employers in search of a match. The service is free to employers and most clients, who are referred by state and federal agencies. These agencies pay the for-profit company a flat fee to counsel each individual referred.

Newcombe, who also teaches sociology at California State University, Dominguez Hills is constantly on the move. She doesn't see her role ending when a client gets a job. ("We're with you for life," she tells them.) HPC is serious about its commitment to [illegible]

Newcombe also makes sure employers [illegible] incentives to hire parolees, including tax breaks and a state-funded bonding system to encourage the employment of parolees.

What keeps her going? Newcombe says it's a look in the eyes when a person realizes their worth. As for her own future, Newcombe sees another need that sorely needs addressing. In the South Bay, finding affordable housing is a big issue for the people HPC counsels. Eventually she would like to offer clean, reasonable room and board to her most at-risk clients, parolees and emancipated youth. We wish her luck. If anyone can meet the need, it's Newcombe, one of Carson's Hometown Heroes. ■

Source: *Carson Chronicles / Winter 2005*

*By: Mayor Jim Dear*

# Katera Estrada Rutledge

Attorney at Law
Rutledge & Rutledge
7960 B Soquel Drive
Suite 354
Aptos, California 95003
Tel: (831) 320-3305
www.RutledgeAttorneys.com

July 8, 2007

Mr. Samuel Lewis E-05524
Y-322-L
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Dear Mr. Lewis,

   Thank you for your resume. Are you being paroled to Monterey County? We have both represented you and would like to help if we can. We currently have two lawyers and three law clerks at our firm. That may change. If you are looking for work now, we cannot help you. But if you are planning to parole here – write back when your hearing is coming up within six months and we will see if we can help you find a job.

Yours Truly,

Katera E. Rutledge
**Attorney at Law**

# BOSSO WILLIAMS
A PROFESSIONAL CORPORATION

ROBERT E. BOSSO
LLOYD R. WILLIAMS
CHARLENE B. ATACK
JOHN M. GALLAGHER
PETER L. SANFORD *
MICHELLE E. ANDERSON **
EDWARD L. CHUN
JENNIFER J. GRAY
VIVA I. HARRIS
CHRISTOPHER C. KIRK
GREGORY W. CARTER
PHILIP M. SACHS, Of Counsel

* Certified Specialist in Taxation Law
** Certified Specialist in Estate Planning, Trust & Probate Law
  By the State Bar of California, Board of Legal Specialization

MAILING ADDRESS:
P.O. Box 1822
Santa Cruz, CA 95061-1822

LOCATION:
133 Mission Street, Suite 280
Santa Cruz, CA 95060

TELEPHONE:
(831) 426-8484

FACSIMILE:
(831) 423-2839

WEBSITE:
www.bossowilliams.com

EMAIL:

July 18, 2007

Samuel Lewis
E-05524 (Y-332_L)
P.O. Box 689
Soledad, CA 93960-0689

Dear Mr. Lewis:

Thank you for the interest you have expressed in employment opportunities with our firm. Your qualifications have been carefully reviewed. However, at the present time no position is available that would utilize your skills and experience.

Your resume will be retained for a reasonable period of time and you will be contacted in the event our employment needs should change.

We appreciate your interest in our company and wish you success in your search for a suitable career position.

Sincerely,

Arlene Gotshalk
Arlene Gotshalk
Administrator

J:\wpdata\TROSA\Applicants\Applicant Letters\#1 Unsolicited Associate

LAW OFFICES OF

# THOMAS J. ESPINOZA

444 PEARL STREET, SUITE A-3
MONTEREY, CALIFORNIA 93940
TELEPHONE: (831) 375-3399    FACSIMILE: (831) 375-3393

OF COUNSEL
ROBERT R. BEBERMEYER
(RETIRED)

THOMAS J. ESPINOZA

E-MAIL: tom@espinozalaw.com

May 25, 2007

Samuel Lewis
E05524 (Y-322-L)
P.O. Box 689
Soledad, CA  93960-0689

Dear Mr. Lewis:

Thank you for your letter of May 3, 2007, regarding potential employment with my office.

As a sole practitioner, I do not have a current need for a paralegal.  However, I wish you every success in all your future endeavors.

Sincerely,

LAW OFFICE OF THOMAS J. ESPINOZA

Thomas J. Espinoza

TJE/kp

# *Randall I. Barkan*

**Attorney at Law**

510 Lighthouse Ave., Suite 7-C, Pacific Grove, California  93950
Phone: (831) 372-5544   Fax: (831) 372-5553   E-mail: rib@realdispute.com

August 31, 2007

Samuel Lewis
E-05524  (Y-322-L)
P.O. Box 689
Soledad, CA  93960

Re:  Application for Paralegal Position

Dear Mr. Lewis:

Thank you for your letter expressing interest in a paralegal position.  Unfortunately, my practice is only part-time, and my business does not require (nor would it support) someone performing those kind of services.  Your letter and resume are impressive, and very professionally presented; and I wish you the best in your job search.

Sincerely,

Randall I. Barkan

# EXHIBIT 14

Lisa Lewis
1621 Cadiz Cir.
Salinas, Ca 93906
(831)443-6791


June 26, 2007


Executive Officer
Board of Parole Hearings
3336 Bradshaw Road # 225
Sacramento, Ca 95827


RE:  Samuel Lewis, (E-05524) Parole Suitability


Dear Board Members:

    I am writing this letter on behalf of my husband, Samuel Lewis. I am submitting this letter to update my June 26, 2006 letter of support. This is the third letter that I have submitted to the Parole Board.

    Samuel and I were married on March 19, 2005, we were engaged on March 19, 2004, and together we set our wedding ceremony a year after our engagement.  Both of us are very happy.

    I have known Samuel now for close to six years through daily letters, weekly visits and phone calls, Samuel and I truly come to know and understand each other. We are always discussing many different topics. We have talked about the crime which he is incarcerated for.  Samuel sends me the transcripts of his Parole Suitability Hearings.  I have looked into his eyes and I know how truly sorry he is for the crime he had committed.  I can see and feel Samuel's sincerity of words that he says and the feelings he shows.  Samuel takes full responsibility for his actions and the bad choices he has made.

    Samuel and I have made plans for his release, we believe we have put together a positive plan for his parole which will ensure Samuel's successful reintegration back into society on where he can be a positive influence in our community.

When Samuel is granted parole, we will be residing in Salinas, California, in my house at 1621 Cadiz Cir. I will provide Samuel with love, emotional support, positive encouragement, housing, financial support, transportation, and anything else that is required by the Board of Parole.

I know Samuel has been rehabilitated. Samuel's educational and vocational achievements demonstrate his rehabilitation. Samuel's consistent participation in different self-help activity groups demonstrates his rehabilitation. The various officers and staff who have documented his positive actions and attitude demonstrate his rehabilitation. His remaining disciplinary free for eight years in September demonstrates his rehabilitation. I know that Samuel is truly rehabilitated and ready to be reintegrated into society based on all these things as well as his letters, our conversations, and the time we spend together. I have come to know and understand him. I have seen how he reacts to pressure and stressful situation. I have watched him interact with his teenage daughter Destiny. Samuel is a very caring and loving, patient and understanding Dad. We need Samuel to be home with us, his family.

I am asking the Board of Parole to please give my husband, Samuel the opportunity to be a positive productive part of our community. Bad choices and bad decisions are a part of life. To be fully responsible, to be held accountable for, and to demonstrate sincere remorse through both word and deed demonstrates a change, focused, and rehabilitated man who is worth a second chance.

Most of all, as I said before, I do know Samuel very well, and from my heart my husband, Samuel will be very successful here in Salinas and I know both of us together we would not let the Board of Parole down and our family members.

I thank you for your time and consideration in this matter.

Very truly yours,

Lisa Lewis

Shirley Lewis
4831 3rd Avenue
Los Angeles, CA 90043
Home (323) 292-1305
Work (213) 748-0491

July 26, 2007

Executive Officer
Board of Prison Terms
3336 Bradshaw Road, #225
Sacramento, CA 95827

To all concerned,

This letter is to update my August 11, 2006, letter of support informing you of my continued support for my son, Samuel Lewis (Sam), inmate # E-05524 (Y-322-L).

Please be advised that should your Board decide to release Sam, his family is prepared to ensure that he is equipped with the tools he will need to succeed. Sam will receive personal support from me including, funding, transportation and moral support. In addition, his family and friends are actively seeking persons and/or companies that are willing to hire him without regard to his criminal record.

Over the course of the years, Sam has consistently prepared himself in various ways to become a worthy candidate for release. I am personally requesting that your Board review his record to verify his improvements. Overall, I'm sure you will agree that Sam has worked to improve himself both professionally and personally. His progress can be attributed to his successful completion of coursework and his maintenance of a high grade point average.

In the many conversations I have had with Sam, he has expressed his regret for his past behavior. He also accepts his responsibility for past events and understands how they have put him into the situation he is in now. Sam insists on using each day to increase his

1

wisdom and knowledge so that he will successfully and effectively function outside of prison walls.

Sam was lucky enough to find a mate who truly loves him and has his best interest at heart. On March 19, 2005, they were married. Sam's wife, Lisa, has not only been a great support factor for Sam, but also for me. She visits Sam often, taking away the difficulty of the many long distance trips I would normally take. They become more and more physically difficult for me as I get older. I am in constant contact with Lisa and very happy to have her as an addition to our family.

Often, over the years I advise Sam to stay faithful and be reminded of his past so that he will continue to learn from it and remember to always help others. I believe that with this in mind, he has been able to rehabilitate himself mentally and emotionally during his incarceration. I also advise him to be persistent in his determination to continually improve himself. Personal improvement requires action and thought on a daily basis.

Sam has become an articulate, expressive and intelligent young man. I am extremely happy that he has decided to use his time wisely to improve himself. He made a commitment to himself and his family to be a better person. Sam has also made a commitment to be a model citizen when he is granted a release. Being a father has helped him to realize that commitments such as these are important. Sam wishes to be more involved with his daughter's life and knows that her success relies on him fulfilling his commitments.

There are benefits awaiting Sam, once he is released. Sam wishes to continue his education, and therefore, I have agreed to personally finance his continued efforts for a degree in higher education. In addition, Sam will reside with his new wife. This is a benefit, in that, he will not be returning to the neighborhood in which he grew up and made the wrong choices. If, for whatever reason, Sam was not able to reside with his new wife, I am always willing and available to provide him with residential and financial assistance.

2

Either way, he will have a real chance for a new start.

Sam's determination along with our willingness to ensure his success should be viewed by the Board as an effective and ideal combination. It should also be viewed as his second chance to prove himself to his family and his community.

Thank You

Shirley Lewis

cc:    Samuel Lewis

3

Tracy Franklin
4817 Slauson Avenue
Apartment # 8
Los Angeles, CA 90056
Home (310) 717-3124
Work (213) 738-2897

July 25, 2007

Executive Officer
Board of Prison Terms
3336 Bradshaw Road, #225
Sacramento, CA 95827

The purpose of this letter is to update my letter of support dated August 11, 2006, expressing my ongoing support for my brother, Samuel Lewis, inmate # E-05524 (Y-322-L). We communicate frequently and therefore, he keeps me apprised of his progress. It is my belief that Samuel has had the ability to improve himself morally, academically and professionally over the period of his incarceration. He is regretful for his involvement in those situations that have caused his demise. However, he has used his time to increase his motivation and desires to redeem himself by pursuing education and by becoming an upstanding person. Therefore, I am requesting that, in your consideration of Samuel, your Board grant his release.

Samuel and I very close. As with any healthy sibling relationship, we often have lengthy debates on current events, politics and religion.    Over the years his views and analysis with regards to issues have impressed me. He is able to rationally develop arguments for or against certain issues and then verbally express how he reaches conclusions that are sound and valid. Since I consider myself a "great debater", his ability to deliberate or contest my ideas with compelling reasoning, has forced me to acknowledge how successful he has been in his own professional and personal development.

Samuel has gained improvements in other areas as well. His attitude and overall outlook on life is positive. Samuel lives by the belief that he will have the opportunity to be a

1

productive citizen and live a law-abiding lifestyle. He also knows that his commitment to seek higher education will assist him in obtaining these goals.

Samuel's appearance and personal physical awareness have also improved tremendously over the years. He is more health conscious with regard to the foods he will consume as well as with the need to consistently participate in physical exercise.

Samuel is a parent of a daughter. Her name is Destiny. Throughout his incarceration he has been a positive influence on her. He relays his life lessons to her and advises her on many issues. Their relationship has blossomed over the years. Samuel has expressed his feelings of regret for not being able to raise Destiny, hands-on, due to his actions. He realizes that his inability to be physically available to his daughter is another way in which he has paid for his transgressions.

Samuel also has a wife who loves him very much. Her name is Lisa. They were married on March 19, 2005. Lisa is beautiful person who is genuinely concerned with Samuel's well-being and has been very supportive of him. She has been a member of our family for over a year and we love her dearly.

Samuel can look forward to receiving assistance from me and all of his family members while pursuing his dream. I am personally available to provide him with room, board, financial assistance and transportation. I will also assist him in anyway I can to obtain his desired goal employed as a paralegal or starting his own business as a freelance paralegal.

In addition, the Maxine Waters Employment Preparation Center (EPC), in Los Angeles, offers vocational training in auto body repair, automotive repair, cable fiber optics, certified nursing assistant, cosmetology, computer occupations, customized bank teller, electronic computer repair, house and apartment repair, licensed vocational nursing, network operator technician, clerical office careers and medical office careers. I have personally

2

visited this facility to learn more about the program. EPC certifies students after 12 months of training. They also assist with job placement after certification.

It is my goal to locate a program or services offering Samuel full transitional services. I am a firm believer that released ex-cons should be prepared to deal with the outside world in order to become happy, well-adjusted and productive citizens.

I feel it is my and my family's responsibility to ensure that Samuel is successful, if he is released. I understand that these opportunities are rare. However, with Samuel's determination and a strong foundation at home to work with, I know he will be successful if given the opportunity.

Your attention and consideration to my request on Samuel's behalf is appreciated.

Should you have any questions or concerns, please feel free to contact me.

Thank You

Tracy Franklin

cc:    Samuel Lewis

3

Nikista Lewis
4803 4th Ave.
Los Angeles, CA 90043
Home (323) 296-0060
Work (213) 741-3619
Cell (310) 901-6968

July 12, 2007

Executive Officer
Board of Parole Hearings
3336 Bradshaw Rd. # 225
Sacramento, CA 95827

To all concerned,

This letter is to update my August 17, 2006 letter of support advising you of my
continued support for my brother, Samuel Lewis (Sam), inmate # E-05542(Y-322-L).

If you were to release my brother, he will have my full support with support and
financially. My family and I are prepared to assist Samuel with the emotional and
spiritual he will need upon his release.

Samuel has proven his determination in returning home by staying focused and has
proven that he will be an upstanding citizen when released. I am humbly requesting that
your board review my brother's entire improvement when determining his release. I am
sure that if you actively and consciously his overall improvement you will see his
determination to continue on his path of improvement. His accomplishments have shown
to be consistent, motivated and focused.

Whenever I am facing a dilemma and I turn to my brother he always reminds me to stay
focused on the prize and to always put my contoured faith in God. My brother expresses
his regret to me for his past behavior and letting me down. But in turn he has
consistently shown to me his dedication to make up for his behavior by making the best
of his time now. He has told me that he has accepted responsibility for his past behavior
and now works hard everyday to become a better person for his family, society and
himself.

Often, over the years it amazes me how he is able to stay so faithful and motivated
whenever I need him. I know and truly believe he has been rehabilitated. I would have

never wanted my brother to have gone to jail but I can say one thing that it did for me and my family "It has brought a lost boy back to his family a found man".

Sam has been blessed to fine someone who truly loves him. Sam married Lisa on March 9, 2005. She visits him every weekend, and stays in constant contact with us. I am truly happy to have her as a part of our family.

Samuel has become a reliable, consistent, efficient man. His is positive, optimistic and God fearing. I pray that God may grant you his peace that is beyond understanding and is able to keep your heart and mine through Christ Jesus and allow you to make the right decision for Samuel.

Samuel's goal is to come home and become an asset to his family, church and his community. Samuel plans on obtaining employment and helping his family upon his release. Please allow Samuel to be there for his family and prove his commitment to society.

Thank you,

Nikista Lewis

Cc: Samuel Lewis

Donald Lewis
891 Etiwanda Ave.
Rialto, Ca 92376
(909) 421-9702


June 05, 2007


Executive Officer
Board of Parole Hearings
3336 Bradshaw Rd. # 225
Sacramento, CA 95827


Dear Board Members,

This is the fourth letter I am submitting on behalf of my nephew. I am the uncle of Samuel Lewis who cares very much for my nephew. I have known from birth. My children and my nephew grew up together and had very good morals.

My nephew has a very good heart, which is the seat of motivation, and he has had a great deal of time to think about the things he learned when he was growing up and he has seen the need to apply them to his life. The things I am talking about applying are Bible principles, which direct a person to obey the laws of the land and having respect for life. My nephew has demonstrated that he is now applying those Bible principles in his life.

The divorce of my nephew's father and mother has had a great effect on him because every child needs a father and mother in their lives, and his mother has done the best the she could. Everyone is entitled to one mistake in life, isn't that true? I know my nephew can and will be a productive law abiding citizen of society because of the things he has learned when he was growing up, and how he has again began to apply them to his life.

I will personally help my nephew to be a productive law abiding citizen in society. I am now retired from Olson Supply Company in Los Angeles. I have my own business and I will provide my nephew with employment. I will also provide housing for my nephew and his wife Lisa if the parole plans he has given to you are acceptable.


Thank you very kindly,

Donald Lewis

# EXHIBIT 15

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**DEPT 100**

| Date: | APRIL 10, 2008 | | | Deputy Clerk |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | Reporter |
| | NONE | Bailiff | NONE | |

| | (Parties and Counsel checked if present) | |
|---|---|---|
| | BH005090 | |
| | In re, | |
| | SAMUEL LEWIS, | |
| |     Petitioner, | |
| |     On Habeas Corpus | Counsel for Respondent: |

Nature of Proceedings: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on January 18, 2008 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on January 4, 1989 after a conviction for murder in the second degree. He was sentenced to 15 years to life. His minimum parole eligibility date was February 19, 1998.

The record reflects that on February 15, 1988, the Petitioner argued with Marcos Villegas and challenged him to a fight. Mr. Villegas' brother intervened and the Petitioner threatened to return with his "homeboys". The Petitioner then told some gang members who he associated with about the incident and asked them to assist him. They gave him a sawed-off shotgun and told him that if he shot Mr. Villegas, it would be considered his initiation into the gang. The Petitioner returned to the area where he previously argued with Mr. Villegas and saw him standing among a group of five or six people. The Petitioner fired several shots toward the group, missing Mr. Villegas. However, Shavonne Perry was shot in the back and killed. Additionally, Lavelle Bullard and April Purcell each suffered non-fatal gunshot wounds.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on October 1, 2007. The Petitioner was denied parole for one year. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The Court finds that there is some evidence to support the Board's findings that the Petitioner's commitment offense killed or injured multiple victims; that it was carried out in a dispassionate and calculated manner; and that his motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subds. (c)(1)(A), (c)(1)(B) and (c)(1)(E). The Petitioner shot at Mr. Villegas, who was among a crowd of people. Although he did not hit his intended target, he did kill one victim and seriously injured two others. The Petitioner sought the help of gang members who he associated with, agreed to shoot Mr. Villegas as an initiation rite, armed himself with a sawed-off shotgun and returned to the area where he had argued with Mr.

1

| Minutes Entered |
|---|
| 04-10-08 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | APRIL 10, 2008 | | | |
|-------|----------------|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH005090
In re,
SAMUEL LEWIS,
    Petitioner,
    On Habeas Corpus

Counsel for Respondent:

Villegas for the purpose of shooting him. These actions were deliberate, planned and calculated and the Petitioner randomly fired into a crowd of unarmed people who posed no threat to him in an execution-style manner. His motive for shooting at the crowd was that he wanted to be initiated into the gang that his friends were in. This was a very trivial motive for killing one person and causing serious bodily injury to two others.

The Board also considered the Petitioner's non-violent prior offenses; his gang association and its relationship to his offense; as well as the seven 115 disciplines that he received prior to 1999, two of which were for violent conduct. While these factors, alone, may not justify a finding of unsuitability, the Board may properly consider them as relevant to a determination of whether the Petitioner is suitable for parole and they do weigh against his suitability. Cal. Code Regs., tit. 15, §2402(b).

The Board also considered the Petitioner's considerable post-conviction gains, however, they still concluded that the Petitioner would pose an unreasonable threat to public safety. Penal Code §3041(b). The Court finds that there is some evidence to support this determination because of the grave nature of the commitment offense and his prior violent behavior in prison.

The Petitioner contends that the Board violated his plea agreement in considering the facts that his offense injured multiple victims, as the charges of attempted murder of those victims were dismissed according his plea agreement. This argument is without merit. The Board is clearly permitted to consider this factor, as it is specifically enumerated as a factor tending to show unsuitability in Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(A). The Board's consideration did not subject the Petitioner to a greater sentence. The Petitioner pled to an indeterminate sentence, which is, in legal effect, a sentence for the maximum term, unless the parole authority acts to fix a shorter term. See In re Dannenberg (2005) 34 Cal.4th 1061, 1097-1098; In re Honesto (2005) 130 Cal. App. 4th 81, 92-93. In making this determination, the Board may consider all relevant, reliable information, including non-fatal injuries to victims, even if the Petitioner was not separately convicted of those charges. Cal. Code Regs., tit. 15, §2402(b).

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

<div align="center">2</div>

| Minutes Entered |
|-----------------|
| 04-10-08 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | APRIL 10, 2008 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH005090
In re,
SAMUEL LEWIS,
　　　　Petitioner,
　　　　On Habeas Corpus

Counsel for Respondent:

Samuel Lewis
E-05524
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice – State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

Department of Justice – State of California
Office of the Attorney General
300 South Spring Street
Los Angeles, CA 90013

3

| Minutes Entered |
|---|
| 04-10-08 |
| County Clerk |

# EXHIBIT 16

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re SAMUEL LEWIS, | B207575 |
| On Habeas Corpus. | (Super. Ct. No. A964645) |
| | **O R D E R** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus filed May 2, 2008.  The petition is denied.

COURT OF APPEAL - SECOND DIST.

**F I L E D**

MAY 1 5 2008

JOSEPH A. LANE _____ Clerk

J. BUEMAN _____ Deputy Clerk

_____        _____        _____
BOREN, P. J.                                   DOI TODD, J.                                  CHAVEZ, J.

Samuel Lewis
CDC:E-05524
Correctional Training Facility
P.O. Box 689, Y-322-L
Soledad, CA 93960


Case Number B207575
Division 2

In re SAMUEL LEWIS on Habeas Corpus.

# EXHIBIT 17

Court of Appeal, Second Appellate District, Div. 2 - No. B207575

**S163758**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re SAMUEL LEWIS on Habeas Corpus

The petition for review is denied.

SUPREME COURT

FILED

JUL 2 3 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015.5)

I, _____Samuel Lewis_____, declare:

I am over 18 years of age and I am party to this action.  I am a resident of CORRECTIONAL TRAINING FACILITY prison, in the County of Monterrey, State of California.  My prison address is:

Samuel Lewis____, CDCR #: E-05524_____
CORRECTIONAL TRAINING FACILITY
P.O. BOX 689, CELL #: Y-322-L_____
SOLEDAD, CA 93960-0689.

On ____August 11, 2008_____, I served the attached:

Petition for Writ of Habeas Corpus and attached Exhibits

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope (verified by prison staff), with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named institution in which I am presently confined.  The envelope was addressed as follows:

Clerk of the U.S. District Court
For the Northern District of California
450 Golden Gate Avenue
Box:  36060
San Francisco, California
94102

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _Argust 11, 2008_ .

_____
Samuel Lewis
Declarant

LEGAL MAIL

Samuel Lewis
E-05524 (Y-322-L)
P.O. Box: 689
Soledad, California
93960-0689



$ 05.20⁰
08.02 02
0000429013
AUG 12 2008
MAILED FROM ZIPCODE 93960

Clerk of the U.S. District Court
For The Northern District of California
450 Golden Gate Avenue
Box: 36060
San Francisco, California
94102

**LEGAL MAIL**